**STEPHEN J. ODELL, OSB #903530**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
E-mail: sodell@martenlaw.com

*Attorney for Plaintiff Malheur Mining Co., Ltd.*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **MALHEUR MINING CO., LTD.**, an Oregon Corporation, | **Case No.** |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **IDAHO POWER CO.**, an Idaho Corporation; and **BUREAU OF LAND MANAGEMENT**, an agency and instrumentality of the U.S. Government, | |
| Defendants. | |

_____

## **INTRODUCTION**

1. Federal law has unequivocally and uninterruptedly authorized the acquisition of mining claims and protected the inviolate property rights that inhere in them to prospect for, explore, and develop the mineral resources of the public lands of the United States for more than a century and a half. Under that law, no other use of public lands can infringe on such claims or materially interfere with a claimant's ability to exercise its rights under its claims. In granting a right-of-way ("ROW") to Defendant Idaho Power Co. ("IPCo") to build the portion of the Boardman to Hemingway ("B2H") transmission line that traverses public lands in eastern

Page 1 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Oregon, Defendant Bureau of Land Management ("BLM") imposed terms and conditions requiring IPCo to comply with all federal laws, including the public-land mining laws, as well as a series of mandatory mitigation measures, one of which is expressly designed to ensure against interference with the rights of claimants to pursue and develop mining resources on public lands.

2. Notwithstanding these mandatory terms and conditions expressly attached to the B2H ROW, and the strenuous objections Plaintiff Malheur Mining Company ("MMC") has raised with IPCo, it is proceeding apace to construct the B2H line on a route that runs straight through the heart of a series of 120 of MMC's distinctly staked, contiguous, valid, active mining claims ("Claims Area") in Malheur County, Oregon. These activities represent a blatant violation of federal law, the terms and conditions of the B2H ROW, and thus in turn, IPCo's authority under that ROW. IPCo has also engaged in such activities simultaneously with negotiation discussions that MMC initiated several months ago in a good-faith effort to seek a compromise that could accommodate both its property rights and IPCo's interests in constructing the B2H line.

3. In response to these recent on-the-ground developments, which appear to be only increasing in pace and intensity, four weeks ago MMC submitted to the Vale District of BLM in which MMC's claims are located and the agency's Oregon/Washington State Director a Notice of Violation to advise of IPCo's ongoing and increasingly extensive violations of MMC's claims and attendant property rights. This Notice also called on BLM to exercise its duty under federal law to protect and enforce MMC's property rights embedded in its mining claims and to immediately suspend IPCo's authority under the ROW and order it to cease any further activities insofar as such authority and activities encroach on, over, or otherwise materially interfere with MMC's mining claims. BLM has yet to take any formal action in response to this Notice, although it facilitated a "technical meeting" among representatives of the agency, IPCo, and

Page 2 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MMC in an effort to help broker a mutually acceptable resolution on July 14, 2026. At this meeting MMC expressed that it has always been, and remains, willing to participate in such efforts and that it welcomed and appreciated the efforts of BLM to become engaged and seek to play a more active role in seeking to resolve the issues underlying the recent Notice of Violation. At the same time, it also reiterated and reaffirmed its reasonable expectation that on-the-ground activities to build the B2H Line directly on its claims should, and need to, cease or be suspended during at last some reasonable finite period during the pendency of any new round of dialogue. Notwithstanding this request, which follows on MMC's multiple previous requests toward this same end, IPCo expressly indicated its unwillingness to cease or suspend its activities on MMC's mining claims for any period of time at this juncture. Thus, although MMC remains willing to continue to sincerely consider further participation in BLM-facilitated discussions in a good-faith effort to achieve a mutually acceptable resolution insofar as is consistent with its ability to enforce its highly valuable property rights in the Claims Area, it feels as if has no choice at this point but to also file the present Complaint in order to adequately protect its legal interests.

4. Having sought and failed to date to secure a resolution with IPCo or to obtain action from BLM to protect its property rights under federal law, and with IPCo continuing to openly trample upon its mining claims, both legally and quite literally on the ground as well as in the subsurface, MMC initiates this action to secure protection and enforcement of its property rights from this Court, bringing claims under both federal statutes—including the mining laws, Federal Land Policy and Management Act ("FLPMA"), the Multiple Surface Use Act, and National Environmental Policy Act—and state law, including quiet title, ejectment, and trespass.

5. Moreover, given the ongoing and increasingly substantial injurious nature of IPCo's actions on MMC's mining claims, MMC believes it will likely have no choice other than to seek

Page 3 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

preliminary injunctive relief among other remedies to protect and enforce its property rights associated with its mining claims, many of which stretch back decades and that it has expended literally millions of dollars to establish, maintain, and explore. These efforts have already indisputably confirmed the existence of at least two major gold ore deposits within MMC's claims that, particularly at today's gold prices, are worth at least tens of millions of dollars. The irreparable injury that MMC is experiencing from IPCo's ongoing actions does not stem principally from the monetary damages it stands to forgo if the B2H line continues unabated, as substantial as those are, but from the fact that IPCo is violating and interfering with MMC's property rights in a manner that will render it impossible for MMC to fully prospect for and explore the complete dimensions of the gold deposits that its mining claims ultimately are found to hold. Indeed, MMC's most recent visit to the Claims Area revealed that the actions of IPCo's contractors are not only disturbing the surface of its claims in a manner that is causing material interference with MMC's mining claims, but such disturbance is also extending into the subsurface in such a way that is causing direct disturbance to MMC's subsurface mineral estate. Irreparable injury also flows from the fact that BLM approved the B2H line based on the projection and assurance that it would have virtually no impact on mineral resource development on the public lands it crosses.

## JURISDICTION & VENUE

6. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction); § 1361 (jurisdiction to compel U.S. officer to perform mandatory duty); and § 1367(a) (supplemental jurisdiction over state-law claims forming part of same case or controversy). The Court's jurisdiction includes authority to provide declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 28 U.S.C. § 2202. The

Page 4 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

United States has waived its sovereign immunity and is subject to judicial review of the claims against Federal Defendants pursuant to 5 U.S.C. § 702 of the Administrative Procedure Act ("APA").

