**STEPHEN J. ODELL, OSB #903530**
**VICTOR Y. XU, OSB #223323**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
E-mail: sodell@martenlaw.com

*Attorney for Plaintiff Malheur Mining Co., Ltd.*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PENDLETON DIVISION**

**MALHEUR MINING CO., LTD.**, an Oregon Corporation,

Plaintiff,

v.

**IDAHO POWER CO.**, an Idaho Corporation; and **BUREAU OF LAND MANAGEMENT**, an agency and instrumentality of the U.S. Government,

Defendants.

**Case No. 2:26-cv-1451-HL**

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER &/OR PRELIMINARY INJUNCTION & MEMORANDUM IN SUPPORT OF MOTION**

***Expedited Consideration & Ruling Respectfully Requested***

***Oral Argument Respectfully Requested***

## MOTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff Malheur Mining Company, Ltd., ("MMC") hereby respectfully moves for a temporary restraining order and/or preliminary injunction to enjoin Defendant Idaho Power Co. and any individual or entity working at its direction from continuing to carry out or complete activities to construct the Boardman-to-Hemingway ("B2H") transmission line on any of MMC's mining claims, or within the existing right-of-way corridor in which such activities are occurring insofar as it encompasses any such claims, until the Court can fully consider and resolve MMC's claims on the merits in the above-captioned action.

MMC also respectfully seeks expedited consideration and resolution of this motion given that the activities it asks the Court to restrain or enjoin are ongoing and the irreparable injuries MMC will likely sustain in the absence of appropriate relief as set forth in its supporting papers will only continue to increase in intensity and magnitude at each sequential stage of construction of the B2H Line across its mining claims. MMC has therefore framed its motion as seeking a temporary restraining order and/or preliminary injunction, as may be necessary, and respectfully would ask the Court to grant a temporary restraining order as articulated above in the event that its calendar or other circumstances do not permit expedited resolution of MMC's request for a preliminary injunction, at least until the Court may consider and rule on that latter request.

In accordance with LR 7-1(a), undersigned counsel for MMC represents that he conferred with counsel for the other parties via video conference in a good-faith effort to resolve the issues underlying the motion and the parties were unable to resolve them or the need for such relief.

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 4

A. MMC Has Spent Decades and Invested Millions of Dollars to Secure and Maintain Its Mining Claims. .......... 4

B. Although BLM Granted IPCo a ROW Subject to Terms and Conditions Respecting Protection of Mineral Rights, IPCo Is Flagrantly Violating These Terms and Conditions by Building the B2H Line on MMC's Mining Claims. .......... 8

III. STATUTORY & REGULATORY FRAMEWORK .......... 14

A. Mining Law of 1872 .......... 14

B. Multiple Surface Use Act .......... 15

C. Federal Land Policy and Management Act .......... 16

D. BLM's Implementing Regulations .......... 16

E. National Environmental Policy Act .......... 16

IV. STANDARD OF REVIEW .......... 17

V. ARGUMENT .......... 18

A. MMC Is Likely to Succeed on the Merits of One or More of Its Claims Against Defendants. .......... 18

1. MMC Is Likely to Prevail on Its State Law Claims Premised on IPCo's Ongoing and Increasingly Injurious Violations of and Material Interference with Its Mining Claims. .......... 18

a. IPCo Has Trespassed on MMC's Claims. .......... 23

(1) IPCo Has Physically and Intentionally Intruded on MMC's Property Interests.… .... 23

(2) MMC Has Not Authorized or Consented to IPCo's Intrusions. .... 24

(3) IPCo's Ongoing and Escalating Intrusions Are Injuring MMC. .... 24

b. MMC Is Likely to Prevail on Its Quiet Title Claim. .... 25

c. MMC Is Likely to Prevail on Its Ejectment Claim. .... 26

2. MMC Is Likely to Prevail on Its Claims Against BLM. .... 26

a. BLM Has Failed to Act to Enforce Terms and Conditions It Expressly Imposed on IPCo in Granting It the B2H ROW. .... 27

b. BLM Must Prepare Supplemental NEPA Analysis Given the Significant Impacts to the Mineral Resources that the Agency Failed to Address and Even Assured Would Not Be Allowed to Occur in the B2H FEIS. .... 28

B. MMC Will Continue to Suffer Irreparable Injury in the Absence of Preliminary Injunctive Relief. .... 28

1. MMC's Irreparable Injury Is Not Just Likely to Occur—It Has Already Started. ... 29

2. Continuous Encroachment on Property Rights Calls for Preliminary Injunctive Relief.… .... 29

3. Quantifying the Ultimate Mineral Resources that Exist Within MMC's Claims Will Likely Become Infeasible. .... 30

4. Continued Construction of the B2H Line Within the Active Construction ROW Corridor Will Effectively Sterilize MMC's Central Ore Deposit from Extraction. .... 31

5. Monetary Damages Alone Cannot Constitute an Adequate Remedy. ..................... 31

C. The Balance of Equities Tips Sharply in Favor of MMC. ........................................... 32

1. IPCo's Mostly Self-Inflicted Hardship and Assumed Risk Merit No Equitable Weight. ........................................................................................................................ 32

2. IPCo Can Avail Itself of Other Options It Has Already Utilized. ........................... 33

D. A Preliminary Injunction Is in the Public Interest. ...................................................... 34

1. The Public Interest Will Not Be Served in Allowing IPCo to Violate Its ROW in Its Desire, However Well-Intentioned, to Enhance the Electricity Grid. .................................. 34

2. The Public Interest Would Be Seriously Undermined if BLM Were Allowed to Abdicate Its Regulatory Duties to Uphold MMC's Federal Statutory Property Rights. ....... 35

VI. CONCLUSION ........................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Actuant Corp. v. Huffman*, No. CV-04-998-HU, 2005 U.S. Dist. LEXIS 49629 (D. Or. Feb. 18, 2005) ..... 32

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ..... 32

*ALCOA v. Bonneville Power Admin.,* 175 F.3d 1156 (9th Cir. 1999) ..... 35

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..... 18

*Alliance for the Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025 (D. Mont. 2023) ..... 27

*Ariz. Mining Reform Coal. v. Forest Serv.*, 172 F.4th 641 (9th Cir. 2026) ..... 14

*Collier v. Wilmington Sav. Fund Soc'y*, 2022 U.S. Dist. LEXIS 75587 (D. Or. Apr. 26, 2022) .. 25

*Concerned Citizens for Responsible Mining*, 124 Interior Dec. 191 (IBLA 1992) ..... 30

*Converse v. Udall*, 399 F.2d 616 (9th Cir. 1968), *cert. denied*, 393 U.S. 1025 (1969) ..... 19

*Coussens v. Stevens*, 200 Or. App. 165 (2005) ..... 25

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202 (9th Cir. 2022) ..... 19

*Eagle Star Rock Prods., LLC v. PCC Structurals, Inc.*, 756 F. Supp. 3d 1062 (D. Or. 2024) ..... 23

*Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985 (9th Cir. 2020) ..... 18

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ..... 30

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024) ..... 18

*Flip Flop Shops Franchise Co. v. Neb*, 2016 U.S. Dist. LEXIS 194406 (C.D. Cal. Dec. 5, 2016) ..... 32

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) ..... 22

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ..... 35

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016) ..... 27

*Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022) ..... 34

*High Sierra Hikers Ass'n v. Blackwell*, 381 F.3d 886 (9th Cir. 2004) ........................................ 35

*Inman v. Ollson*, 213 Or. 56, 66, 321 P.2d 1043 (1958)............................................................ 26

*Krein v. Szewc*, 287 Or. App. 481, 490, 403 P.3d 520 (2017)..................................................... 32

*Lara v. Sec'y of the Interior*, 820 F.2d 1535 (9th Cir. 1987)....................................................... 19

*Loper-Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ................................................. 22

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1980)......................................................... 17, 28

*Martin v. Reynolds Metals Co.,* 342 P.2d 790 (Or. 1959) ......................................................... 23

*Minto v. Salem Water, Light & Power Co.*, 120 Or. 202 (1926) ................................................. 30

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .............................................................. 26

*Opticians Ass'n of Am. V. Indep. Opticians of Am.*, 920 F.3d 187 (3d Cir. 1990) ....................... 32

*Pacito v. Trump*, 169 F.4th 895 (9th Cir. 2026) ................................................................... 17, 18

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150 (9th Cir. 2011) ... 29

*Robert E. Shoemaker*, 110 Interior Dec. 39 (IBLA 1989)......................................................... 22

*Sacramento Grazing Assn. v. United States*, 176 Fed. Cl. 204(2025) ......................................... 25

*Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281 (9th Cir. 2013) .................................... 18

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) ................................................................... 33

*Tyler v. Cisneros*, 136 F.3d 603 (9th Cir. 1998)........................................................................... 27

*Union Oil Co. v. Smith*, 249 U.S. 337 (1919) .............................................................................. 14

