**STEPHEN J. ODELL, OSB #903530**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
E-mail: sodell@martenlaw.com

*Attorney for Plaintiff Malheur Mining Co., Ltd*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PENDLETON DIVISION**

**MALHEUR MINING CO., LTD.**, an Oregon Corporation,

Plaintiff,

v.

**IDAHO POWER CO.**, an Idaho Corporation; and **BUREAU OF LAND MANAGEMENT**, an agency and instrumentality of the U.S. Government,

Defendants.

**Case No. 2:26-cv-01451-HL**

**DECLARATION OF EDWARD GLOWACKI III IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

I, EDWARD GLOWACKI III, hereby declare as follows:

1. My name is Edward Glowacki III. I work as a consulting geologist for Malheur Mining Company ("MMC") in support of its ongoing efforts to further explore and eventually develop the mining claims it holds in Malheur County on public lands in eastern Oregon ("Kerby Project"). I make this declaration based upon my personal knowledge and professional

experience working as a geologist on various mining projects. If called as a witness, I could and would testify competently to the statements averred to in this declaration.

2. After graduating from Michigan Technological University with a Bachelor of Science in Geological Engineering and a minor in mining, I worked on numerous exploration projects on the greenfield side of the mining industry. From 2017-18, these included Highland Copper's UPX Minerals' initiative to explore for Archean orogenic gold and Paleoproterozoic magmatic Cu-Ni-PGE deposits in Michigan. Following that, I worked on a drilling program at AngloGold Ashanti's epithermal Silicon Gold project in Nevada from 2018-19, and from 2020-22 on an orogenic gold exploration project in Minnesota for Vermillion Gold. Additionally, I been working with Keweenaw Land Association from 2020 to the present on its target generation and drilling programs covering gold, Cu-Ni-PGE, and sediment hosted copper prospects in Michigan. From 2024 until the present, I have also served as a consultant for MMC. Collectively, these projects have involved me in work across a full panoply of mining industry practices, including field mapping, soil sampling, historical data compilations, working with historic drill core, sonic basil till drilling, RC drilling, and diamond drilling. A more comprehensive and detailed summary of my experience is provided in my resume that is attached as Exhibit 1.

3. I have worked as a consulting geologist for MMC on the Kerby Project that is the subject of the Complaint in this case since 2024. During that time, I have made multiple visits to the Claims Site, which currently comprises 122 active mining claims, some of which date back to 1986. These were primarily to familiarize myself with the property's geology, verify the validity of the locations of drill holes from the historic data, and to monitor Idaho Power Company's ("IPCo's") activity on the claims. During my site visits to the project area, as well as on the basis of my review of satellite imagery and aerial drone footage taken of the Site, I have

become familiar with the ground- and subsurface-disturbing work that IPCo has been carrying out on multiple mining claims that MMC holds, including directly over the central ore deposit within the Claims Area. I provide below a more detailed description and a series of photos documenting my observations of that work and how it has, and is continuing to, materially interfere with many of MMC's active mining claims. In broad terms, those claims date back to ones that were located in the 1980s and 1990s and that have been maintained since that time, denominated as Kerby Claims 11, 13-15, 22-24, 25A, 26, 36-38, 66, 76-77, and 301, and those located in late 2025 and recorded in January 2026, denominated as Malheur Claims 1-106.

**A Historical Summary of the Extensive Prospecting and Exploration on MMC's Claims**

4. Exploration of the subsurface is a fundamental and necessary element in the multi-step process of developing a mining project. The results of exploratory drilling to ascertain and discover the presence, quality, magnitude, and types of mineral-bearing ore within a claim provide much of the primary data on which a mining claimant determines whether the expenditure and investment of further time and money toward the ultimate development of mineral resources present in its claim(s) are justified and would likely be profitable.

5. Exploratory drilling activities have occurred in MMC's Kerby-Malheur Claims Area since at least 1987, with MMC's having commenced its extensive exploratory drilling activities in 1988 pursuant to a Notice of Intent filed with the Bureau of Land Management ("BLM") that it amended multiple times to enable it to continue with further exploratory drilling through 1990. Metallurgical tests performed on the ore samples obtained from these early exploratory drilling indicated that the gold recovery was well within accepted economic standards even as of that time. The results of these activities further revealed the presence of two primary ore bodies containing ore-grade mineralization of gold with upside potential laterally and at depth within