7. Venue in this court is proper under 28 U.S.C. § 1391 because all the events or omissions giving rise to the claims herein occurred within this judicial district. The BLM official with administrative authority over management of the public lands on which MMC's mining claims lie is Defendant Manager of the BLM's Vale District whose headquarters is in Vale, and the office of Defendant BLM Oregon/Washington State Director is in Portland, both within this judicial district. Plaintiff MMC is also incorporated in the State of Oregon.

8. For purposes of divisional venue, this action is properly identified as lying in the District's Pendleton Division pursuant to Local Rule 3 because virtually all the events or omissions giving rise to MMC's claims occurred and virtually all the property that is the subject of this action are situated in Malheur County, Oregon.

## PARTIES

9. Plaintiff MMC is a privately held mining company that owns the mining claims in the Claims Area and is registered to operate as a corporation under the laws of Oregon.

10. Defendant IPCo is a private, investor-owned utility registered as a corporation in the State of Idaho.

11. Defendant BLM is a federal agency within the meaning of 5 U.S.C. § 551(1) and a bureau that operates within the U.S. Department of the Interior.

## LEGAL FRAMEWORK

12. The Mining Law of 1872, ch. 152, § 1, 17 Stat. 91 (May 10, 1872), continues to serve as the major Federal law governing locatable minerals, including gold, and declared that all

Page 5 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

valuable mineral deposits in land belonging to the United States are free and open to exploration and purchase and that the public lands in which they are found are open to occupation and purchase. 30 U.S.C. § 22. The law continues to grant U.S. citizens the authority to claim, prospect for, explore, discover, and purchase certain valuable mineral deposits on any Federal lands that have not been withdrawn from mineral entry. Lode mining claims located after enactment of the Mining Law of 1872 may be up to 1500 feet in length along the lode, and no more than 300 feet on each side of the middle of the vein at the surface. 30 U.S.C. § 23.

13. The Ninth Circuit recently reaffirmed the well-established property rights that inhere in mining claims on public lands, iterating that the general mining laws of the United States establish that discovery of a mineral deposit, followed by the minimal procedures required to formally locate the deposit, gives an individual a property right to exclusive possession of the land for mining purposes and to all the minerals that may be extracted thereon. *Arizona Mining Reform Coal. v. Forest Serv.*, 170 F.4th 879, 894 (9th Cir. 2026). Moreover, it has definitively ruled in this same context that mining claims are "vested possessory rights which are recognized as interests in real property" and "not merely assertions of rights, as claims are in the more common sense of the word." *United States v. Shumway*, 199 F.3d 1093, 1095, 1099–1100 (9th Cir. 1999); *see also United States v. Locke*, 471 U.S. 84, 86 (1985) (unpatented mining claims represent fully recognized possessory interests). As the court clarified in applying these principles in *AMRC*, an unpatented mining claim gives the owner "the right to mine the minerals . . . and the minerals themselves" that exist in its claims. The law also recognizes an additional layer of a claimant's property rights to engage in diligent and appropriate prospecting activities on its claims under the doctrine of *pedis possessio*.

Page 6 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

14.  In 1955, Congress enacted the Multiple Surface Use Act to grant BLM limited authority to manage vegetative and other surface resources on unpatented mining claims but made explicit in so doing that such resources do not include mineral deposits subject to location under U.S. mining laws.  30 U.S.C. § 612(b).  Any such use of the surface of an unpatented mining claim is limited to only "so much of the surface thereof as may be necessary" for the non-mining surface use, and even then, any such use "shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." *Id.*  The Act further expressly confirms and reaffirms the rights of mining claimants "to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land." *Id.*  Congress explained in the legislative history underlying the Act its clear intent that the rights of the mining claimant should still take precedence.  As the legislative report from the Committee with jurisdiction over the bill that became the Multiple Surface Act explained, "[t]his language, carefully developed, emphasizes the committee's insistence that this legislation not have the effect of modifying longstanding essential rights springing from location of a mining claim. Dominant and primary use of the locations hereafter made, as in the past, would be vested first in the locator; the United States would be authorized to manage and dispose of surface resources, or to use the surface for access to adjacent lands, so long as and to the extent that these activities do not endanger or materially interfere with mining, or related operations or activities on the mining claim."  H.R. Rep. No. 730, 84th Cong., 1st Sess. 10, reprinted in 1955 U.S. Code Cong. & Admin. News 2474, 2483; S. Rep. No. 554, 84th Cong., 1st Sess. 8-9.  Thus, the Multiple Surface Use Act was designed to allow for the limited use of other surface resources on unpatented mining claims such as timber or forage as may be necessary for such uses and only insofar as any such uses also do not materially interfere with or injure the ability of a mining

Page 7 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

claimant to prospect for, explore, develop, or carry out any and all other related reasonable activities associated with the exercise of the possessory property rights its claim confers on it.

15.  BLM's regulations define "mining operations" as meaning "all functions, work, facilities, and activities in connection with the prospecting, development, extraction, and processing of mineral deposits and all uses reasonably incident thereto including the construction and maintenance of means of access to and across lands subject to these regulations, whether the operations take place on or off the claim." 43 C.F.R. § 3802.0–5(f).  "Prospecting" means "searching for minerals."  *Bohmker v. Oregon*, 903 F.3d 1029, 1034 (9th Cir. 2018); *see also, e.g.,* 16 U.S.C. § 2462(7) (defining "prospecting" as "any activity, including logistic support, the purpose of which is the identification of mineral resource potential for possible exploration and development").

16.  The Ninth Circuit prescribes "at least two remedies" in the event an alternate surface resource use interferes with prospecting or mining activities, one of which it encapsulated as follows:  "The mining claimant can protest to the managing federal agency about public use which results in material interference and, if unsatisfied, can bring suit to enjoin the activity." *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1286 (9th Cir. 1980).

17.  In the Mining and Mineral Policy Act of 1970, 30 U.S.C. § 21a, Congress reaffirmed that it is the continuing policy of the federal government to foster and encourage private enterprise in the development of a stable domestic minerals industry and the orderly and economic development of all domestic mineral resources, including gold.