*United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277 (9th Cir. 1980)................... 15, 21, 27

*United States v. Locke*, 471 U.S. 84 (1985) ..................................................................... 14, 19

*United States v. Shumway*, 199 F.3d 1093(9th Cir. 1999)........................................................ 14

*United States v. W. Radio Svcs. Co.*, 2013 U.S. Dist. LEXIS 64636 (D. Or. May 3, 2013) ........ 29

*W. Watersheds Project v. Foss*, 2006 U.S. Dist. LEXIS 73577 (D. Idaho Oct. 4, 2006)............ 35

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ..................................................................................... 17

**Statutes**

30 U.S.C. § 22 .......... 14, 19

30 U.S.C. § 612(b) .......... 15, 20, 21, 22

42 U.S.C. § 4332(2) .......... 8

42 U.S.C. § 4332(2)(C) & (H) .......... 17

43 U.S.C. § 1701(a)(12) .......... 34

43 U.S.C. § 1714 .......... 16

43 U.S.C. § 1732(b) .......... 16

43 U.S.C. § 1744 .......... 5

43 U.S.C. § 1761 .......... 8, 16

43 U.S.C. § 1765(b) .......... 27

5 U.S.C. § 706(1) .......... 26

Mining Law of 1872 .......... 1, 14

ORS § 517.080 .......... 23

ORS 105.605 .......... 25

**Regulations**

43 C.F.R. § 2801.9(a)(4) .......... 16

43 C.F.R. § 2805.14(a) .......... 27, 34

43 C.F.R. § 2808.10(a) .......... 23

43 C.F.R. § 3712.1(b) .......... 16

43 C.F.R. § 3809.1 .......... 16

43 C.F.R. § 3832.1(a) .......... 16

43 C.F.R. § 3833.11 .......... 33

43 C.F.R. Part 2800 ........ 16

43 C.F.R. Part 3710 ........ 16

43 CFR Subpart 3809 ........ 16

**Congressional Materials**

H.R. Rep. 84-730 (June 6, 1955) ........ 15

S. Rep. 84-554 (June 15, 1955) ........ 15, 21

**Federal Register Notices**

73 Fed. Reg. 52,944 (Sept. 12, 2008) ........ 9

**MEMORANDUM IN SUPPORT OF MOTION**

Defendant Idaho Power Co. ("IPCo") is building a transmission line straight through the heart of mining claims that Plaintiff Malheur Mining Co., Ltd. ("MMC") has actively explored for four decades that sit atop a known gold deposit currently valued at over half a billion dollars. This deposit amply supports "discovery" of valuable minerals for many of these mining claims within the meaning of the Mining Law of 1872, thereby granting MMC exclusive possessory rights to further explore and develop these claims free from material interference. But IPCo's ongoing construction not only constitutes significant interference, but may threaten the ability of MMC to ever mine the gold it has spent millions of dollars to discover. IPCo is also in flagrant violation of multiple terms of the Right-of-Way ("ROW") under which IPCo is constructing the line, but Defendant Bureau of Land Management ("BLM") has taken no affirmative steps to remedy such violations. Without expeditious issuance of the temporary restraining order or preliminary injunction that MMC seeks by this motion, the irreparable injuries it is sustaining will only continue to mount. To be clear, MMC does not seek to stop the nearly 300-mile Boardman-to-Hemingway ("B2H") line at issue, but simply to have it built on a route that does not run roughshod over its mining claims and the gold it has a right to mine under federal law.

## I. INTRODUCTION

IPCo's construction of the B2H Line has already involved digging into and installing dozens of footings in concrete that extend well into the subsurface on MMC's mining claims and erection of portions of 15 transmission towers. Such acts have already harmed the property rights MMC holds under its mining claims, and if allowed to continue unabated to completion of the B2H Line, will only increase in severity and result in further irreparable injury at each stage of development, including threatening the ability of MMC to ever develop its mineral resources. This injury is graphically depicted by the following map showing the B2H ROW Corridor in

which IPCo is presently constructing the B2H line ("IPCo Active Construction ROW Corridor") through the epicenter of MMC's mining claims, including over much of the main gold ore body:




MMC has made multiple overtures to IPCo to adjust the route of the B2H line to avoid its mining claims, consistent with many other route adjustments IPCo has made in constructing the line, to no avail. MMC also notified BLM, the agency with authority over the public lands on which MMC's mining claims are located, that IPCo is materially interfering with its claims and

failing to abide by multiple terms and conditions BLM imposed on the ROW it granted to IPCo for construction of the B2H line. These explicit terms and conditions include requiring IPCo to comply with all federal laws, including those protecting mining claims, subjecting the ROW to valid existing rights, and imposing a series of mandatory mitigation measures, one of which is manifestly designed to ensure the B2H line does not materially affect mineral resources.

In response to the notice MMC provided to BLM, the agency did facilitate one meeting between MMC and IPCo, but the meeting failed to resolve the impasse. BLM offered to facilitate further meetings in which MMC indicated its willingness to participate, but to which IPCo simply neglected to respond at all. Otherwise, BLM has failed to take any action to remedy the violations of the B2H ROW and MMC's mining rights.

BLM's abject failure to act to protect MMC's mining claims is difficult to square with its patent knowledge of the multi-decadal history and significant expenditure of resources MMC has made to establish and continue to proceed toward development of its mining claims. Indeed, the agency approved and defended against multiple legal challenges a major initiative MMC took to further explore its claims in the early 1990s. In the Environmental Assessment ("EA") BLM prepared in approving this exploration plan, it expressly recognized that even initial exploratory efforts revealed "substantial amounts" of gold-bearing rock had been discovered and that the entire project area showed a "high potential" for the discovery of gold. More recently, in correspondence earlier this year between the agency and IPCo, there is an express acknowledgment that "the planned B2H transmission line route (including five towers) crosses five MMC mining claims," which are described as "active, unpatented gold mining claims located on BLM lands" that date back to 1986. This unequivocally confirms that both Defendants were well aware of the direct and material encroachment on MMC's mining claims

that would result from IPCo's activities to construct the B2H line along the ROW Corridor within which IPCo is presently building it well before full-scale construction was underway.

Again, MMC is not seeking to have this Court enjoin the B2H line writ large, but rather simply to ensure that MMC's considerable investment in its mining claims and its rights that flow therefrom are respected and upheld as the law requires. MMC has run out of options other than to move this Court to preliminarily enjoin IPCo's ongoing violation of MMC's federal property rights that inhere in its mining claims across which IPCo is actively continuing to build the B2H line, at least until the Court has the opportunity to rule on the merits of MMC's claims.

As explained further below, the Court should grant this motion. MMC is likely to prevail on the merits of its claims (any one of which would justify relief), including claims against IPCo for trespass, quiet title, and ejectment and claims against BLM for failure to timely act to remedy IPCo's violations of the B2H ROW and to supplement its National Environmental Policy Act ("NEPA") analysis in which it projected the line would only have negligible impacts on mineral resources. MMC will also suffer irreparable injury in the absence of a preliminary injunction because the harm caused by IPCo is ongoing, damages are difficult of estimation given IPCo's obstructions, and damages cannot compensate ongoing and recurring encroachment on real property rights in any event. The balance of equities tips in MMC's favor in large measure because IPCo's countervailing harms, reflect a fully aware assumption of risk and are completely avoidable by route amendments. Finally, granting the motion would serve the public interest given the importance of upholding investment-backed expectations and the rule of law.

## II. FACTUAL BACKGROUND

### A. MMC Has Spent Decades and Invested Millions of Dollars to Secure and Maintain Its Mining Claims.

Active prospecting for gold deposits in the Kerby Project Area comprising MMC's active

mining claims dates back four decades. On the basis of those initial prospecting efforts, in 1986 Don Adair located Kerby Claims 1-82 pursuant to the Mining Law of 1872. Decl. of W. Kirk Williams ("Williams Decl.") ¶4. Mr. Adair appropriately submitted Notices of Location for these claims pursuant to Section 314 of the Federal Land and Policy Management Act ("FLPMA"), 43 U.S.C. § 1744. Ex. B to Williams Decl.

Shortly thereafter, Mr. Adair transferred all 82 of these original 1986 Kerby Claims to Western Epithermal ("Western"), Ex. C to Williams Decl., which in turn transferred the lion's share of these claims, including all of the ones within the IPCo Active Construction ROW Corridor (and a few others MMC subsequently located), to MMC. Williams Decl. ¶¶4-5. These claims comprise Kerby 14, Kerby 15, Kerby 26, Kerby 37, and Kerby 38. Decl. of Edward Glowacki III ("Glowacki Decl.") ¶15; Ex. 3 to Glowacki Decl. In 1989, MMC filed Notices of Location for an additional 37 Kerby Claims, bringing its total to 119. Williams Decl. ¶5.