MMC's Claims Area. These deposits were of sufficient scope and quality to warrant the preparation in 1990 by Mine Reserves Associates, Inc., of a geostatistical reserve estimate to characterize the ore bodies, one of which lies near the center of MMC's Claims Block ("Central Ore Deposit") and the other of which is on the eastern edge of MMC's Claims Block ("Eastern Ore Deposit"). This preliminary estimate reported a range of approximately 943,000 to slightly more than 1,000,000 tons of ore using cut-off grades based on the then-extant gold price, which at the time was right around $400/ounce. In general terms, a cutoff grade is the minimum grade required in order for a mineral or metal to be economically mined and processed, and is thus used as a key metric in determining the profitability and economic viability of a project. In 1990 N.S. Lynn & Associates Inc produced a Preliminary Feasibility Study ("1990 PFS") based on a $410/ounce gold price in conjunction with the 1990 Mine Reserve Associates modeling and estimates. Exhibit 2 at p. 5, Page 26. The 1990 PFS modeled the Central Ore Deposit (referred to in the document as the "Main Ore Body" or "Kerby Main Mine") as being able to economically support a mine with a resource of 12,000,000 tons at 0.039 troy ounces of gold per ton, for a total gold content of 46,800 troy ounces. *Id.* at p. 14. This resource valuation conducted that included a more refined preliminary delineation of the mining pits within the Kerby Project Area that yielded results showing that development of the project was economically viable and warranted, even at the much lower gold price then prevailing in the market, with an operational cost per ounce of $216.22. *Id.* at p. 15

6. On the strength of these initial discoveries of significant valuable ore bodies present within its claims, MMC contracted with JMM Consulting Engineers for the preparation of a full-scale draft Mine Plan of Operations in September 1990 laying out its proposal to develop an open-pit gold mine along with attendant processing and refining facilities in or adjacent to its

Kerby Project Claims Area. This draft Mine Plan of Operations projected the removal of approximately 1 million tons of waste material to recover approximately 2.2 million tons of gold ore for on-site processing. The Draft Plan provided a preliminary conceptual delineation of the mining pits that would be needed to access and extract the ore from the Central and Eastern Ore Deposits within the Kerby Project Area and further addressed all of the various activities that would be required or reasonably incidental to the eventual mining operations, including processing the recovered ore, stockpiling of the overburden and intra-pit waste, development of a heap leach system for beneficiation of the ore including pad and pond liner systems to protect against environmental contamination from leaching operations, and construction of a processing plant and project office, among other items. By comparison, the then-proposed beneficiation facilities along with the areas needed for waste handling and storage in the 1990 Draft Mine Plan encompass an overall operating area that is larger than the open pit mine footprint itself. The Draft Plan exemplifies the reality that, in order to develop a viable mining operation for deposits the size of those already known to exist within the Kerby Project, a significantly larger area than that covering just the subsurface ore bodies is needed.

7. MMC also followed up to continue to pursue more extensive and in-depth exploratory activities as a further step toward mineral development of the Claims Area by entering into a draft Memorandum of Understanding with BLM that prescribed the parties' respective roles and responsibilities in the preparation of an Environmental Assessment ("EA") under the National Environmental Policy Act to analyze the environmental effects of such activities. This more extensive exploratory drilling and related assessment activities necessitated the preparation of an Exploration Plan of Operations for such activities that MMC submitted to the agency in 1990. Following the preparation of an initial and revised EA, and BLM's approval of the Exploration

Plan of Operations, MMC carried out further exploratory drilling over the next several years, up through the early 2000s. All told, over 400 drill holes have been completed on the property to date by MMC or its partners, with the results from the vast majority of those (375) forming a primary database on which I have been able to rely as a source of sound and extensive data in support of my conclusions regarding the value, validity, and marketability of the gold ore already discovered and known to exist within MMC's claims.

8. This initial spate of significant activity to explore and develop MMC's claims within the Kerby Project Area that ran from the mid-1980s through the early 2000s thus produced and yielded not only the location of the valuable Central and Eastern Ore Deposits, but reflected the expenditure of millions of dollars on the part of MMC as well as a substantial investment of its time and resources, including development of an original Draft Mine Plan of Operations providing a solid basis for the economic viability of the Project. At the same time, it is not uncommon for mining claims to go undeveloped for a variety of reasons having nothing to do with their value, validity, or profitability, and Oregon's Department of Geology and Mineral Industries ("DOGAMI"), the regulatory body with authority over mining activities within the state, had not then approved a new gold mining project in many decades.