18.  Mining continues to be recognized as a vitally important use on public lands.  43 U.S.C. § 1701(a)(12).  Indeed, on its website BLM declares that "[m]ineral development is an important land use within the BLM's multiple-use mandate. In communities across the country,

Page 8 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

mining provides jobs, economic activity and important commodities that are essential to maintain a high quality of life." BLM, *Mining and Minerals*, https://www.blm.gov/programs/energy-and-minerals/mining-and-minerals (last visited July 10, 2026).

19. In enacting the Federal Land Policy and Management Act ("FLPMA") in 1976, Congress specifically prescribed that, with several narrow exceptions irrelevant to the present action, no provision in the Act "shall in any way amend the Mining Law of 1872 or impair the rights of any locators of claims under that Act." 43 U.S.C. § 1732(b). Although FLPMA did not amend the Mining Law of 1872, it did add certain recordation requirements applicable to owners of unpatented mining claims. 43 U.S.C. § 1744. These requirements include a requirement to file within 90 days of locating a claim in the local BLM office for the district in which the claim is located an initial notice or certificate of location of the mining claim. *Id.* at § 1744(b). In addition, the owner also needs to file on an annual basis either a claim maintenance fee of $100 per claim or description of annual assessment work of value of at least that amount that the claimant has performed on the claim. 30 U.S.C. §§ 28-28f; 43 U.S.C. § 1744(a).

20. FLPMA further authorizes BLM to engage in "withdrawal" of certain Federal lands from location of mining claims or other multiple uses to reserve it for a particular public purpose, so long as it does so in accordance with specific provisions and limitations in the Act. 43 U.S.C. §§ 1702(j) & 1714. In the absence of any such mineral withdrawal, the public lands remain open to location, exploration, development, and processing of valuable mineral resources on or located within the subsurface of public lands.

21. FLPMA further provides that BLM "shall . . . regulate, through easements, permits, leases, licenses, published rules, or other instruments" all developmental uses on public lands,

Page 9 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

but again, must do so fully in accord with the Mining Law of 1872 and in a manner that does not impair the rights of any locators or claims under that law. 43 U.S.C. § 1714.

22. One such instrument by which BLM regulates these uses, including systems for electricity transmission, is through granting rights-of-way pursuant to 43 U.S.C. § 1761(a)(4). In its FLPMA implementing regulations, addressing its issuance of right-of-way grants on public lands at 43 C.F.R. Part 2800, BLM confirms that a user of public lands "must have a grant" if it plans to use public lands for systems or facilities over, under, on, or through public lands "for generating, transmitting, and distributing electricity." 43 C.F.R. § 2801.9(a)(4).

23. The National Environmental Policy Act ("NEPA") directs that, to the fullest extent possible, all federal agencies shall, before undertaking or authorizing a major proposed action, prepare a detailed statement addressing, among other things, the reasonably foreseeable effects on the human environment of the proposed action and a reasonable range of alternatives to the proposed action, and also study, develop, and describe appropriate alternatives to recommended courses of action for any proposed action involving unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(C) & (H).

24. The Department of the Interior's recently promulgated NEPA Implementation Handbook defines "effects" or "impacts" broadly to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, local custom and culture or health effects." Sec. 6.1(k)(1), U.S. Dept. of the Interior NEPA Implementing Procedures, 516 DM 1 (Feb. 2026) ("DOI NEPA Handbook"). The Handbook likewise defines "human environment" broadly to mean "comprehensively the natural and physical environment and the relationship of Americans with that environment." *Id*. at Sec. 6.1(m). In providing

guidance on how the DOI bureaus should address economic effects in a NEPA document, the

Handbook offers the following more detailed explication:

> Consider the degree to which the action, including any changes to the natural and physical environment, would affect economic activity. This may require evaluation of jobs and income, spending and output, property values, and/or other economic factors. When evaluating significance, evaluate the degree of the economic effects against an established baseline where possible. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance. Economic effects by themselves generally do not require preparation of an EIS. Consider effects on the local economy and not only those to the State or national economy. The impacts of a closure of an area or a limitation on livestock grazing in an area may not have any impact to the State, but it may have impacts on the local county or municipality economy.

25.  Section 3.6(a) of BLM's NEPA Implementation Handbook provides as follows with

respect to "[w]hen a supplement" to an EIS "must be prepared":

> A bureau should prepare supplements to environmental impact statements only if a major Federal action remains to occur, and:
> (1) The bureau makes substantial changes to the proposed action that are relevant to environmental concerns; or
> (2) The bureau determines, in its discretion, that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects.

26.  BLM's NEPA Implementation Handbook also expressly requires that "[w]hile a

NEPA review is ongoing, a bureau will take no action concerning the proposed action that:

(i) limits the choice of reasonable alternatives; or (ii) is not independently justified and

accompanied by an adequate environmental review."  Sec. 1.3(b)(1).

## FACTS UNDERLYING CLAIMS

### *MMC's Multi-Decade Investment of Time & Money to Secure & Maintain Its Mining Claims*

27.  The potential for the presence of gold deposits in the Claims Area came to light at

least four decades ago by two geologists employed by Western Epithermal ("Western") who

were carrying out prospecting activities in the region.  Based on that potential, in 1986 Western

Page 11 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

staked 83 claims in the Claims Area pursuant to the Mining Law of 1872. All of these claims were properly recorded in accordance with Section 314 of FLPMA, 43 U.S.C. § 1744, and reflected in the publicly available mineral title documents that BLM maintains.

28. Shortly thereafter, in 1986-87, Western initiated a comprehensive geological mapping, soil geochemistry, and drilling program that immediately yielded positive results. More specifically, their geochemistry testing revealed several anomalies. The presence of anomalies is a vital component of the mining prospecting and exploration process, as it often provides the initial indication of the presence of a subsurface ore body. Subsequent drilling confirmed surface mineralization ranging from 0.010 to 0.250 ounces of gold per ton.

29. In 1987, Western merged this portion of its holdings into the new entity of MMC. Following this merger, MMC expanded its land and mineral holdings and conducted additional soil and drilling sampling in the Claims Area. MMC has been exploring for gold on unpatented lode claims within the Claims Area since 1988.