Since acquiring these Kerby Claims, MMC properly maintained all of them through 2013, and has continued to do so for the current subset of 16 such claims it still holds, including those in the IPCo Active Construction ROW Corridor. *Id.* ¶6. BLM corroborated the active status of these Kerby Claims as recently as earlier this year when it ran a report showing that all 16 such claims are reflected as viable and properly maintained mining claims in its official agency records. *Id.*; Ex. H to Williams Decl.

Since shortly after location of the 1986 Kerby Claims, MMC or its predecessor in interest (Western) has engaged in extensive exploratory drilling activities in the Kerby Project Area, a critical early stage in the multi-step process of developing a successful mining project. Glowacki Decl. ¶¶4-5. Metallurgical tests performed on samples from this early exploratory drilling revealed the presence of two primary ore bodies within the Area ("Central Ore Deposit" and

"Eastern Ore Deposit") and that gold recovery was well within accepted economic standards even as of that early stage of exploration. *Id.* ¶5. MMC contracted for the preparation of a geostatistical reserve estimate of these ore bodies that reported a range of approximately 943,000-1 million tons of ore using cut-off grades deriving from the then-prevailing gold price, around $400/ounce. *Id.* At a cut-off grade pegged to current gold prices, which are hovering around $4000/ounce, recent state-of-the-art modeling indicates the Central Ore Deposit alone presently has an in-situ gold value of approximately $544.4 million. Anderson Decl. ¶21.

MMC early on signaled its intent to progress beyond exploration by contracting for preparation of a full-scale draft Mining Plan of Operations ("Draft Kerby MPO") in September 1990. Ex. A to Decl. of Brian Anderson ("Anderson Decl."). This Draft MPO provided a preliminary conceptual delineation of the mining pits that would be needed to access and extract MMC's ore deposits in the Kerby Project Area along with attendant processing and refinery facilities essential to a fully functioning mine. Glowacki Decl. ¶6. These conceptual designs in the Draft Kerby MPO show that ancillary facilities for gold mines like the Kerby Project typically encompass far greater surface area than do the mining pits themselves, which typically comprise just 14-18 percent of the total area needed for full operations. Anderson Decl. ¶32.

MMC also ramped up its exploratory activity in the Kerby Project Area during this period, submitting a Notice of Intent to conduct further exploration across 2150 acres of the area. Revised EA, Kerby Project Plan of Operations at 1 (Mar. 1991)(Ex. 1). In the Revised EA that BLM prepared for the expansive exploration plan, BLM acknowledged that "[MMC] has been actively exploring for gold in the area (Kerby Project) since 1988 under a Notice of Intent…filed with the BLM on March 15, 1988, and subsequently amended numerous times throughout 1988, 1989…and 1990." *Id.* The agency also recognized in the Revised EA the valuable nature of the

ore deposits that had been discovered in the Project Area: "As a result of mineral exploration activities…over the past four (4) years, substantial amounts of gold-bearing and mercury-bearing rock has been discovered. Consequently, the area of the Kerby Project has a high potential for the discovery of these metals." *Id.* at 14. BLM reaffirmed its awareness of this high potential for gold deposits within the Kerby Project Area in adopting its Southeastern Oregon Resource Management Plan in 2002 by depicting the area as lying within an area that the U.S. Geological Survey had identified as "Most Likely to Contain Large Gold Deposits." Ex. 2.

All told, more than 400 drill holes have been excavated in the Kerby Project Area, with 375 continuing to provide reliable data and 261 of those within the range of the Central Ore Deposit. Glowacki Decl. ¶8; Anderson Decl. ¶26. Registered Geologist Brian Anderson, the Principal Geologist of Sespe Consulting, Inc., who has more than 30 years of experience in the mineral extraction industries, has concluded that MMC's 261-drill hole data base provides substantial and sufficient data to support the modeling he has done to define the Central Ore Deposit. Anderson Decl. ¶26; Ex. E to Anderson Decl.

Last year MMC decided in light of various factors to re-stake and locate anew many of the Kerby Claims that had lapsed, including the increasing price of gold that had been on a steep ascent since the early 2000s before topping out at an all-time high earlier this year at around $5600/ounce. Glowacki Decl. ¶10. Another gold mine also had recently received approval from Oregon to proceed with development in October 2023, the first such project to receive such state approval in decades. *Id.* The primary purposes of this renewed claim-staking campaign were to reestablish a contiguous claim block between the known ore bodies in the Central and Eastern Ore Deposits and to prevent others from locating mining claims in the vicinity. *Id.* ¶11. It was on this visit in July 2025 that MMC observed contractors from IPCo staking out pads over

MMC's Central Ore Deposit, thereby providing MMC with its first actual notice of the prospect that IPCo intended to build the B2H Line across that ore body. *Id.* ¶12.

Following this visit, Certified Professional Landman Kirk Williams reviewed BLM's public lands records at the behest of MMC. Williams Decl. ¶8. His review included examining official BLM records to identify any prior existing conflicts in the area covered by MMC's proposed new mining claims, including both BLM's Master Title Plat ("MTP") (Ex. J to Williams Decl.) and the applicable Historical Index ("HI") encompassing the claims area (Ex. K to Williams Decl.). *Id.* ¶¶9-10. His examination did not reveal the B2H ROW on either the MTP or HI. *Id.* Nor did it show that any of the Kerby Project Area had been withdrawn from mineral entry pursuant to 43 U.S.C. § 1714 of FLPMA. *Id.* ¶¶9, 11. Based on his more than four decades of experience in the field, Mr. Williams offered his professional recommendation that MMC proceed with locating the Malheur Claims to encompass all the public lands administered by BLM that are adjacent to MMC's Kerby Claims. *Id.* ¶12. MMC thereby followed up with another visit to the Kerby Project Area in November 2025 to stake Malheur Claims 1-106. Glowacki Decl. ¶12. MMC submitted the necessary paperwork with BLM to formally satisfy the recordation requirements for these Malheur Claims in early January 2026. Williams Decl. ¶7; Ex. I to Williams Decl. At present, then, MMC holds 122 active unpatented mining claims in the Kerby Project Area, 21 of which lie within the IPCo Active Construction ROW Corridor.

### B. Although BLM Granted IPCo a ROW Subject to Terms and Conditions Respecting Protection of Mineral Rights, IPCo Is Flagrantly Violating These Terms and Conditions by Building the B2H Line on MMC's Mining Claims.

Because substantial segments of the B2H Line traverse public lands, IPCo needs a ROW to authorize them to utilize such segments pursuant to FLPMA. 43 U.S.C. § 1761. In evaluating IPCo's application for the B2H ROW, BLM prepared an Environmental Impact Statement ("EIS") pursuant to NEPA. 42 U.S.C. § 4332(2). In response to the request for scoping

comments in the Notice of Intent for the EIS, 73 Fed. Reg. 52,944 (Sept. 12, 2008), Mr. Williams, on behalf of MMC, timely submitted comments to notify BLM and IPCo of the presence of MMC's block of mining claims on which it had already expended more than $3.5 million in the vicinity of the ROW routes under consideration. Ex. 3. He went on to explain more specifically that MMC vigorously objected to the "green" alternative route given that "it would be very difficult to place a power line right-of-way anywhere in Sections 21 or 22 – T15S, R45E without creating economic hardships on the ability to develop the mineral potential" of MMC's claims. *Id.* He clarified, however, that the preferred "red" corridor route would have no impact on MMC's mining claims if the ROW were "placed in the center of the corridor or at least one thousand five hundred feet east of" its western edge. *Id.* A map depicting the original preferred "red" route and the alternative "green" route was provided during Scoping. Ex. 4.

During the process of preparing the B2H Draft EIS, in July 2010 BLM circulated letters to a group of 27 mining claimants within the B2H Project Area to provide notice in accordance with BLM mining regulations that the proposed B2H route crosses BLM-administered lands "located on or near your BLM mining claims." Ex. 5. BLM advised the holders of the mining claims who received this notification that they were being provided "the opportunity to provide recommendations to the BLM as to how the proposed B2H Project may affect the integrity of, or your ability to operate, your facilities." *Id.* Notwithstanding that BLM had been substantially involved with MMC's extensive activities on its mining claims and that MMC's counsel had previously advised BLM that the proposed B2H Project had the potential to seriously interfere with or even jeopardize MMC's ability to develop its mining claims, MMC was not included in the list of mining claimants to whom BLM sent this letter pursuant to its regulatory duties.

The Final EIS for the B2H Project contains a chapter dedicated to projecting impacts to

earth resources, including minerals. Ex. 6 (excerpts of FEIS). One of the key issues the FEIS identified for analysis is: "Would the B2H Project restrict the ability to extract minerals?" *Id.* at 3-11. In addressing this issue, BLM acknowledged the potential for the proposed B2H Project to have significant impacts on mineral resource development, including on "active mining claims" (distinguished from "active mines"), but stated that application of the mitigation measures it developed for the Project, specifying in particular Mitigation Measure 8, would be imposed to mitigate impacts to mineral resources to a negligible level. *Id.* at 3-24.