**Recent Actions to Stake & Locate Additional Claims and Engage in Further Exploration**

9. The State of Oregon's Technical Review Team issued a unanimous determination in October 2023 that Paramount Gold Nevada Corporation's application to mine gold at its Grassy Mountain Project Area in eastern Oregon was complete for purposes of the state's Chemical Process Mining program, the first time that had occurred since inception of the program in 1991. In addition, the price of gold had started a fairly steady ascent in the early 2000s, first hitting $1000/oz. in March 2008 and then exceeding $2000/oz. in August 2020. The last two years in

particular have seen a "hockey stick" increase, with gold hitting an all-time record high price of around $5600/oz. earlier this year.

10. In this context, in late July 2025, MMC's Manager Christopher Goelet and I visited the property with the objective of advancing the Kerby Project. This included a claim staking campaign revolving around the primary purpose of creating a contiguous claim block between the known ore bodies in the Central and Eastern Ore Deposits. The campaign was aimed at pursuing exploration upside in the immediate vicinity, utilizing the deep cache of data that MMC had accumulated over the years. Additionally, the campaign sought to prevent other parties from locating claims in the vicinity.

11. During our visit we discovered personnel and contractors from IPCo taking what appeared to be the initial steps for staking out pads within the Kerby Project Area over the Central Ore Deposit. MMC proceeded with its re-staking campaign in November 2025 and properly filed Notices of Location of its additional 106 Malheur claims with BLM in January 2026.

12. Shortly thereafter, MMC filed a Notice of Intent with BLM to reinitiate further exploration drilling on its claims. BLM notified MMC that its 2026 Exploratory Notice of Intent was deemed complete and that it had determined that it would not result in any undue or unnecessary degradation of public lands on July 20, 2026. I am now actively assisting MMC in seeking authorization from DOGAMI to carry out such further exploratory drilling in the Kerby-Malheur Claims Area through submission of an Exploration Permit Application.

**Overview of the Claim Area**

13. The following map of the Kerby Project Claims Area shows the positions of the pads and towers that Idaho Power has constructed on and/or that are in the immediate vicinity of and

are thereby directly impacting MMC's claims, superimposed over a satellite image from July 19, 2026. The conceptual mine pits from the company's 1990 resource valuation are outlined in the black hatched area. As described in subsequent sections, the map shows that Idaho Power through its contractors has undertaken substantial ground-disturbing activities on 15 of MMC's active mining claims in the Claims Area, primarily through the emplacement of pads and footings, and the construction of the lower segments of transmission towers for the B2H transmission line.



14. I also have prepared the following table identifying the 21 MMC mining claims directly within the B2H ROW Corridor within which IPCo is carrying out its work to construct the B2H line and/or materially impacted by such work to date in the Claims Area ("Immediate Interference Zone"):

| Claims Impacted by Idaho Power Co. B2H ROW | | | |
|---|---|---|---|
| **Area** | **Claim(s) Affected** | **UTMx** | **UTMy** |
| Pad 1 | **Malheur 4** | 483350.1 | 4901294.3 |
| Pad 2 | **Malheur 18** | 483396.0 | 4901035.8 |
| Pad 3 | **Malheur 21, Malheur 19** | 483470.4 | 4900618.0 |
| Pad 4 | **Malheur 21** | 483524.8 | 4900315.8 |
| Pad 5 | **Kerby 15** | 483560.5 | 4900107.6 |
| Pad 6 | **Kerby 26** | 483622.3 | 4899775.1 |
| Pad 7 | **Malheur 43, Kerby 26** | 483677.3 | 4899471.3 |
| Pad 8 | **Kerby 38** | 483711.9 | 4899259.7 |
| Pad 9 | **Malheur 72** | 483804.1 | 4898731.5 |
| Pad 10 | **Malheur 74, Malheur 73, Malheur 72** | 483841.5 | 4898520.3 |
| Pad 11 | **Malheur 75** | 483901.7 | 4898190.2 |
| Pad 12 | **Malheur 90** | 483950.9 | 4897906.2 |
| Pad 13 | **Malheur 90, Malheur 92** | 484005.8 | 4897605.6 |
| Pad 14 | **Malheur 93** | 484066.6 | 4897253.5 |
| Pad 15 | **Malheur 105** | 484115.2 | 4896983.2 |
| Crossed by Power Line ROW Area but not a tower. | **Malheur 3** | 483277.0 | 4901639.5 |
| | **Malheur 20** | 483463.8 | 4900728.9 |
| | **Malheur 91** | 484006.4 | 4897520.8 |
| | **Kerby 14** | 483495.9 | 4900276.6 |
| | **Kerby 37** | 483658.8 | 4899392.2 |