30. On April 19 and May 6, 1990, MMC filed a plan of operation for exploration with BLM's Vale District to conduct extensive exploration activities projected to occur over a five-year period. In the Revised Environmental Assessment that BLM prepared to analyze the effects of the plan, the agency stated its view that, "[a]s a result of mineral exploration activities conducted by Malheur Mining and its predecessor of interest, Western Epithermal, over the past four (4) years, substantial amounts of gold-bearing and mercury-bearing rock has been discovered. Consequently, the area of the Kerby Project has a high potential for the discovery of these metals." From 1996-98, the Kerby property was leased to North Broken Hill Mining, which expanded the geochemistry, mapping, geophysics (induced potential and ground magnetics), and drilling in the Claims Area. The primary purpose of these exploration activities

Page 12 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

was to determine if precious metals, in particular, gold, were present in economically viable quantities to justify eventual development. All told, MMC has invested and made expenditures that run into the millions of dollars in exploration and development of the Claims Area to date.

31. The upshot of this initial round of exploratory activities was the discovery and identification of two primary ore zones or pods containing ore grade mineralization of gold with upside potential laterally and at depth within the Claims Area. One of these zones is near the center of MMC's Claims Block ("Central Ore Deposit") and bisects the dividing line between Sections 21 and 22, Township 15 South ("T15S"), Range 45 East ("R45E"). The other zone is on the eastern edge of MMC's Claims Block and extends farther east onto BLM land ("Eastern Ore Deposit") that lies approximately equidistant within Sections 23 and 26 – T15S, R45E. Notwithstanding the discovery of these valuable and marketable gold deposits, MMC opted not to develop them during this period for business reasons in light of market conditions.

32. MMC nevertheless continued to hold and properly maintain its claims in the Claims Area, including by paying the annual claim maintenance fees required under FLPMA to keep them valid and active. Then, in 2014, again for business reasons and to minimize its carrying costs as it looked for additional exploration opportunities within the Claims Area, MMC opted to suspend payments on all but 16 of its claims that encompass and surround the defined Central and Eastern Ore Deposits. MMC has continued to make annual claim maintenance payments in accordance with FLPMA requirements and validly hold these 16 claims, all but two of which date back to 1986 and the other two at least to 1996, without interruption to the present.

33. As part of these efforts, in late July 2025, MMC representatives visited the property to continue to proceed with their plans to further explore and eventually develop its Claims, particularly in light of improving market conditions in the price of gold, which has effectively

doubled in the last three years and hit an all-time record high of $5,602.22 per troy ounce earlier this year.  These plans included a claim-staking campaign to re-stake dropped claims upon which a discovery had been previously made and to create a contiguous claim block between the known ore bodies in the Central and Eastern Ore Deposits. The visit reflected MMC's plans to pursue exploration upside in the immediate vicinity, utilizing the wealth of data it had accumulated over the years.  Additionally, the campaign sought to prevent other parties from locating claims in the Claims Area.

34.  MMC followed up this visit with another one in November 2025 on which it staked its additional 104 claims, the majority of which overlap with the 67 original claims it had held but for which it had temporarily suspended payment of annual claims assessment fees.  All of these supplemental claims surround and fan out from the 16 claims MMC has continuously maintained, and exist on public land open to mineral entry.  MMC staked these supplemental claims for reasons directly tied to the prospecting, exploration, and mining purposes described above.  MMC submitted the necessary claim paperwork with BLM and Malheur County to formally satisfy the recordation requirements for these claims in early January 2026.

35.  MMC therefore presently holds 120 active, valid unpatented mining claims that reflect varying levels of prospecting and exploration within Sections 15, 16, 21, 22, 23, 26, 27, 28, 33, and 34 – T15S, R45E, within Malheur County.  Notwithstanding the varying level of data that exist across its claims, at current gold prices, just the two known ore zones that exist within the claims MMC has owned and maintained for 30-40 years, the Central and Eastern Ore Deposits, contain gold worth at least $300 million and likely considerably more, but only additional planned prospecting and exploration activities will be able to determine that amount.

Page 14 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

***Treatment of Mining Claims & Resources During BLM's B2H NEPA/FLPMA Process***

36. IPCo submitted its initial Application for Transportation and Utility Systems and Facilities on Federal Lands and a preliminary Plan of Development ("POD") for the B2H Project to the BLM Vale District on Dec. 19, 2007.

37. BLM determined that approval of IPCo's application would constitute a major federal action within the meaning of NEPA and thereby required it to prepare an Environmental Impact Statement ("EIS") under that statute. Consistent with this determination, BLM (along with the Forest Service given that the proposed B2H route also traversed National Forest System lands) jointly published in the Federal Register a Notice of Intent ("NOI") to prepare an EIS. 73 Fed. Reg. 52,944 (Sept. 12, 2008). That NOI stated that "[t]he purpose and need of the Project is to relieve existing congestion, capacity, and reliability constraints and allow for the delivery of up to 1500 megawatts (MW) of additional energy to target service areas principally in Idaho and Utah." The NOI also noted that the original, preliminarily preferred route comprised approximately 195 miles, or 70 percent, on privately owned land; 45 miles, or 16 percent, on public lands that BLM administers; 27 miles, or 10 percent, on the Wallowa-Whitman National Forest that the Forest Service manages; and approximately 11 miles, or 4 percent, of lands administered by the State of Oregon or other jurisdictions. The NOI explained that "the EIS will analyze the proposed action and a reasonable range of route alternatives" and encouraged interested persons to submit comments "concerning the Project as currently proposed, feasible alternative locations, possible mitigation measures," and any other relevant information. The

Page 15 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOI identified a website, http://boardmantohemingway.com, at which maps and other information concerning the Proposed Action could be digitally accessed.  The NOI requested that the public submit scoping comments on the proposed B2H project by November 14, 2008.