Mitigation Measure 8 is one of 15 measures delineated in the FEIS and calls for re-routing or re-aligning the B2H transmission towers along an alternative route to avoid sensitive features, expressly defined to include mineral resources and active mining claims. *Id.* at 2-103. In explaining the efficacy of this measure, BLM explained it is designed to avoid or minimize impacts on the sensitive resources and land uses it is designed to protect. *Id.*

In November 2017, the Interior Department issued a Record of Decision ("ROD") approving the B2H ROW, "subject to terms, conditions, stipulations, and environmental protection measures" identified in the ROD and Plan of Development ("POD"), a draft of which was an appendix. Ex. 7 at i-iii. The ROD further clarified that the final version of the POD was required to provide a description of the application of the requisite Mitigation Measures based on final design and engineering work. *Id.* at 7. The ROD further states the ROW grant "is conditioned on [IPCo's] satisfaction of the mitigation plans and monitoring requirements and all the commitments and requirements outlined" in the ROD and "requires [IPCo] to comply with all applicable Tribal, Federal, State, and local laws and regulations." *Id.* at v.

In issuing the B2H ROW to IPCo in January 2018, BLM made the ROW expressly subject to any and all valid existing rights as required by FLPMA. Ex. 8 at 24. Moreover,

pursuant to 43 U.S.C. § 1765, the B2H ROW contains a series of terms and conditions with which IPCo must comply in exercising the authority it conveys, which include: (1) "the Holder's compliance with all applicable regulations contained in *Title 43 Code of Federal Regulations, part 2800 and part 2880*"; (2) "the mitigation measures contained in the Final EIS, dated November 2017, and Exhibit D [Draft POD] dated June 9, 2017, and any subsequent revision to the [POD], attached hereto, are incorporated into and made a part of this grant instrument as fully and effectively as if they were set forth herein in their entirety"; and (3) "Failure of the Holder to comply with applicable law or any provision of this right-of-way grant(s) or permit shall constitute grounds for suspension or termination thereof." *Id.* at 3.

With respect to Minerals, the Draft POD attached as an appendix to the ROW contains only a single conclusory assertion assuring that the B2H Project as authorized by BLM will "not displace mineral operations; therefore, there are no identifiable impacts on mineral resources and extractive activities from the Project." Ex. 9. This assertion presumably derives from faithful application of the requisite Mitigation Measures, many of which the Draft POD explains will be applied during the future design and engineering phases of the Project. The Draft POD notes in this context that the plan will thus be updated during preparations for actual construction and expressly acknowledges that a "variance to the location of facilities" may be required.

In sum, the ROD, Draft POD, and ROW for the B2H Project all require IPCo to comply with all of the Mitigation Measures prescribed for the project, including Measure 8 that is designed to avoid interference with active mining claims or impacts to the development of mineral resources, as well as all other applicable laws, including federal mining laws. Moreover, based on the mandatory requirement imposed on IPCo to apply and adhere to the Mitigation Measures in construction of the B2H Project, the Draft POD and FEIS projected virtually no

impacts to active mining claims or the extraction of mineral resources within the project area.

Notwithstanding multiple requests to IPCo, its counsel, and BLM, including in a pending request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, submitted nearly five months ago, Ex. 10, MMC still has not been provided with the Final POD to ascertain if and how IPCo abided by the terms and conditions of the B2H ROW that require compliance with federal law, Valid Existing Rights, and Mitigation Measures. In this same vein, IPCo has also repeatedly refused in response to MMC's multiple requests to provide its projected schedule for its ongoing construction of the segment of the B2H Line that traverses MMC's mining claims.

Since the route for the B2H Line received its initial round of agency approvals, IPCo has sought and secured approval for multiple amendments to the route, thereby establishing that the route as approved is not permanently fixed in place and can still be modified as construction continues in order to satisfy terms and conditions of the ROW or other critical priorities and legal obligations as they emerge. These amendments include at least five major route adjustments that BLM approved as recently as December 2025. Williams Decl. ¶11; Ex. L to Williams Decl. These amendments included five significant B2H Route adjustments. *Id.*

Even though IPCo has adjusted the B2H Line route on multiple occasions for other reasons and knew as early as January 2026 that the IPCo Active Construction ROW Corridor in which it is presently operating would transgress at least five of MMC's active mining claims, it has continued to construct that segment of the line and recently appears to have only escalated the pace and intensity of its work, including over MMC's Central Ore Deposit. Mr. Glowacki provides a description and photos showing the extent and scope of this work as of August 14, 2026, on 15 of MMC's mining claims. Glowacki Decl. ¶¶13, 26-47. He also explains how the ongoing construction activities within the B2H ROW Corridor as IPCo is construing and

implementing it is materially interfering with as many as 21 of MMC's mining claims. *Id.* ¶14. A summary of these adverse effects and material interference includes the following:

• construction of the lower portions of transmission towers on 15 of MMC's mining claims, with staging of the upper parts of these towers on the same pads;

• substantial excavation and pouring of concrete into the subsurface on MMC's mining claims for the placement of four footings for each of the transmission towers IPCo is constructing, deep enough in some places to have intruded into hard rock and MMC's ore deposits;

• emplacement of footings, including metal stanchions extending into the subsurface, in places that directly interfere with the further exploratory activities on its mining claims that MMC has received approval from BLM to carry out as described in its pending Notice of Intent; and

• carrying out such construction activities within the IPCo Active Construction ROW Corridor on four of MMC's mining claims that lie directly over its Central Ore Deposit, the in-situ value of which was recently projected at approximately $544 million.

In June 2026, MMC through its undersigned counsel transmitted a Notice of Violation and Material Interference with Valid Mining Claims and a Request to Immediately Suspend and Order Cessation of All Such Violative Activities to BLM's Vale District Manager and State Director. Ex. 11. BLM has made no formal response to this Notice. The agency did facilitate one meeting among representatives of MMC, IPCo, and several of its own officials, but progress was complicated considerably due to IPCo's unwillingness to pause construction activities on the segment of the B2H Line crossing over MMC's mining claims for any period of time whatsoever during the pendency of those discussions. MMC nevertheless indicated its willingness to continue with such discussions per BLM's offer to broker further dialogue, but IPCo declined to respond to BLM's offer and therefore no further discussions on this track have transpired.

## III. STATUTORY & REGULATORY FRAMEWORK

### A. Mining Law of 1872

Since its enactment more than 150 years ago, the Mining Law of 1872, ch. 152, § 1, 17 Stat. 91 (May 10, 1872), as amended, has served as the principal Federal law governing locatable hard rock minerals, including gold, and declares that all valuable mineral deposits in federal lands are free and open to exploration and development for all U.S. citizens. 30 U.S.C. § 22. The law continues to grant citizens the rights to prospect for, locate, explore, discover, and mine certain valuable mineral deposits on any Federal lands that have not been withdrawn from mineral entry. The rights federal mining law grants to prospect for and explore valuable mineral deposits necessarily precede and are not legally conditioned on discovery of valuable minerals in a properly located claim. *Union Oil Co. v. Smith*, 249 U.S. 337, 346 (1919).

The Ninth Circuit recently reaffirmed the well-established property rights that inhere in mining claims on public lands, iterating that the general mining laws of the United States establish that discovery of a mineral deposit, followed by the minimal procedures required to formally locate the deposit, gives an individual a property right to exclusive possession of the land for mining purposes and to all the minerals that may be extracted thereon. *Ariz. Mining Reform Coal. v. Forest Serv.*, 172 F.4th 641, 656 (9th Cir. 2026). Moreover, the court has definitively ruled in this same context that valid mining claims are "vested possessory rights which are recognized as interests in real property" and "not merely assertions of rights, as claims are in the more common sense of the word." *United States v. Shumway*, 199 F.3d 1093, 1095, 1099–1100 (9th Cir. 1999); *see also United States v. Locke*, 471 U.S. 84, 86 (1985) (unpatented mining claims represent fully recognized possessory interests). As the court clarified in applying these principles in *AMRC*, an unpatented mining claim gives the owner "the right to mine the minerals . . . and the minerals themselves" that exist in its claims. 172 F.4th at 657.

### B. Multiple Surface Use Act

In 1955, Congress enacted the Multiple Surface Use Act ("MSUA") to grant BLM limited authority to manage vegetative and other surface resources on unpatented mining claims. 30 U.S.C. § 612(b). Any such use of the surface of an unpatented mining claim is limited to only "so much of the surface thereof as may be necessary" for the non-mining surface use, and even then, any such use "shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." *Id.* The Act confirms the rights of mining claimants "to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land." *Id.* Legislative history makes clear Congress's intent that a mining claimant's rights still take precedence. As committee reports explain, "[t]his language, carefully developed, emphasizes the committee's insistence that this legislation not have the effect of modifying longstanding essential rights springing from location of a mining claim. Dominant and primary use of the locations hereafter made, as in the past, would be vested first in the locator." H.R. Rep. 84-730, at 10; S. Rep. 84-554 at 8-9.