15. In 2002, after wildfires had burned in the area of MMC's claims, MMC contracted with an Oregon licensed surveyor to re-monument the claims. This surveyor generated a map that documented the position of the claims relative to the sections and included exact coordinates for the positions of the stakes making up the claim's positions on the Oregon South NAD83 grid, relative to where he located the section corner. Exhibit 3. When these are plotted in GIS the claims are shifted slightly west relative to the available BLM government section and quarter section shapefiles IPCo has used to map MMC's claims. This is revealed in drawings set forth in e-mail correspondence between officials of Idaho Power and BLM from early January 2026

showing "how the planned B2H transmission line route (including five towers) crosses five MMC mining claims" described as "active, unpatented gold mining claims on BLM lands." Exhibit 4. As a result, these maps generated by Idaho Power and the BLM plot MMC's Kerby claims to the east of where they were surveyed based on the surveyor's work for which MMC contracted in 2002. If the licensed surveyor was in error, and the map based on the BLM GIS section locations is an accurate representation of where MMC's claims are, the one substantive difference is that MMC's Kerby claim block would be shifted approximately between 31ft and 65ft east, depending on where the claims are delineated along the western section line of Section 22 T15S R45E. This does not affect or undermine the validity of the claims, only where they are located relative to the true position of the section corner. This also does not affect the 2025 Claims as they are referenced to the Northwest corner of Section 16 T15S R45E from the BLM shapefile. I simply note this apparent minor mapping discrepancy in the interests of transparency and ensuring accuracy in all of my statements in this declaration, and believe that it can be resolved without materially changing any of the primary substantive points set forth herein.

**Claims on which Valid Discoveries Have Been Made**

16. In addition to the substantial exploration data that has been generated and analyzed as described above, certain additional data are also foundational to an analysis of the value of the known ore deposits within MMC's claims. One of these variables is referred to as the "cut-off grade," which serves as an estimate of the mineral concentration below which the ore material is of such a low quantity of economic elements that it would generally cost more to process the ore than could be generated from processing it, meaning that it will likely either remain in place or go to a waste pile during the process of mining the claim. I considered the use of two cut-off

grades for evaluating the quality of the ore yielded from the exploratory drilling that has occurred on MMC's claims, 0.01 ounces per ton (0.342857 grams per tonne) for the resource area and 0.00405 ounces per ton (0.137 grams per tonne). For purposes of my analysis, I have opted for the more conservative cut-off grade used by MMC's mining consultant Sespe, which has developed an updated resource estimation using the extensive Kerby Project drilling database, so as to conform and be consistent with its work in this regard. It should be noted that, based on past resource calculations from the 1990 Geostatistical Reserve Estimate, a $600 per ounce gold price would have a cut-off grade of 0.011 ounces per ton, very close to that being used by Sespe at today's prices much higher gold prices that are nearly seven times higher at around $4000/oz. Indeed, the market price of gold has not been less than $600/oz. for nearly two decades now.

17. I also have opted to be conservative in selecting the metric of 0.137 grams per tonne for the exploration cut-off for some claims outside the immediate resource area of the Malheur claims. The conservative nature of that grade is reflected in part by the fact that it was used to assess AngloGold Ashanti's Merlin deposit in southern Nevada, even though it was modeled on a much lower gold price of $1,750 per ounce than that which prevails today. AngloGoldAshanti, Technical Report Summary, Merlin Deposit, Expanded Silicon Proj.: An Initial Assessment Rpt. (effective date Dec. 31, 2023) (attached as Exhibit 5). The Merlin gold deposit is also an oxide-only open pit mining operation with milling and heap leach processing, similar to what has been planned and is reasonably anticipated to be utilized to develop the Kerby Project, as well as interpreted as an epithermal deposit, as is the Kerby Project. Moreover, the fact that this real-world example is available in a publicly available SEC document further bolsters the conclusion that a prudent person, engaged in the exploration and development of a gold mine, could see that

a project with grades above the cut-off of those published by a multibillion-dollar company like AngloGold Ashanti would be acceptable for exploration and development.