38.  In response to the NOI, on Nov. 13, 2008, MMC, through its counsel, submitted comments on project to BLM's and IPCo's Project Managers.  In these comments, MMC disclosed to BLM's B2H Project Manager that its mining claims in Malheur County "has the potential to be impacted by the proposed transmission right-of-way based on the preliminary preferred route and alternative route corridors as shown by the maps" on the B2H Project Website.  More specifically, MMC conveyed in its timely submitted scoping comments that it owned a block of unpatented mining claims in portions of Sections 9, 10, 15, 16, 21, 22, 23, 26, 27, and 28 – T15S, R45E on which it had expended millions of dollars to explore and develop, and that these claims encompassed both the Central and Eastern Ore Deposits.  Given its ownership of these mining claims, MMC expressly advised that it strongly opposed one of the alternative routes then under consideration (represented by the green corridor on Map 21 from the B2H Project Website) on the ground that "it would be very difficult to place a power line right-of-way anywhere in Sections 21 or 22 – T15S, R45E without creating economic hardships on the ability to develop the mineral potential" of MMC's claims.  MMC went on to explain, however, that "the preferred red corridor would have no impact" on its then-extant mining claims if the B2H ROW were "placed in the center of the corridor or at least one thousand five hundred feet east of the western edge of the red corridor."  MMC therefore recommended that the proposed B2H route run "in the vicinity of and parallel to the existing utility rights-of-way that already exist on Map 21 in the red corridor, or easterly therefrom."  MMC closed its letter by stating that "[w]e appreciate the opportunity to provide these comments, so Idaho Power may

Page 16 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

better plan for a final right-of-way with the least impact on anyone."  MMC therefore made clear even from the earliest stages of the process, nearly 20 years ago, that it did not oppose the B2H Project, but merely sought to have it built along a route that would not infringe on its mining claims or materially interfere with its ability to exercise the property rights it owns under such claims.

39.  During the process of preparing the Draft EIS for the B2H Project, on or around July 12, 2010, BLM's Vale District circulated a series of letters via certified mail, return-receipt requested, to a group of 27 mining claimants within the B2H Project Area to provide notice to them in accordance with BLM mining regulations that the proposed B2H route crosses BLM-administered lands "located on or near your BLM mining claims."  As a result, BLM advised the holders of the mining claims who received this notification that they each were being provided "the opportunity to provide recommendations to the BLM as to how the proposed B2H Project may affect the integrity of, or your ability to operate, your facilities."  Notwithstanding the fact that MMC's counsel had previously advised BLM that the proposed B2H Project had the potential to affect its integrity of and ability to operate on its mining claims, MMC did not receive such a letter nor does MMC believe that the agency sent such a letter to MMC.  Thus, they were not afforded the opportunity referenced in the letter prior to the publication of the Draft EIS for the B2H Project on December 19, 2014.

40.  On November 25, 2016, BLM and the Forest Service published the Final EIS for the B2H Project ("FEIS").  The FEIS contains a chapter dedicated to projecting impacts to earth resources, including minerals.  In this context, BLM acknowledges upfront that "[m]ining of locatable minerals on public land is a right protected by" the Mining Law of 1872 and the agency's implementing regulations at 43 C.F.R. §§ 3800-3870.  FEIS at 3-8.  One of the key

Page 17 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

issues the FEIS expressly identified as being a focal point of its analysis is: "Would the B2H Project restrict the ability to extract minerals?" FEIS at 3-11. In addressing this issue, BLM acknowledged that the proposed B2H Project could have high impacts on minerals, including on "active mining claims" (distinguished from "active mines"), but that application of mitigation measures it developed for the Project, specifying in particular Mitigation Measure 8, would be used to mitigate impacts to mineral resources to a low or negligible level. FEIS at 3-24.

41. Mitigation Measure 8 calls for re-routing or re-aligning the B2H transmission towers along an alternative route to avoid sensitive features, which as the FEIS indicates, include mineral resources and active mining claims. In explaining the efficacy of this mitigation measure, BLM states that it is designed to avoid or minimize direct and indirect impacts on other resources and land uses that fall within its ambit.

42. On November 17, 2017, the Deputy Assistant Secretary of the Interior for Lands and Minerals Management issued a Record of Decision ("ROD") approving the grant of a ROW for the B2H Project, "subject to terms, conditions, stipulations, and environmental protection measures" identified in the ROD, including its appendices, and the Plan of Development ("POD"), a draft of which was one of those appendices and included a refined version of the required Mitigation Measures summarized in the FEIS. The ROD further clarified that the final version of the POD will be required to include a description of the application of the requisite Mitigation Measures based on final design and engineering work. The ROD further states that the ROW grant "is conditioned on [IPCo's] satisfaction of the mitigation plans and monitoring requirements and all the commitments and requirements outlined" in the ROD and also "requires [IPCo] to comply with all applicable Tribal, Federal, State, and local laws and regulations." It further expressly declares that the ROD does not authorize IPCo to engage in any ground-

Page 18 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

disturbing activities, which cannot occur until finalization of the POD and BLM's issuance in accordance with 43 C.F.R. § 2807.10 of a final written Notice to Proceed ("NTP"), neither of which have been made publicly available.

43.  Following resolution of protests to the B2H ROD, BLM's Vale District Manager issued the B2H ROW grant to IPCo on Jan. 19, 2018.  As required by FLPMA, the ROW is issued expressly subject to any and all valid existing rights.  Moreover, pursuant to 43 U.S.C. § 1765, the B2H ROW contains a series of terms and conditions with which IPCo must comply in exercising the authority it conveys, which include the following:  (1) "the Holder's compliance with all applicable regulations contained in *Title 43 Code of Federal Regulations, part 2800 and part 2880*"; (2) "the mitigation measures contained in the Final EIS, dated November 2017, and Exhibit D Plan of Development dated June 9, 2017, and any subsequent revision to the Plan of Development, attached hereto, are incorporated into and made a part of this grant instrument as fully and effectively as if they were set forth herein in their entirety"; and (3) "Failure of the Holder to comply with applicable law or any provision of this right-of-way grant(s) or permit shall constitute grounds for suspension or termination thereof."

44.  As referenced above, Exhibit D to the B2H ROW is IPCo's Draft POD dated June 2017.  With respect to Minerals, the Draft POD contains only a single conclusory assertion assuring that construction and operation of the B2H Project as authorized by BLM will "not displace mineral operations; therefore, there are no identifiable impacts on mineral resources and extractive activities from the Project."  Support for this assertion presumably derives from faithful application of the requisite Mitigation Measures, many of which the Draft POD explains will be applied during the future design and engineering phases of the Project.  The Draft POD notes in this context that the plan will thus be updated during preparations for actual construction

and expressly acknowledges that a "variance to the location of facilities" may be required as a result. One of the key objectives the Draft POD identifies for application of the requisite Mitigation Measures is to "[d]emonstrate methods of compliance with current federal land-management agency management guidance for federal lands."