The MSUA was therefore designed to allow for the limited use of other surface resources on unpatented mining claims such as timber or forage insofar as may be necessary for such uses, and only insofar as any such uses do not materially interfere with or injure the ability of a mining claimant to prospect for, explore, develop, or carry out any and all other related reasonable activities associated with the exercise of the possessory property rights its claim confers on it.

The Ninth Circuit prescribes "at least two remedies" in the event an alternate surface resource use interferes with prospecting or mining activities: "The mining claimant can protest to the managing federal agency about public use which results in material interference and, if unsatisfied, can bring suit to enjoin the activity." *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1286 (9th Cir. 1980).

### C. Federal Land Policy and Management Act

In enacting the Federal Land Policy and Management Act ("FLPMA") nearly two decades later, the Congress specifically prescribed that, with several narrow exceptions irrelevant to the present action, no provision in the Act "shall in any way amend the Mining Law of 1872 or impair the rights of any locators of claims under that Act." 43 U.S.C. § 1732(b). FLPMA further provides that BLM "shall . . . regulate, through easements, permits, leases, licenses, published rules, or other instruments" all developmental uses on public lands, but again, must do so fully in accord with the Mining Law of 1872 and in a manner that does not impair the rights of any locators or claims under that law. 43 U.S.C. § 1714. One such instrument by which BLM regulates such uses, including electricity transmission systems, is a ROW issued pursuant to 43 U.S.C. § 1761(a)(4). In its FLPMA implementing regulations, addressing issuance of ROW grants on public lands at 43 C.F.R. Part 2800, BLM confirms that a user of public lands "must have a grant" if it plans to use public lands for systems or facilities over, under, on, or through public lands "for generating, transmitting, and distributing electricity." 43 C.F.R. § 2801.9(a)(4).

### D. BLM's Implementing Regulations

BLM has also promulgated a series of regulations authorizing and governing surface management of mining claims. 43 C.F.R. Part 3710; 43 CFR Subpart 3809. Consistent with the Mining Law of 1872 and MSUA, these regulations authorize locators of unpatented claims to engage in pre-discovery prospecting and exploration activities on such claims and also prescribe requirements locators must follow in conducting such activities. See 43 C.F.R. § 3712.1(b); 43 C.F.R. § 3809.1. BLM defines the requirements for locating a claim in 43 C.F.R. § 3832.1(a).

### E. National Environmental Policy Act

NEPA directs that, to the fullest extent possible, federal agencies shall, before undertaking or authorizing a major proposed action, prepare a detailed statement addressing the

proposed action's reasonably foreseeable effects on the human environment and a reasonable range of alternatives to the proposed action, and also study, develop, and describe appropriate alternatives to recommended courses of action for any proposed action involving unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(C) & (H).

The Department of the Interior's recently promulgated NEPA Implementation Handbook defines "effects" or "impacts" broadly to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, local custom and culture or health effects." Sec. 6.1(k)(1), U.S. Dept. of the Interior NEPA Implementing Procedures, 516 DM 1 (Feb. 2026) ("DOI NEPA Handbook")(Ex. 12). The Handbook likewise defines "human environment" broadly to mean "comprehensively the natural and physical environment and the relationship of Americans with that environment." *Id*. at Sec. 6.1(m).

Moreover, even after an agency completes an EIS and makes a decision to approve a federal action on that basis, if "major Federal action" remains to occur and new information arises showing that whatever action yet to be completed will "affec[t] the quality of the human environment" to a significant extent not previously considered, NEPA requires the agency to prepare a supplemental EIS. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1980).

## IV. STANDARD OF REVIEW

To secure a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Pacito v. Trump*, 169 F.4th 895, 919 (9th Cir. 2026) (citing *Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008)). A movant for a preliminary injunction need not prove its case with absolute certainty. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180,

1192 (9th Cir. 2024). The Ninth Circuit relies on a "sliding scale approach under which a stronger showing of one element may offset a weaker showing of another." *Pacito*, 169 F.4th at 919 (citation modified). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). At the same time, "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). But under the sliding scale approach, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Cottrell*, 632 F.3d at 1135).

## V. ARGUMENT

### A. MMC Is Likely to Succeed on the Merits of One or More of Its Claims Against Defendants.

#### 1. MMC Is Likely to Prevail on Its State Law Claims Premised on IPCo's Ongoing and Increasingly Injurious Violations of and Material Interference with Its Mining Claims.

The property, possessory, occupancy, and usufructuary rights that MMC holds and that IPCo's activities are encroaching on and materially interfering with stem principally and most directly from the Mining Law of 1872, MSUA, and BLM's surface-use regulations.

First, MMC holds possessory property rights deriving from longstanding federal mining law in at least seven mining claims within the "Immediate Interference Zone" of the B2H Line as IPCo is presently constructing it that are and have long been supported by valid discoveries of highly valuable gold ore deposits. Glowacki Decl. ¶18. Such discoveries render all such mining claims property rights in the fullest sense of that term and give MMC the exclusive right to

possess the land for purposes of developing the minerals it has discovered, free from any injury or material interference. *See Locke*, 471 U.S. at 86. To support his finding that valid discoveries have been made and continue to exist in these seven mining claims with which IPCo's ongoing construction activities are materially interfering, Mr. Glowacki engaged in a systematic analysis of MMC's extensive drill hole data base applicable to each claim in the context of other relevant variables such as an appropriate cut-off grade that projects the concentration of ore below which processing of a mineral would likely not be profitable. Glowacki Decl. ¶¶16-25. In so doing, he utilized a "prudent person" standard that appropriately factored in consideration of complementary marketability test factors such as projected costs and profits consonant with the Ninth Circuit's articulation, particularly for precious metals such as gold. *Lara v. Sec'y of the Interior*, 820 F.2d 1535, 1541 (9th Cir. 1987); *Converse v. Udall*, 399 F.2d 616, 619-21 (9th Cir. 1968), *cert. denied*, 393 U.S. 1025 (1969).

Second, even as to the 14 claims with which IPCo's activities are materially interfering that do not yet have evidence of a valid discovery, MMC has exploratory rights that also derive from federal mining laws. 30 U.S.C. § 22 (public lands, without restriction, are free and open to "exploration and purchase" of "valuable mineral deposits"); *Union Oil Co.*, 249 U.S. at 346 ("[A]s a practical matter, exploration must precede the discovery of minerals, and some occupation of the land ordinarily is necessary for adequate and systematic exploration"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1218-20 (9th Cir. 2022)(Sec. 22 of the Mining Law of 1872 affords exploration rights to mining claimants prior to discovery). The subsurface installation of footings, stanchions, and towers on MMC's mining claims in the ROW Corridor in which IPCO is constructing the B2H Line is materially interfering with MMC's statutorily derived exploratory rights. Glowacki Decl. ¶49; Anderson Decl. ¶35.

Third, the B2H ROW does not and cannot supersede MMC's mining claims and attendant rights inherent in them as explained above for three primary reasons. As an initial matter and most straightforwardly, IPCo's ROW is expressly subject to terms and conditions, including most relevant here compliance with federal law, including the mining laws and implementing regulations from which MMC's rights derive. Thus, on its face, the ROW cannot be read in contravention of MMC's rights deriving from federal law. In a similar vein, the B2H ROW is also subject to all Valid Existing Rights and compliance with the Mitigation Measures BLM imposed in issuing the grant, including Measure 8 that requires avoidance of more than negligible impacts on active mining claims or mineral resource development.

Nor can Defendants rely on the MSUA as authority for overcoming MMC's well-established rights flowing from the mining claims that are being violated by IPCo's current construction activities. For one thing, as explained above, Glowacki Decl. ¶¶35, 48, such activities are not limited to surface use of MMC's mining claims, but are intruding into and disturbing MMC's subsurface mineral estate that MMC holds under its valid mining claims. By its very terms, the MSUA only grants the U.S. the authority to permit other uses on "the surface of" mining claims. 30 U.S.C. § 612(b). By engaging in activities that have undeniably penetrated below the Earth's surface and interfered or disturbed MMC's minerals, IPCo is well outside the bounds of what BLM could have even purported to authorize in the B2H ROW (the terms of which do not permit any subsurface use in any event). In addition, the right of the U.S. to authorize alternate uses on the surface of mining claims is further expressly limited by the terms of the statute to "so much of the surface thereof as may be necessary for such purposes." *Id.* Here, as IPCo has categorically revealed by seeking and obtaining multiple amendments to the B2H Line route, not only has there been no showing that IPCo's use of the surface of MMC's

mining claims is necessary, no such showing is even feasible. As Mr. Anderson explains in his declaration, perhaps the most foundational differences between these competing uses is that the ore deposits MMC owns under its mining claims cannot be moved, whereas IPCo can move the B2H Line route (and, indeed, has already repeatedly done so). Anderson Decl. ¶¶3c, 38.