18. Based on my analysis of the foregoing data, seven of MMC's Kerby-Malheur Claims within the Immediate Interference Zone have well-established valid discoveries of gold deposits. All of these specified Kerby claims within the zone have had such deposits since at least 2004 based on the 1990 preliminary feasibility study resource, with the specified Malheur claims' being able to rely on the previous discoveries that had been made within their boundaries as well upon their being re-staked in 2025, and these discoveries have remained valid since gold has been above $410/oz. since the fall of 2004 with the exceptions of Malheur 63, Malheur 72, and Malheur 74 that are outside the historic resource area but have grades that support valid discoveries at other prices. I now explain the status of exploration on each of these claims and how relevant data supports my findings that these seven claims have had, and continue to have, valid discoveries of gold ore, as follows:

19. Kerby 26 Claim. Seventy-six (76) drill holes have been completed on this claim. Numerous of these holes have oxide gold grades above the cut-off grade and these were used to make up a significant portion of the initial 1990 preliminary feasibility resource at $410/oz. gold. Notably, hole 88-155 had 0-95 feet of oxide material above the resource cut-off of 0.01 ounces per ton ("OPT") (0.3428 grams per ton ("GPT")). In addition, the claim contains a very strong gold anomaly in soil geochemistry. Based on these factors and consideration of the likely costs and profits based in part on utilization of an appropriate cut-off grade, I believe since at least 2004 a reasonably prudent mining claimant would be amply justified in the expenditure of further monetary and other resources to continue toward a profitable development of valuable

mineral resources known to exist within the claim, a conclusion that has formed much of the basis of my ongoing work for MMC for that purpose.

20. Kerby 37 Claim. Twenty-nine (29) drill holes have been completed on the claim. Numerous of these holes have oxide gold grades above the cut-off grade and these were used to make up a portion of the initial 1990 preliminary feasibility resource at $410/oz. gold. Notably, hole 88-14 had 0-105 feet of oxide material above the resource cut-off of 0.01 OPT (0.3428 GPT) with one 5 foot interval of 0.108 OPT (3.702 GPT). In addition, the claim contains a very strong gold anomaly in soil geochemistry. Based on these factors and consideration of the likely costs and profits based in part on utilization of an appropriate cut-off grade, I believe since at least 2004 a reasonably prudent mining claimant would be amply justified in the expenditure of further monetary and other resources to continue toward a profitable development of valuable mineral resources known to exist within the claim, a conclusion that has formed much of the basis of my ongoing work for MMC for that purpose.

21. Kerby 38 Claim. Twenty-five (25) drill holes have been completed on the claim. Numerous of these holes have oxide gold grades above the cut-off grade and these were used to make up a portion of the initial 1990 preliminary feasibility resource at $410/oz gold. Notably, hole 88-79 had 20-80 feet of oxide material above the resource cut-off of 0.01OPT (0.3428 GPT) with 5 feet at 0.142 OPT (4.86 GPT). In addition, the claim contains a very strong gold anomaly in soil geochemistry. Based on these factors and consideration of the likely costs and profits based in part on utilization of an appropriate cut-off grade, I believe at since at least 2004 reasonably prudent mining claimant would be amply justified in the expenditure of further monetary and other resources to continue toward a profitable development of valuable mineral

resources known to exist within the claim, a conclusion that has formed much of the basis of my ongoing work for MMC for that purpose.

22. Malheur 43 Claim. Nine drill holes have been completed on the claim. Four of these holes have oxide gold grades above the cut-off grade and these were used to make up a portion of the initial 1990 preliminary feasibility resource at $410/oz gold. Notably hole 88-180 had oxide gold mineralization from 0-130 feet. Fifty five (55) feet of this was at or below the resource cut-off of 0.01 OPT (0.3428 GPT) with 5 feet intervals of 0.236 OPT (8.09 GPT) and 0.117 OPT (4.01 GPT). In addition, the claim contains a very strong gold anomaly in soil geochemistry. Based on these factors and consideration of the likely costs and profits based in part on utilization of an appropriate cut-off grade, I believe since at least 2004 a reasonably prudent mining claimant would be amply justified in the expenditure of further monetary and other resources to continue toward a profitable development of the valuable mineral resources known to exist within the claim, and I would recommend in particular that further drilling be done to the north of the claim to fill in areas that have not been drilled but would need to be mined for planning purposes. My conclusions in this regard have formed much of the basis for my ongoing work for MMC for that purpose.