45. Several months ago, MMC through its counsel submitted a request to BLM pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to acquire a copy of the Final POD and NTP, among other materials relevant to its claims and this proceeding to which it has a right under that statute. BLM responded by indicating that it would provide the requested materials by July 20, 2026, but MMC provides notice and reserves its right to amend this complaint to add a claim premised on a violation of FOIA depending on how the agency ultimately responds to its pending request. MMC has also requested such materials from IPCo to no avail. For present purposes then, MMC notes that, in the absence of the documents that are the subject of its FOIA request and that it has unsuccessfully sought to obtain from IPCo, MMC is necessarily limited in the specificity of the allegations it is able to make at this juncture related to the ultimate legal rubric and restrictions under which IPCo is operating in building the B2H Project.

46. Thus, the ROD, Draft POD, and ROW for the B2H Project all require IPCo to comply with all the Mitigation Measures prescribed for the project, including Mitigation Measure 8 that is designed to avoid interference with active mining claims or impacts to the development of mineral resources, as well as all other applicable laws, including the federal mining laws and Multiple Surface Use Act. Moreover, based on the supposition that IPCo would faithfully apply and adhere to the Mitigation Measures in the Final POD and actual construction of the B2H Project, the Draft POD and FEIS projected virtually no impacts to extraction of mineral resources within the project area.

Page 20 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

47.  In addition to securing authorization to construct and operate the B2H Line on the surface of public lands that BLM administers by securing the B2H ROW, IPCo had to obtain other approvals to proceed with the project.  These included approval of the project from the Oregon Public Utility Commission, which among other things provided IPCo eminent domain authority from the State to condemn private property for easements to build the transmission line along the ultimate route on which the B2H Project is to be built.  In order to secure this Certificate of Public Convenience and Necessity ("CPCN"), *see* ORS 758.015 (laying out CPCN requirements), IPCo had to establish that the B2H Project was in the public interest based on the purposes it is designed to serve, which at the time were described as primarily to more efficiently serve a broad swath of its retail customers as well as those of its co-project proponent, Pacificorp, but evidence has come to light since that time that the bulk of the electricity to be transmitted on the line as revealed in the 2025 Integrated Resource Portfolio (IRP) of PacifiCorp indicated that the east to west aspect of the line would provide power to a large single load data center customer, thereby nullifying much of the broader public benefits the line was ostensibly designed to serve and that formed the basis of its Purpose and Need as articulated by BLM in its FEIS.

48.  Since the route for the line has received the necessary agency approvals, IPCo has continued to seek and obtain approval for multiple amendments to the route, in part based on application of the requisite Mitigation Measures and other variables, thereby establishing that the route as approved is not fixed and can still be modified as construction continues in order to satisfy terms and conditions for the line or other critical priorities and legal obligations as they emerge.

Page 21 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

49. As referenced above, MMC had made BLM aware of its concerns with potential encroachment on or material interference with its mining claims from the B2H Line at the earliest phase of the NEPA process and had not been contacted by the agency since its express transmission of those concerns.

50. MMC therefore did not have actual notice that its concerns and mining claims were being wholly disregarded until its representatives visited the Claims Area site in the summer of 2025 for the purpose of conducting further prospecting activities including investigating and determining where to conduct additional exploration and stake, or re-stake, additional claims in light of the considerably more favorable conditions and significantly increased prices in the gold market that had recently emerged at that time. During this visit they saw IPCo's personnel and contractors carrying out work that appeared to involve the construction of access roads as it continued with work to lay out pads for B2H transmission towers that were directly on and over its mining claims, including those containing the known Central Ore Deposit. The sixteen of MMC's claims that date back to the 1980s and 1990s were all still visibly and openly staked at this time, and evidence of the substantial drilling activities it had undertaken in the Claims Area was also manifest at the site.

51. Based on its exploratory work in July 2025, MMC followed up to stake or re-stake new claims surrounding the original claims on the unwithdrawn public lands pursuant to the general mining laws for the purpose and with the intent to carry out further prospecting and mining exploration work in the Claims Area in November 2025, largely driven by the substantial increase and attendant marketability of the gold deposits in the area and to ensure against any further encroachments with its planned prospecting and exploratory activities in the area. A portion of this newer set of MMC's present claims overlaps with the claims it previously held

and maintained in the area dating back to the 1980s and have been the subject of previous exploratory mining activity, including documented discoveries. MMC filed the necessary paperwork to formally record and document this newer set of claims with BLM and Malheur County in early January 2026, which therefore serve to put all users of public lands of such claims and MMC's attendant rights. On May 14, 2026, MMC submitted to BLM a Notice of Intent to engage in further exploration of its mining claims in the Claims Area. This Notice of Intent is still pending before BLM as the agency has requested additional information that it alleges is required by its regulations.

52. MMC also initiated contact with IPCo in the Fall of 2025 after MMC learned of IPCo's work on and in the immediate vicinity of its claims to advise that IPCo was in violation of MMC's property rights deriving from its unpatented mining claims. Nevertheless, on a follow-up site visit in February 2026, MMC representatives observed not only access roads, but a series of pads directly encroaching on and traversing right through the center of its mining claims, including over the Central Ore Deposit. Upon discovering this additional work, MMC contacted IPCo to strenuously object to the violation of MMC's property rights and infringement on its mining claims, and to seek to engage IPCo in discussions aimed at resolving those violations and requesting that the parties enter into a standstill agreement to pause any further work on MMC's claims while those discussions were underway. IPCo, through its outside counsel, acceded to the request to engage in intermittent discussions for this purpose, but demurred on the request for a standstill agreement to cease further work in the Claims Area.