Finally, of course, BLM's authority under MSUA to allow any additional surface uses on a located mining claim explicitly may not "endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." 30 U.S.C. § 612(B). After multiple site visits, Mr. Glowacki explains the many ways in which IPCo's construction activities within the current ROW Corridor as IPCo is construing and implementing are causing just these proscribed interferences, both now and in the future. Glowacki Decl. ¶¶48-52.

In *Curtis-Nevada*, the Ninth Circuit reaffirmed that the Congress did not intend to change the basic principles of the mining laws in enacting the MSUA. 611 F.2d at 1280. This is consonant with the unmistakable thrust of the Act's legislative history described above, which reinforces the ongoing primacy of a mining claimant's rights. The Senate Committee on Interior and Insular Affairs declared in this vein that "the measure faithfully safeguards all of the rights and interests of bona fide prospectors and mine operators. In no way would it deprive them of rights and means for development of the mineral resources of the public lands of the United States. . . . it is the intent of the proposed legislation that mineral resource development shall remain the dominant use of lands under [a] mining claim." S. Rpt. 84-554 at 2.

Both the text of the statute and this legislative history categorically establish that the scope of supplemental surface uses on a mining claim that BLM is proscribed from authorizing under Sec. 612(b) is not limited to just those which impede active mining operations. Regarding the statutory text, it expressly includes "prospecting" as well as the catch-all references to other

reasonably incidental uses. 30 U.S.C. § 612(b). Largely on the basis of this understanding of congressional intent, the Interior Board of Land Appeals ("IBLA") ruled that BLM's installation of fish weirs and placement of gravel to enhance fish habitat in a streambed constituted material interference with a claimant's placer mining operations.[1] *Robert E. Shoemaker*, 110 Interior Dec. 39, 55–56 (IBLA 1989). In making this finding, the IBLA relied on its findings that the weirs would preclude the claimant from being able to mine 20 percent of the streambed and the gravel would increase its difficulty of carrying out future mining operations. *Id.*

IPCo's construction of footings, stanchions, and tower segments directly on top of and even extending into MMC's identified ore body renders drilling, excavation, equipment staging, and safe personnel access physically impossible or prohibitively dangerous within the ROW Corridor. Glowacki Decl. ¶¶48-52. Importantly, Mr. Glowacki explains in this context that IPCo's material interference is so centrally located over MMC's Central Ore Deposit that the B2H Line cannot be completed within the IPCo Active Construction ROW Corridor even accounting for potential micro-adjustments within the buffers of the ROW, rendering formal amendment of the ROW necessary to avoid violating its terms. *Id.* ¶ 77. IPCo's ongoing actions do not just render MMC's prospecting and mining and other reasonably incidental uses of its mining claims more difficult; they threaten to preclude the Kerby Project entirely.

The foregoing fundamental points form the foundations for its state law property-based claims: trespass, quiet title, and ejectment, as discussed more specifically, below.

---

[1] In referencing this IBLA decision, MMC does so in full recognition that, although agency interpretations of ambiguous statutory text may be persuasive, they are no longer entitled to deference from federal courts in their exercise of judicial review, but rather that such questions are squarely within the remit of the judiciary. *Loper-Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2257-60 (2024). In carrying out that duty, if a term is undefined by the statute, courts are to "ask what that term's 'ordinary, contemporary, common meaning' was when Congress enacted" the Act. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-34 (2019).

**a. IPCo Has Trespassed on MMC's Claims.**

To prevail on a claim for trespass in Oregon, "a plaintiff must establish an intentional, physical intrusion by the defendant on the plaintiff's property, which plaintiff did not authorize or consent to and which caused plaintiff damage." *Eagle Star Rock Prods., LLC v. PCC Structurals, Inc.*, 756 F. Supp. 3d 1062, 1096 (D. Or. 2024). Trespass broadly encompasses "any intrusion which invades the possessor's protected interest in exclusive possession, whether that intrusion is by visible or invisible pieces of matter or by energy which can be measured only by the mathematical language of the physicist." *Martin v. Reynolds Metals Co.,* 342 P.2d 790, 794 (Or. 1959). MMC's mining claims constitute a protectible interest under Oregon law, and the ones in which MMC has made a valid discovery in particular are quintessentially the type for which a claimant exclusive possessory rights in both the surface land and underlying mineral deposits. Oregon law treats mining claims as real estate, granting the claim holder a legal estate that includes the rights to possess, access, extract minerals, and exclude others from the claim. ORS § 517.080. BLM's regulations further define trespass as using, occupying, or developing the public lands or their resources inconsistent with the terms and conditions of any required authorization such as a ROW and is considered a prohibited act. 43 C.F.R. § 2808.10(a).

**(1) IPCo Has Physically and Intentionally Intruded on MMC's Property Interests.**

IPCo's ongoing construction activities constitute a direct and intentional physical intrusion into MMC's property rights. IPCo's tower footing installation has required digging into the subsurface, with at least some footings extending into and disturbing MMC's subsurface mineral estate. Glowacki Decl. ¶¶35, 48. IPCo has erected tower segments on 15 of MMC's mining claims. *Id.* ¶13. Several of these towers and pads lie directly over MMC's Central Ore Deposit. Any and certainly all of these constitute intrusion of the highest order.

**(2) MMC Has Not Authorized or Consented to IPCo's Intrusions.**

MMC has not authorized any intrusion onto its mining claims, either explicitly or implicitly. And though BLM issued IPCo the B2H ROW, its authorization is explicitly conditioned on recognizing and protecting valid existing rights, including MMC's Kerby Claims that predate the ROW by decades, compliance with all federal law and regulations, including the Mining Law of 1872 and MSUA that prohibits surface uses that "materially interfere with prospecting, mining or processing operations," and mitigation measures that require IPCo to avoid or minimize to a negligible level any impacts of the line on active mining claims and mineral resource development. IPCo is in violation of all of these terms and conditions, thereby effectively invalidating the authority granted by the ROW.

**(3) IPCo's Ongoing and Escalating Intrusions Are Injuring MMC.**

*First*, IPCo's physical occupation of MMC's claims renders it physically impossible for MMC to conduct certain approved mineral exploration and development activities, depriving it of the use and enjoyment of its subsurface mineral estate and the surface it is entitled to occupy and use under federal law. Exploration is the essential prerequisite to mineral development. Anderson Decl. ¶¶13-14. Without the ability to explore, a claimant cannot discover new or fully delineate the extent of known ore bodies, continue to assess the economic viability of its deposits, or satisfy the statutory requirements for maintaining and perfecting its surface possessory interests. The intrusions in the IPCo Active Construction ROW Corridor are intruding on MMC's prospecting and exploration rights protected by statute.

*Second*, IPCo's construction of a high-voltage transmission line directly over the principal ore body currently known to exist within the Kerby Project Area will effectively "sterilize" the Central Ore Deposit and render it more difficult for MMC to secure financing or

additional investors to enable the Project's full development. Anderson Decl. ¶¶34-35. As Mr. Anderson explains, "[o]nly relief preserving the status quo can suffice to protect the resource itself that MMC legally possesses and has a right to mine under federal law. *Id.* ¶36.

**b. MMC Is Likely to Prevail on Its Quiet Title Claim.**

A quiet title claim is an equitable action to determine conflicting adverse claims, interests, or estates in real property governed by ORS 105.605, which provides:

> Any person claiming an interest or estate in real property not in the actual possession of another may maintain a suit in equity against another who claims an adverse interest or estate therein for the purpose of determining such conflicting or adverse claims, interests or estates.

*Collier v. Wilmington Sav. Fund Soc'y*, 2022 U.S. Dist. LEXIS 75587, at *2-3 (D. Or. Apr. 26, 2022) (citing ORS 105.605). To secure a judgment quieting title, a plaintiff must prove that it has a substantial interest in, or claim to, the disputed property and that its title is superior to that of defendant. *Id*. at *3 (citing *Coussens v. Stevens*, 200 Or. App. 165, 171 (2005)). A license to access, use, and occupy a natural resource constitutes a property right that is the proper subject of a quiet title action. *Sacramento Grazing Assn. v. U.S.*, 176 Fed. Cl. 204, 205-06 (2025).

As discussed above, holders of valid mining claims on the public domain hold possessory title and "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations," as well as all veins, lodes, and ledges throughout their entire depth, provided they comply with federal laws and non-conflicting state, territorial, and local regulations. Because an unpatented mining claim grants the locator a recognized possessory interest subject only to the paramount title of the United States, courts have exercised equitable jurisdiction to quiet title to such claims.