23. Malheur 63 Claim. Four drill holes have been completed on this claim. Hole 99-365 has 20-60 feet above the exploration cut-off of 0.004 OPT (0.137 GPT). More drilling should be done on the claim further define the mineralization as a prudent man would seek to expend further time and monetary resources develop as it is a discovery when compared to a deposit like AngloGold's Merlin Project cited above. Additionally, the claim contains a small gold anomaly in soil geochemistry. My conclusions in this regard have formed much of the basis for my ongoing work for MMC for that purpose.

24. Malheur 72 Claim. Two drill holes have been completed on this claim. One of these holes has oxide gold grades above the resource cut-off grade. Specifically, hole 90-289 had oxide gold mineralization above the resource cut-off grade of 0.01 OPT (0.3428 GPT) from 0-5 feet and 15-20 feet. In addition, the claim contains a very strong gold anomaly in soil geochemistry. Based on these factors and consideration of the likely costs and profits based in part on utilization of an appropriate cut-off grade, I believe a reasonably prudent mining claimant would be amply justified in the expenditure of further monetary and other resources to continue toward a profitable development of the valuable mineral resources known to exist within the claim area, and would recommend more drilling to increase the definition of gold mineralization. My conclusions in this regard have formed much of the basis for my ongoing work for MMC for that purpose.

25. Malheur 74 Claim. Five drill holes have been completed on the claim. Three of these holes have oxide gold grades above the resource cut-off grade. Notably, hole 90-284 had oxide gold mineralization above the resource cut-off grade of 0.01 OPT (0.3428 GPT) from 20-45 feet. In addition, the claim contains a very strong gold anomaly in soil geochemistry. Based on these factors and consideration of the likely costs and profits based in part on utilization of an appropriate cut-off grade, I believe a reasonably prudent mining claimant would be amply justified in the expenditure of further monetary and other resources to continue toward a profitable development of the valuable mineral resources known to exist within the claim area, and my conclusion in this regard forms a large portion of the basis for my ongoing work for MMC for that purpose.

**Detailed descriptions of Idaho Power's construction activities on MMC's mining claims**

26. I have made two recent on the-ground in-person visits to observe IPCo's recent work in the vicinity of MMC's claims to assess the progress of such work and the extent to which such work is encroaching on and materially interfering with such claims. On June 29, 2026, I proceeded to the north end of the project area and moved to the south end, observing IPCo's activities and taking photos.

27. I made a follow-up visit to the project area and took additional photos on July 13, 2026. After a brief stop south of Pad 8 along the access road, I proceeded to the north end of the project area and moved to the south end observing Idaho Power's activities, taking a few photos along the way, some of which I set forth below. My descriptions below also draw on aerial drone footage that was shot of the Claims Area on several dates, including June 29, July 11, and August 14, 2026. For ease of reference, the pad numbers go from 1-15 starting at the north end of MMC's Claims Area as delineated on both the map and table set forth above, while the parentheticals contain what I believe to be the B2H Line reference numbers based on my on-site observations.

**Pad 1 (B2H 201/3)**

28. On August 14, 2026, a tower situated on the Malheur 4 Claim had been partially constructed on this pad with the lower third installed on the footings and the upper two-thirds in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 2 (B2H 201/4)**

29. On August 14, 2026, a tower situated on the Malheur 18 Claim had been partially constructed on the pad with the lower half installed on the footings and the portion assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 3 (B2H 202/1)**

30. On August 14, 2026, a tower had been partially constructed on the pad situated on Malheur 21 Claim with the lower half installed and the upper portion in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 4 (B2H 202/2)**

31. On August 14, 2026, a tower situated on Malheur 21 Claim had been partially constructed on the pad with the lower third installed and the upper two thirds in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 5 (B2H 202/3)**

32. On August 14, 2026, a tower situated on Kerby 15 Claim had been partially constructed on the pad with the lower third installed and the upper two thirds in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 6 (B2H 202/4)**

33. On August 14, 2026, a tower situated on the Kerby 26 Claim had been partially constructed on the pad with the lower third installed and the upper two thirds in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 7 (B2H 202/5)**

34. On June 29, 2026 an excavator outfitted with an auger to bore holes for footings on the pad with the auger bored into the subsurface of Malheur 43 (see photos Pad 7-A). Materials for building a tower were stocked to the north of the pad (see photo pad 7-B).



**Pad 7-A**

35. First is an auger beginning to dig into subsurface for a footing. Second is a photo of the excavator/drill on the pad site from behind with material excavated from both Kerby 26 and Malheur 43 claims.





**Pad 7-B**

36. Below is a photo of tower building materials situated near Pad 7.



37. On July 13, 2026 the footings have now been constructed on the site with the forms still in place on Malheur 43. The pad has been constructed utilizing fill material taken from Kerby 26 on the west side of the pad.