53. In fact, IPCo has continued with such work since that time and has recently escalated the pace and scale of its work on a route that is squarely on MMC's mining claims and the Central Ore Deposit. More specifically, recent data that includes satellite imagery, aerial drone

footage, and MMC's own recent on-the-ground inspection reveal that IPCo's contractors now have either carried out construction activity or staged materials apparently antecedent to such activity on each of the 15 transmission tower pads on or over MMC's mining claims.  On two of those pads IPCo has already erected the bottom segment of transmission towers and placed footings for the erection of additional towers on the lion's share of the rest of these pads.  Placement of these footings has involved drilling and digging into the subsurface and at least some of them on information and belief have extended into and directly disturbed MMC's subsurface mineral estate.  These pads also reveal an unmistakable present intent on the part of IPCo to run roughshod over MMC's mining claims and no willingness to even attempt to avoid them or the mining-related activities that MMC has the right under federal law to pursue.

54.  Given these developments, on June 16, 2026, MMC through its undersigned counsel transmitted a Notice of Violation and Material Interference with Valid Mining Claims and a Request to Immediately Suspend and Order Cessation of All Such Violative Activities to BLM's Vale District Manager and BLM's Oregon/Washington State Director.

## CLAIMS

### CLAIM ONE:
### TRESPASS
(Against Defendant IPCo)

55. Plaintiff realleges and incorporates by reference all of the preceding paragraphs of the Complaint.

56.  A claimant with a valid unpatented mining claim enjoys an exclusive possessory right in the surface of his location and the underlying mineral deposits.  *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336-37 (1963).  MMC owns multiple valid unpatented mining claims in the Claims Area.

Page 24 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

57.  Defendant IPCo has violated, and continues to infringe upon and violate, Plaintiff's valid existing property rights to use the surface for mining purposes and the subsurface mineral resources located within its claims in the Claims Area, by performing work that is and will materially interfere with MMC's exploration activities. This work includes construction to date and imminently planned construction, which has rendered and will render impossible MMC's ability to exercise a significant portion of its rights to explore and develop its mining claims in the Claims Area.  IPCo's actions on MMC's mining claims in the Claims Area, all of which are on public land, are also limited to and constrained by the authority and conditions prescribed in the B2H ROW.  IPCo's construction activities in the Claims Area also exceeds and is inconsistent with the authority Defendant BLM granted to IPCo in the B2H ROW.

58.  IPCo's continuing trespass is intentional given that MMC notified IPCo of the existence of the mining claims MMC owns that IPCo is openly disregarding and violating.

59.  IPCo's trespass is without right or license and violates MMC's exclusive valid property rights.

60.  Defendants' intentional trespass has resulted in actual and substantial damages to the real property possessory rights owned by MMC.

61.  Resolution of this claim turns principally on federal law, including the Mining Law of 1872, as amended, FLPMA, and the B2H ROW and related documents all of which were issued and prepared pursuant to federal law.

### CLAIM TWO:
### QUIET TITLE
(Against Defendant IPCo)

62. Plaintiff realleges and incorporates by reference all of the preceding paragraphs of the Complaint.

Page 25 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

63.  A dispute exists over the property rights to possess and/or occupy and utilize the Claims Area between MMC and IPCo.  Part of that dispute arises from the scope, authority, terms, and conditions of the B2H ROW that BLM granted to IPCo.

64.  MMC has claims to and a substantial interest in the Claims Area given that it owns valid unpatented mining claims under federal law on the Claims Area.

65.  MMC's property rights are superior to that of IPCo, which under the express terms and conditions of the B2H ROW that serves as the sole source of the authority upon which it does and can rely to use the public lands encompassing the Claims Area are subject to valid existing rights including MMC's mining claims, compliance with federal law including the general mining laws and Multiple Surface Use Act, and satisfaction of Mitigation Measures that include a requirement to avoid interfering with active mining claims or the ability to extract mineral resources on public lands, among others.

66.  MMC's valid existing property rights deriving from its mining claims are being infringed upon and its claims materially interfered with by the actions IPCo is undertaking pursuant to the B2H ROW and therefore there is a compelling and imminent need for the Court to quiet title as between the property interests that MMC and IPCo respectively claim.

**CLAIM THREE:**
**EJECTMENT**
**ORS § 105.005**
(Against Defendant IPCo)

67. Plaintiff realleges and incorporates by reference all of the preceding paragraphs of the Complaint.

68.  MMC owns possessory property rights constituting an exclusive right to use the surface of the mining claims at issue for the purposes of mineral exploration and operations as well as exclusive rights to develop the subsurface mineral estate in its claims.

69.  For the same reasons, MMC enjoys the present right of possession to the surface use for the purposes of mineral exploration and operations and the exclusive right to develop the subsurface mineral estate within its claims.

70.  To vindicate MMC's valid existing property rights in the Claims Area, the Court needs to eject IPCo from the Claims Area and direct it to remove its partially constructed facilities, including the parts of transmission towers it has erected, and all of its equipment.

**CLAIM FOUR:**
**COMPELLING BLM TO EXECUTE FEDERAL DUTY TO PREVENT**
**UNAUTHORIZED USE OF PUBLIC LANDS**
**43 U.S.C. §§ 1732 & 1761; 5 U.S.C. § 706(1)**
(Against Federal Defendants)

71. Plaintiff realleges and incorporates by reference all of the preceding paragraphs of the Complaint.

72.  5 U.S.C. § 706(1) authorizes federal courts to compel agency action unlawfully withheld or unreasonably delayed.

73.  FLPMA authorizes the Secretary of the Interior to grant rights-of-way on public lands to authorize systems for transmission of electricity, and without such a right-of-way, any such development is not permitted on public lands.  43 U.S.C. § 1732(b); 43 U.S.C. § 1761(a)(4). BLM's regulations provide that a user of public lands "must have a grant" of a FLPMA right-of-way to use public lands for systems for transmitting electricity.  43 C.F.R. § 2801.9.

74.  30 U.S.C. § 612(b) limits the authority that BLM has to manage other non-mining surface resources within mining claims on public lands of the United States such that it encompasses only so much of the surface as is necessary for such other uses to occur and only insofar as the authorized use does not endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto by the owner of a mining claim.