MMC holds well-established and longstanding possessory and other forms of property rights under federal mining statutes, while IPCo asserts a right to occupy and use MMC's mining

claims under the B2H ROW. MMC's interest is superior because the ROW is subject to valid existing rights, must comply with the mining laws and MSUA, and is conditioned on Mitigation Measures requiring avoidance of active mining claims and mineral resource impacts. Ex. 9. MMC is therefore likely to prevail on its legal claim quieting title to its mining-claim rights as superior to whatever conditional surface rights IPCo obtained pursuant to the B2H ROW.

**c. MMC Is Likely to Prevail on Its Ejectment Claim.**

An ejectment action requires a showing that the plaintiff has a legal right to possession and that the defendant is wrongfully withholding or occupying that possession. A possessory mining claim interest supports an ejectment action. *Inman v. Ollson*, 213 Or. 56, 66, 321 P.2d 1043, 1048 (1958) ("Possession, at all times, without regard to record, location or even the fee simple, [] still gives a certain title as against a mere trespasser, upon which ejectment and other actions may be maintained.") (internal citations omitted).

MMC established above its present, exclusive right to possess the surface for mineral exploration and operations and develop the subsurface mineral estate for those claims in which it has made a valid discovery. It has statutory exploratory rights with respect to its remaining claims. IPCo is in wrongful possession by virtue of its improper pads, footings, and partially-erected towers. Glowacki Decl. ¶¶13, 26-47. MMC is likely to succeed on its ejectment claim.

**2. MMC Is Likely to Prevail on Its Claims Against BLM.**

The Administrative Procedure Act ("APA") authorizes federal courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). To obtain relief under § 706(1), MMC must show that BLM failed to take "a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The Ninth Circuit has expressly directed mining claimants who notify BLM that other surface uses are materially interfering with the statutory rights they possess under their claims and do not obtain satisfactory

recourse from the agency to "bring suit to enjoin the activity." *Curtis-Nevada*, 611 F.2d at 1286.

#### a. BLM Has Failed to Act to Enforce Terms and Conditions It Expressly Imposed on IPCo in Granting It the B2H ROW.

In granting a ROW for the use of public lands under FLPMA, BLM must include such terms and conditions that, among other things, protect the other lawful users of such lands traversed by the ROW. 43 U.S.C. § 1765(b). Similarly, BLM's own regulations, 43 C.F.R. § 2805.14(a), provide that a ROW grant is "subject to valid existing rights of others," and the B2H ROW contains that express stipulation. Ex. 9 at 24.

When an agency adopts mitigation measures on which it expressly relies in its NEPA analysis, it possesses full authority to impose and enforce those measures as binding conditions of the approved action. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1122 (D. Mont. 2016) (holding that commitments made in a NEPA record of decision are binding); *see Tyler v. Cisneros*, 136 F.3d 603, 608 (9th Cir. 1998) (an agency must comply with mitigation measures it agrees to engage in during the NEPA review process).

Implementing these commitments is non-discretionary. *Alliance for the Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1036-38 (D. Mont. 2023). In *Cooley*, the court determined that "an agency is bound to commitments it makes in the ROD." *Id.* at 1037. The court found that where a ROD outlines "non-discretionary activity the [agency] must take, the [agency] has a statutory duty to act." *Id.* at 1036. On that basis, the court held the non-discretionary commitments the agency expressly laid out in its Record of Decision were binding and established a duty to act that it could compel be taken under § 706(1) of the APA. *Id.* at 1038.

Here, BLM committed to protecting valid existing rights through mitigation measures and terms and conditions of the ROW grant. BLM has been notified of the existing and escalating encroachments on MMC's rights but it has not acted. Ex. 10. BLM's role in ensuring

compliance with those terms is not an exercise of broad policy judgment or resource-allocation discretion. Rather, BLM's actions are the enforcement of specific, already-determined conditions. This is analogous to a ministerial duty, where the agency's obligation is defined by the instrument itself and the governing regulations, leaving little room for the exercise of independent judgment. Characterizing such enforcement as discretionary would effectively render ROW conditions unenforceable suggestions rather than binding requirements, a result plainly inconsistent with FLPMA's framework for managing public lands.

**b. BLM Must Prepare Supplemental NEPA Analysis Given the Significant Impacts to the Mineral Resources that the Agency Failed to Address and Even Assured Would Not Be Allowed to Occur in the B2H FEIS.**

A more quintessential scenario compelling NEPA supplementation would be difficult to fathom. Here, BLM made an explicit finding that the B2H Project would have negligible effects on active mining claims and development of mineral resources, in large measure predicated on its imposition of Mitigation Measure 8 as a condition to granting IPCo the B2H ROW. Ex. 5 at 3-24. Indeed, without ever been provided the Final POD, the stage of implementation where IPCo was required to show compliance with the prescribed mitigation measures, it is impossible for MMC to even know how and even if IPCo purported to comply with this mitigation measure. Under such circumstances, MMC is likely to prevail on its NEPA supplementation claim against BLM and the court should enjoin further construction of the segment of the B2H line on MMC's mining claims until such time as the agency does so. *See Marsh*, 490 U.S.C. at 372 & n.15.

**B. MMC Will Continue to Suffer Irreparable Injury in the Absence of Preliminary Injunctive Relief.**

Mr. Anderson provides a systematic accounting of the myriad irreparable injuries MMC will likely suffer in the absence of a preliminary injunction against further construction and completion of the B2H Line across its mining claims, in particular those overlying its Central

Ore Deposit. Anderson Decl. ¶¶ 29-39; *see also* Glowacki Decl. ¶¶ 77-81. MMC will now offer a summary of the principal injuries in this context, but would refer the Court to its supporting declarations in this regard for further important detail and explanation.

**1. MMC's Irreparable Injury Is Not Just Likely to Occur—It Has Already Started.**

Serious harm from IPCo's activities is already occurring. IPCo is currently constructing towers on top of MMC's Kerby claims, making the surface of these claims less accessible and usable for exploration purposes. See photos accompanying ¶¶ 30-45 of Glowacki Decl.

Mineral exploration and transmission towers are incompatible within the same ore body footprint. Anderson Decl. ¶35. Exploration activities, particularly drilling, blasting, and excavation, pose risks to transmission tower foundations. Bore holes, trenches, and vibrations from blasting can compromise the structural integrity of tower footings. Glowacki Decl. ¶80. Further, Oregon law prohibits dangerous activities from taking place near transmission lines for public safety purposes. Oregon mining regulations also require minimum clearances between mining equipment and activities and high-voltage power lines. OAR 632-030-0025.

**2. Continuous Encroachment on Property Rights Calls for Preliminary Injunctive Relief.**

Compensatory damages are generally inadequate to fully remedy a continuous or recurring encroachment on real property. *United States v. W. Radio Svcs. Co.*, 2013 U.S. Dist. LEXIS 64636, at *3-4 (D. Or. May 3, 2013); *see Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("It is well-established that the loss of an interest in real property constitutes an irreparable injury.").

The presence of permanent towers, wires, and energized conductors across the claims diminishes the value of that possessory interest and renders the exercise of core mining rights—drilling, excavation, equipment staging, and safe personnel access—physically impossible or

prohibitively dangerous. As in *Western Radio*, the continuing physical presence of structures on the surface is an injury that recurs with each passing day and cannot be reduced to a fixed monetary equivalent. Accordingly, injunctive relief—requiring removal of the encroaching facilities—is the appropriate remedy to protect MMC's possessory rights.

#### 3. Quantifying the Ultimate Mineral Resources that Exist Within MMC's Claims Will Likely Become Infeasible.

In part because they depend on further exploration and resources that can only be projected until actually developed, MMC's monetary damages cannot be calculated with any reasonable degree of final accuracy, and IPCo's continued actions further frustrate potential measurement and quantification of the damages. Anderson Decl. ¶36. When calculating damages requires a highly speculative and protracted inquiry, the underlying economic injury is deemed irreparable. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023); *Minto v. Salem Water, Light & Power Co.*, 120 Or. 202, 220 (1926).

What MMC does have is a concrete understanding that there has been a discovery of substantial amounts of gold and mercury-bearing rock in the Kerby Project Area. *See Concerned Citizens for Responsible Mining*, 124 Interior Dec. 191, 194 n.3 (IBLA 1992). MMC and its predecessors have implemented substantial exploration plans and conducted substantial drilling activities providing it with an ample database. These activities have only served to confirm that at least seven of MMC's mining claims are supported by valid discoveries of valuable gold deposits. Glowacki Decl. ¶¶ 17-26. Thus, while it may be difficult to define with precision the damages MMC will continue to experience from IPCo's actions, or the full extent of injuries from allowing the transmission line to be completed and operated right on top of MMC's mining claims, there can be no doubt that the damages are prodigious and subject to further increase.