38. On August 14, 2026 a tower had been partially constructed on Pad 7 with the lower two thirds installed and the upper third assembled on the pad adjacent to the tower.



**Pad 8 (B2H 202/6)**

39. On July 13, 2026 contractors were actively constructing the footings on the Kerby 38 Claim at the time we visited, utilizing a concrete pump to place concrete for the footings.



40. On August 14, 2026, a tower situated on Kerby 38 had been partially constructed on the pad with the lower third attached to the concrete footings and the upper two thirds in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 9 (B2H 203/1)**

41. On August 14, 2026, a tower situated on the Malheur 72 Claim had been partially constructed on Pad 9 with the lower half installed and the upper portion in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 10 (B2H 203/2)**

42. On August 14, 2026, a tower situated on the Malheur 74 Claim had been partially constructed, attached to concrete footings emplaced on the pad with the upper portion assembled and lying beside it on the northwest corner of the pad covering Malheur 72 and Malheur 73. Materials that appeared to be insulators for the power lines themselves were stocked on the site as well.



**Pad 11 (B2H 203/3)**

43. On August 14, 2026, a tower situated on the Malheur 75 Claim had been partially constructed on the pad with the lower half installed and the upper portion in two sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 12 (B2H 203/4)**

44. On August 14, 2026, a tower situated on the Malheur 90 Claim had been partially constructed on the pad with the lower portion attached to concrete footings and the upper section assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 13 (B2H 203/5)**

45. On August 14, 2026, a tower situated on the claims Malheur 90 and Malheur 92 had been partially constructed on Pad 13 with the lower third installed and the upper two thirds in sections assembled on the pad adjacent to the tower. Other construction materials are present on the pad.



**Pad 14 (B2H 204/1)**

46. On August 14, 2026, a tower situated on the Malheur 93 Claim had been partially constructed on the pad with the lower third installed and the upper two thirds in sections assembled on the pad adjacent to the tower.



**Pad 15 (B2H 204/2)**

47. On August 14, 2026, a tower situated on the Malheur 105 Claim had been partially constructed on Pad 15 with the lower half attached to the concrete footings and the remaining portions in sections partially assembled on the pad adjacent to the tower with other building materials.




**Material Interference of B2H Powerline Construction with MMC's Claims**

48. IPCo is progressing with construction of the B2H Transmission Line directly over MMC's claims, many of which contain longstanding discoveries and an established historic and valuable mineral resource. Most alarmingly, IPCo has constructed lower sections of transmission towers and emplaced footings on Pad 7, which is on the Malheur 43 Claim, within the Central Ore Deposit resource area, as well as on Pad 8 which is situated on the Kerby 38

Claim. Standing on the Malheur 43 Claim, I observed altered rocks in the pad excavations that likely contain gold, which is MMC's property, as is the excavated material from both the Kerby 26 and Malheur 43 Claims. IPCo has dispersed MMC's material to form a level pad for constructing footings which are now cemented into the subsurface. This tower on Pad 7 is placed immediately adjacent to the Kerby 26 Claim in such a way that, particularly when accounting for slope stability requirements, it will almost certainly preclude any mining on that claim as well as on the Malheur 43 Claim. Moreover, the area of these claims covers such a width of the right of way (ROW) corridor as presently being construed and implemented by Idaho Power that there is no place to have a 250-foot strip go through the southwest of the southwest quarter-quarter and the northwest of the southwest quarter-quarter of Section 22 Township 15 South, Range 45 East without the 250-foot strip either being on or that would materially interfere with at least one of MMC's claims that contains a valid discovery of gold ore or outside the corridor and thus requiring a formal amendment to the ROW. This statement holds true even if the Malheur Claims are not considered as Kerby Claims 38 and 37 are in the southern margin of the northwest of the southwest quarter-quarter of Section 22.

49. Idaho Power's continued construction and eventual completion of the B2H power line across MMC's claims will inhibit MMC drilling in the vicinity of IPCO's ROW which will hinder MMC's ability to further define areas of economic resources, such as it is attempting to do under the exploration Notice of Intent that BLM recently approved, as well as geochemical sampling for environmental permitting. Additionally, the towers will prohibit the construction of open pits in their vicinity, blocking areas from mining entirely, even outside the B2H ROW 250-foot corridor as presently being construed and implemented by IPCo. The towers associated with Pads 7 and 8 are directly impinging on the historic planned pit from the historic resource for the

Central Ore Deposit on the Malheur 43 and Kerby 38 Claims, with Pad 7 over the pit itself and Pad 8 on the south edge. These same towers will also materially encumber appropriate activities on the Kerby 26 and 37 Claims because the towers are so close to the borders of these claims.