Page 27 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

75. IPCo's B2H ROW contains mandatory terms and conditions that expressly require construction of the transmission line to avoid any discernable effect on active mining claims or the capacity to develop mineral resources on public lands and by its own terms and operation of FLPMA is subject to valid existing rights, including those deriving from MMC's mining claims.

76. Consistent with the Ninth Circuit's opinion in *United States v. Curtis-Nevada Mines*, 611 F.2d 1277 (9th Cir. 1980), MMC has protested to BLM about the surface uses that IPCo is making of its mining claims in violation of federal law and well outside the authority granted in the B2H ROW.

77. BLM has a discrete, mandatory duty under FLPMA and its own implementing regulations to ensure that the public lands not be used for electricity transmission purposes beyond the explicit authority conveyed in and/or inconsistently with the express terms and conditions of a right-of-way granted pursuant to that statute and in accordance with those regulations. *See* 43 C.F.R. § 2808.10(a) (defining trespass as "using, occupying, developing, or subleasing the public lands or their resources without a required authorization or in a way that is beyond the scope and terms and conditions" of a right-of-way"). BLM has failed and/or unreasonably delayed in taking any action to fulfill this duty resulting in injury to and material interference with MMC's mining claims in the Claims Area.

**CLAIM FIVE:**
**DUTY TO SUPPLEMENT FEIS IN LIGHT OF SIGNIFICANT NEW INFORMATION**
**42 U.S.C. § 4332(2)(C)**
(Against Federal Defendants)

78. Plaintiff realleges and incorporates by reference all of the preceding paragraphs of the Complaint.

79. BLM's NEPA analysis in the FEIS projected that there would be no or extremely limited effects to mineral resources from issuance of the B2H ROW due to its analytical

Page 28 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

supposition that IPCo would faithfully satisfy and follow the Mitigation Measures upon which BLM conditioned its granting of the ROW to IPCo. Mitigation Measure 8 in particular calls on IPCo to avoid such impacts by relocating the route of the B2H transmission line.

80. At present, however, IPCo is proceeding with plans to construct the B2H transmission line directly on and over MMC's valid unpatented mining claims that will cause significant and material interference with its ability to explore and develop such claims in a manner that is significantly different from that projected by BLM in its FEIS. NEPA requires supplementation of an EIS if there remains major Federal action to occur and if new information arises since completion of the EIS revealing that the remaining action will affect the quality of the human environment to some significant extent not addressed in the EIS. Here, major Federal action remains to be carried out because the B2H Project that BLM authorized in granting the B2H ROW is far from complete and BLM retains significant authority over construction of the Project under the express terms of the ROW and its own regulations. BLM's own internal NEPA direction also requires it to supplement the FEIS under these circumstances.

81. NEPA also constrains the ability of agencies to authorize proposed actions, or the portions of those for which it has not undertaken a proper effects analysis that remain to be carried out, until it has performed the requisite supplemental analysis consistent with the duties imposed by the statute and BLM's own internal mandatory NEPA direction and guidance.

82. The Court should compel BLM to carry out its mandatory duty to undertake the necessary supplemental analysis in accordance with NEPA and the agency's own internal NEPA implementation direction and guidance, and should suspend IPCo from taking any further construction or other ground-disturbing activities on or across MMC's claims in the Claims Area until such supplemental analysis has been satisfactorily completed.

Page 29 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

83. In the alternative, insofar as BLM were to now try to recant from its position in the ROW, POD, and EIS as to what the ROW authorizes, that would give rise to at least three other statutory violations: (1) violation of federal mining laws; (2) violation of Multiple Surface Use Act; and (3) violation of NEPA given that its effects analysis in the original FEIS indicated that impacts to mining resources would be negligible or non-existent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MMC prays for judgment against Defendants as follows:

A. A declaration that IPCo is in violation of MMC's vested property rights deriving from its active mining claims in the Claims Area, that IPCo lacks the authority under the ROW to encroach, endanger, or materially interfere with and otherwise injure MMC's ability to exercise its rights under those claims, and that IPCo is acting in violation of FLPMA and its implementing regulations as well as inconsistently with the Multiple Surface Use Act;

B. A judgment that IPCo is liable to MMC under Oregon trespass and ejectment law;

C. A declaration quieting title in MMC to all property rights inhering in MMC's mining claims and confirming that such rights are superior to and may not be infringed by whatever rights to use the surface that IPCo may have been granted by the B2H ROW, and that the B2H Project must therefore be built on a route outside the existing ROW and wholly consistent with MMC's property rights deriving from its mining claims in the Claims Area;

D. Entry of both preliminary and permanent injunctive relief to preclude IPCo from carrying out any further construction or other ground-disturbing activities on or across MMC's mining claims in the Claims Area and to eject it from further possessing the Claims Area in a manner that materially interferes or otherwise injures MMC's mining claims and/or the posting of a bond of sufficient amount to protect MMC's economic interests in its mining claims;

Page 30 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

E.  Entry of a mandatory injunction directing IPCo to remove all of its facilities, including but not limited to footings, concrete foundations, and transmission towers that it has built on or across MMC's mining claims;

F.  An award of damages against IPCo in favor of MMC for an award of damages of up to or in excess of $184 million, the approximate current projected value of the Central Ore Deposit based on current gold prices, or whatever sum the evidence adduced during this action may ultimately support for injury to MMC's mining claims and the rights that arise therefrom;

G.  An order compelling BLM to execute its mandatory duty to preclude the unauthorized and illegal use of the public lands as openly manifested by IPCo's construction of the B2H Project directly through and on MMC's active valid mining claims;

H.  A declaration that BLM must supplement the B2H FEIS given the significant new information reflected in IPCo's violation of MMC's mining claims and concomitant failure to abide by federal law and multiple terms and conditions of the B2H ROW, including the requisite Mitigation Measures intended to avoid adverse impacts to active mining claims and extraction of mineral resources on public lands in the project area, and an injunction against any further activity under the B2H ROW until such supplementation has been satisfactorily completed;

I.  Any other relief or damages as allowed by law or that the Court may find appropriate.


Respectfully submitted this 14th day of July 2026.


*s/ Stephen J. Odell*
Stephen J. Odell
MARTEN LAW, LLP

Attorney for Plaintiff Malheur Mining Co., Ltd.