### 4. Continued Construction of the B2H Line Within the Active Construction ROW Corridor Will Effectively Sterilize MMC's Central Ore Deposit from Extraction.

Based on the modeling and analysis he has performed and his own empirical observations during a site visit to the Kerby Project Area, Mr. Anderson projects that completion of the B2H line within the existing ROW Corridor in which IPCo is presently constructing it would likely permanently "sterilize" a substantial portion of MMC's known Central Ore Deposit from ever being able to be extracted. Anderson Decl. ¶29. More specifically, he projects that this could impact more than 30 percent of the presently marketable gold ore in that deposit. *Id.* Moreover, because this sterilization strikes at the heart of MMC's Central Ore Deposit, such an encumbrance "gives rise to a meaningful risk that MMC will not be able to develop the Kerby Project at all." *Id.* ¶34.

### 5. Monetary Damages Alone Cannot Constitute an Adequate Remedy.

Mr. Anderson explains why the injuries that MMC is suffering and will increasingly sustain in the absence of a preliminary injunction cannot be adequately remedied by monetary damages. Anderson Decl. ¶36. These reasons include: (1) the Central Ore Deposit that MMC has invested millions of dollars to discover and maintain for development is a unique resource and cannot be moved or replaced; (2) once access to the ore deposits known to exist under MMC's mining claims is lost, money cannot restore such access; (3) the value and extent of an economically viable ore deposit necessarily varies over time, and hence, any effort to value the ore to which MMC will lose access from the current ROW Corridor and the lost project opportunity it represents would be subject to multiple, episodic updates and refinements over time; and (4) the monetary damages to MMC are only likely to compound over time. *Id.* These points square with precedent holding that a remedy at law is inadequate where, absent an injunction, a plaintiff would likely need to engage in a multiplicity of suits to obtain complete

relief. *See Krein v. Szewc*, 287 Or. App. 481, 490, 403 P.3d 520, 526 (2017); *Actuant Corp. v. Huffman*, No. CV-04-998-HU, 2005 U.S. Dist. LEXIS 49629, at *57 (D. Or. Feb. 18, 2005).

**C. The Balance of Equities Tips Sharply in Favor of MMC.**

MMC's injuries are concrete, largely irreparable, and strike at the core of established property rights and a known and immovable valuable natural resource, while IPCo's hardship is self-imposed and can, unlike MMC's, readily be avoided. In fact, the means to adjust the B2H route are in place and have already been successfully utilized. The equities favor MMC.

**1. IPCo's Mostly Self-Inflicted Hardship and Assumed Risk Merit No Equitable Weight.**

When a defendant knowingly and intentionally embarks on a course of conduct despite being on notice of the potential legal consequences, any resulting hardship to the defendant from injunctive relief is entitled to little or no equitable weight. *Flip Flop Shops Franchise Co. v. Neb*, 2016 U.S. Dist. LEXIS 194406, at *26-27 (C.D. Cal. Dec. 5, 2016); *see also Opticians Ass'n of Am. V. Indep. Opticians of Am.*, 920 F.3d 187, 197 (3d Cir. 1990). As the Ninth Circuit has recognized, "self-inflicted wounds are not irreparable injury." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). The same reasoning applies with full force to the balance-of-equities analysis—a defendant who proceeds with full knowledge of the risks cannot later invoke those very consequences as a basis for denying the plaintiff relief.

In litigation over construction of the southern border wall, the Ninth Circuit found that the government's financial obligations—contractor penalties of "hundreds of thousands of dollars" per day—were a direct result of the government's own decisions to proceed with construction despite knowing the risks that such activity might be ruled illegal. The court held that "[p]lacing significant weight on financial obligations that Defendants knowingly undertook would, in effect, reward them for self-inflicted wounds." *Sierra Club v. Trump*, 929 F.3d 670,

706 (9th Cir. 2019). The court refused to allow what it determined to be largely self-created harms the risks of which the government had assumed to tip the equitable balance in its favor.

IPCo openly acknowledged that building the B2H Line within the IPCo Active Construction ROW Corridor would directly impact five of MMC's mining claims that were located decades before it acquired the ROW. Ex. L to Williams Decl. But knowledge of MMC's claims was readily and publicly available well before that. BLM, grantor of the ROW, actively worked on and helped to defend activities on MMC's claims. The agency maintains public records of mining claims, most recently in its Mineral & Land Records System. When proposing projects on federal land, landmen and project proponents routinely reference these online databases to identify existing surface and subsurface land-use conflicts. *Id.* In addition to BLM's records, mining claims are also recorded in the local county recording office. 43 C.F.R. § 3833.11. All of these sources were available to IPCo before it committed to line design.

IPCo advanced with its current construction knowing of the property rights conflicts and legal liability it could face. It also did so in contravention of the terms and conditions imposed in the B2H ROW. It did all those things knowingly, deliberately, and at its own risk with an understanding that it is responsible for rectifying any harm to third parties.

**2. IPCo Can Avail Itself of Other Options It Has Already Utilized.**

IPCo retains the ability to pursue alternative routes during the pendency of this litigation. Indeed, BLM's decision approving the ROW explicitly anticipated and provided means for modifying the route, and in that light IPCo has already adjusted the B2H route numerous times.

By contrast, the harm to MMC is much more significant. *First*, IPCo's actions threaten fundamental property rights. Permitting a non-mineral use to override or physically encumber those possessory rights without MMC's consent would subvert the very statutory scheme that vests those rights in the first place. The equities thus favor preservation of MMC's longstanding,

legally protected interest over newcomer IPCo's desire to impose an incompatible surface use.

*Second*, the physical harm to MMC's mineral estate is permanent and irreversible. Transmission line construction will effectively sterilize or render inaccessible much of the known ore deposits underlying MMC's claims. Anderson Decl. ¶29. A sterilized ore body cannot be restored or moved; gold does not "replenish" in the Earth. This asymmetry in irreversibility weighs heavily in MMC's favor.

**D. A Preliminary Injunction Is in the Public Interest.**

This case involves competing public interests—interests in protecting property rights and facilitating domestic mineral production and an interest in safe, reliable electricity transmission. But "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022). Moreover, domestic mining continues to be recognized as a vitally important use on public lands. 43 U.S.C. § 1701(a)(12). BLM declares that "[m]ineral development is an important land use within the BLM's multiple-use mandate. In communities across the country, mining provides jobs, economic activity and important commodities that are essential to maintain a high quality of life." BLM, Mining and Minerals, https://www.blm.gov/programs/energy-and-minerals/mining-and-minerals.

**1. The Public Interest Will Not Be Served in Allowing IPCo to Violate Its ROW in Its Desire, However Well-Intentioned, to Enhance the Electricity Grid.**

IPCo's interest in delivering power cannot override its duty to adhere to federal law. As detailed above, the ROW grant BLM issued to IPCo requires that the grant be exercised subject to valid existing rights. 43 C.F.R. § 2805.14. Whatever economic utility the company provides to its ratepayers, that interest does not override the public's fundamental interest in the rule of law. Courts routinely reject arguments that business convenience or economic productivity justify ongoing violations of environmental or public-lands statutes. *See, e.g., ALCOA v. Adm'r,*

*Bonneville Power Admin.,* 175 F.3d 1156, 1162-63 (9th Cir. 1999) ("[P]roviding economical power, however, does not supplant the. . . obligation to comply with environmental mandates.").

### 2. The Public Interest Would Be Seriously Undermined if BLM Were Allowed to Abdicate Its Regulatory Duties to Uphold MMC's Federal Statutory Property Rights.

Similarly, the public interest equally disfavors permitting BLM to shirk its statutory obligations. Congress enacted FLPMA and related authorities to ensure that federal public lands are managed in the public interest, subject to regulatory oversight and accountability. When BLM fails to discharge those duties, the public ultimately bears that harm. The public interest is served by compelling agency compliance with mandatory statutory duties. *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1192–93 (10th Cir. 1999) (the public interest is served by requiring agencies to comply with their obligations); *W. Watersheds Project v. Foss*, 2006 U.S. Dist. LEXIS 73577, at *11 (D. Idaho Oct. 4, 2006). BLM's failure to act is an ongoing injury to the public, which is entitled to the protection that Congress mandated the agency provide. *High Sierra Hikers Ass'n v. Blackwell*, 381 F.3d 886, 896-97 (9th Cir. 2004).

## VI. CONCLUSION

For the foregoing reasons, the Court should grant MMC's motion for temporary restraining order and/or preliminary injunction, and enjoin or restrain IPCo or those acting at its direction from carrying out or completing construction activities on MMC's active mining claims or within the existing right-of-way corridor in which such activities are occurring insofar as it encompasses any such claims until the Court fully resolves the merits of MMC's legal claims.

Respectfully submitted this 1st day of September 2026.

*s/ Stephen J. Odell*
Stephen J. Odell
MARTEN LAW, LLP

Attorney for Plaintiff Malheur Mining Co., Ltd.