50. In the area under the power lines that would be built within the B2H ROW corridor as Idaho Power is construing and implementing it, strict limits will presumably be placed on the height of equipment that is allowed to operate under the lines for safety purposes that will likely constrain, and possibly preclude entirely, the ability to mine on any claim where the power lines would pass overhead. For example, on the Kerby 26 Claim, the rising hillside that is immediately adjacent to the prospective power line within the current ROW corridor will rapidly consume whatever clearance is available and likely prevent mining in the historic resource area. Enough clearance must be present for equipment to freely operate in the vicinity of the resource to be mined as well as for further drilling to refine the resource on the margins of the deposit.

51. Additionally, in order for MMC to mine the areas of outlined known mineralization in the Kerby Project, the use of blasting will be necessary. The mineralized rock in the area is broadly interspersed with two types of alteration, clay which is very soft, and silica which makes rocks very hard. Both of these are observable on Pad 7 as exposed by Idaho Power's activities on the pad, as described and shown above. When it comes to mining the ore body, while the clay altered portions can likely be removed by mechanical excavation, the silica portions will require some blasting. This blasting should not occur under high voltage power line. While no blast design has been established yet and will have to be designed by experts specifically to the site, and include standoff distances for personnel, these distances can reasonably be expected to be hundreds if not thousands of feet away. Any fly rock coming off a blast and striking the overhead lines and/or tower structures would create an immediate risk of damage and hazard to

both equipment and personnel. While there is not a specific rule under Mine Safety and Health Administration for a blast standoff distance from a power line, the Virginia Department of Mines, Minerals & Energy Division of Mines published Surface blaster Certification Study Guide (2003) states that "*The actual shot area should never be located closer to a power line than a distance equal to the length of the firing line plus the length of both legwires. Never extend firing lines under power lines.*" Exhibit 6 at p. 69. This is to prevent contact of the combined leg and firing line assembly with the powerline once the blast is set off, because it may lead to electrocution of the blasting personnel. This means that no blasting would be able to occur under the transmission wires that Idaho Power appears to be moving ever closer to stringing on the towers that cross MMC's claims, as well as in the immediate vicinity outside the 250-foot strip. The document also describes other issues with blasting in the vicinity of high voltage lines; stray currents, induced currents, and electrical surges from distant lightning strikes prematurely triggering blasts in the vicinity of the power line. *Id.* at pp. 69-70.

52. If the B2H line were allowed to be completed across MMC's claims within the ROW corridor as Idaho Power is presently construing and implementing it, it would also put in jeopardy the ability of MMC to secure authorization from BLM or DOGAMI to engage in any future drilling in the vicinity of the line and towers to avoid impacts to the B2H line's integrity and to protect personnel. If this were to occur, MMC will not be able to obtain additional samples from drilling to either expand its outlined mineral resources or obtain fresh geochemical samples in areas that are already drilled to fulfill the environmental requirements of a mine permit, not to mention the necessary permits to mine the ore body. More specifically, in MMC's 2026 Notice of Intent to engage in further exploratory activities that BLM recently confirmed was complete, this plan includes two drill holes on the Malheur 43 Claim that would necessitate

placing a drill rig where Idaho Power has subsequently constructed a footing for one of the B2H towers. (It should be noted that, if the claims are indeed more to the east for reasons described above, the location of these two drillholes would be on the Kerby 26 Claim instead of the Malheur 43 Claim.)

53. Finally, based on the historic reserve calculations in 1990, the Central Ore Deposit, the primary subject threatened by IPCo's ongoing construction, was calculated to be 46,800 troy oz of gold for the oxide portions of the resource which was done at $410 per troy oz which the market gold price has been above since 2004. At the approximate current price of $4000 per troy oz gold, this equates to $187,200,000 in situ value. MMC has just had an updated reassessment of this value completed showing that the economically accessible gold in the Central Ore Deposit has considerably expanded to approximately 136,000 ounces of gold, giving it an in-situ value of well more than half a billion dollars, as further defined and described in the Declaration of Brian Anderson filed this same date.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and information.

Executed this 31st day of August 2026.

s/ Edward Glowacki III
Edward Glowacki III