**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**CHELSEA WEIN, CASB #353557**
Assistant United States Attorney
Chelsea.Wein@usdoj.gov
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204
Telephone: (503) 727-1000
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**MALHEUR MINING CO., LTD.**, an Oregon Corporation,

Plaintiff,

v.

**IDAHO POWER CO.**, an Idaho Corporation; and **BUREAU OF LAND MANAGEMENT**, an agency and instrumentality of the U.S. Government,

Defendants.

Case No.: 2:26-cv-01451-HL

**DEFENDANT BUREAU OF LAND MANAGEMENT'S RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

LEGAL STANDARD .......... 1

FACTUAL BACKGROUND .......... 2

LEGAL BACKGROUND .......... 4

I. FLPMA .......... 4

II. NEPA .......... 5

III. Mining Laws .......... 5

A. General Mining Law of 1872 .......... 6

B. Surface Resources and Multiple Use Act of 1955 .......... 6

C. 43 C.F.R. § 3809 Regulations .......... 8

ARGUMENT .......... 10

I. Likelihood of Success on the Merits .......... 10

A. MMC Has No Likelihood of Success on the Merits of its FLPMA Claim Against BLM .......... 11

1. There is No Specific, Unequivocal Command Compelling BLM to Take a Discrete Agency Action .......... 11

2. Even if There Were a Specific, Unequivocal Command Compelling BLM to Take a Discrete Agency Action, that Command Does Not Mandate That BLM Take Any Action at This Time .......... 15

3. Even if There Were a Specific, Unequivocal Command Compelling BLM to Take a Discrete Agency Action at This Time, BLM Has Done So .......... 18

B. MMC Has No Likelihood of Success on the Merits of its NEPA Claim Against BLM .......... 19

1. MMC Lacks Standing to Bring a NEPA Challenge Because MMC's Purely Economic Concerns Lie Outside NEPA's Zone of Interests .......... 21

2. Even if MMC Had Standing to Bring a NEPA Challenge, No Supplemental NEPA Analysis is Required....21

i. There is No Major Federal Action Left to Occur....22

ii. There Has Been No Significant Change to the B2H Project that Would Require Additional NEPA Analysis....24

iii. There Are No Substantial New Circumstances or Information About the Significance of Adverse Effects that Bear on the Analysis....25

II. Irreparable Harm....25

III. Balance of Equities....25

IV. Public Interest....26

CONCLUSION....26

## TABLE OF AUTHORITIES

### FEDERAL CASES


*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .............................................. 1

*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934 (9th Cir. 2005) ................................. 19, 20

*Center for Biological Diversity v. Salazar*, No. CV-09-8207C, 2010 WL 2493988 (D. Ariz. June 17, 2010)........................................................................................ 23

*Center for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687 (D. Ariz. 2011) ................. 23, 24

*Center for Biological Diversity v. Salazar*, 431 F. App'x 593 (9th Cir. 2011)............................. 23

*Center for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) ................................. 22

*Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 1:25-cv-710-DCN, 2026 WL 810003 (D. Idaho Mar. 24, 2026) ............................................................... 23

*Chrisman v. Miller*, 197 U.S. 313 (1905) ........................................................................... 6

*Coalition v. BLM*, 552 F. Supp. 3d 1101 (D. Or. 2021) ...................................................... 3

*Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004) ....................................................... 22, 23

*Env't Prot. Info. Center v. U.S. Fish & Wildlife Serv.*, No. C, 04-4647 CRB, 2005 WL 3877605 (N.D. Cal. Apr. 22, 2005)............................................................ 24

*Farris v. Seabrook*, 677 F.3d 858 (9th Cir. 2012) ................................................................ 1

*Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923 (9th Cir. 2010)........................... 10

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071 (N.D. Cal. 2005)........................ 24

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) ............................................... 15

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)............................................................. 19, 20

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989)..................................................... 22

*Multnomah Mining, Milling & Dev. Co. v. United States*, 211 F. 100 (9th Cir. 1914).................... 6

*Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713 (9th Cir. 1993).......................... 20, 21

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)...............................................10, 11, 13, 15

*Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941 (9th Cir. 2006) ........ 19, 20

*Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. DOI*, 927 F. Supp. 2d 921 (S.D. Cal. 2013) ........ 13, 14

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078 (9th Cir. 2005) ........ 21

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168 (2025) ........ 5

*Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988) ........ 24

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832 (9th Cir. 2001) ........ 1

*United States ex rel. Dunlap v. Black*, 128 U.S. 40 (1888) ........ 11

*United States v. Coleman*, 390 U.S. 599 (1968) ........ 6

*United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277 (9th Cir. 1980) ........ 6, 7

*United States v. Locke*, 471 U.S. 84, (1985) ........ 6

*United States v. Shumway*, 199 F.3d 1093 (9th Cir. 1999) ........ 6

*Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068 (9th Cir. 2016) ........ 11

*Villegas Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ........ 1

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ........ 1

*Winter v. NRDC*, 555 U.S. 7 (2008) ........ 1

**FEDERAL STATUTES**

5 U.S.C. § 706(1) ........ 10, 12

30 U.S.C. §§ 22-54 ........ 6

30 U.S.C. § 26 ........ 6

30 U.S.C. §§ 611-612 ........ 6, 7

30 U.S.C. § 612(a) ........ 7

30 U.S.C. § 612(b) ........ 7

42 U.S.C. § 4332(C) .......... 5

42 U.S.C. § 4336(b) .......... 5

43 U.S.C. § 1732 .......... 11, 12

43 U.S.C. § 1732(b) .......... 4, 11

43 U.S.C. § 1761 .......... 11, 12

43 U.S.C. § 1761(a)(4) .......... 2, 4, 11

**FEDERAL REGULATIONS**

33 C.F.R. § 333.34 .......... 21

40 C.F.R. § 1502.9(d)(1) .......... 21

43 C.F.R. Part 2800 .......... 13

43 C.F.R. § 2800 .......... 11

43 C.F.R. § 2801.9(a)(4) .......... 4

43 C.F.R. 2807.16 .......... 14

43 C.F.R. § 2808.10(a) .......... 13

43 C.F.R. § 3809 .......... 5, 8

43 C.F.R. § 3809.5 .......... 8

43 C.F.R. § 3809.11 .......... 2, 8

43 C.F.R. § 3809.401 .......... 8

43 C.F.R. § 3809.401(b) .......... 9

43 C.F.R. § 3809.401(b)(2) .......... 9

43 C.F.R. § 3809.401(b)(5) .......... 9

43 C.F.R. § 3809.411 .......... 8, 9

43 C.F.R. § 3809.411(c) .......... 9

43 C.F.R. § 3809.411(d) ........ 9

43 C.F.R. § 3809.420 ........ 8

**OTHER AUTHORITIES**

*Boardman to Hemingway Project,* BLM NATIONAL NEPA REGISTER, last accessed Sep. 14, 2026, https://eplanning.blm.gov/Project-Home/?id=8e67a393-a7f2-f011-8407-001dd80c29f3 ("B2H Webpage") ........ 2

*Concerned Citizens for Responsible Mining (On Reconsideration)*, 131 IBLA 257, 266 (Nov. 23, 1994) ........ 9, 17

*Robert E. Shoemaker*, 110 IBLA 39, 54 (July 13, 1989) ........ 7

*Willoughby/Leavitt Ass'n*, 149 IBLA 250, 255 (June 22, 1999) ........ 7

## LEGAL STANDARD

Courts use the same standard to evaluate whether to issue temporary restraining orders and preliminary injunctions. *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). A plaintiff seeking a temporary restraining order or preliminary injunction must show that: "(1) [it] is likely to succeed on the merits, (2) [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

In the Ninth Circuit, courts may apply an alternative test which allows for a preliminary injunction where a plaintiff shows "serious questions going to the merits" and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

Here, because plaintiff Malheur Mining Company ("MMC") does not appear to be seeking a preliminary injunction or temporary restraining order against the United States Bureau of Land Management ("BLM"), BLM will limit its briefing to MMC's likelihood of success on the merits of its claims against BLM and whether MMC's requested preliminary injunction or temporary restraining order is in the public interest.[1]

---

[1] By limiting its briefing in this way, BLM does not waive and expressly preserves all arguments regarding irreparable harm and the balance of equities.

## FACTUAL BACKGROUND

In 1986, MMC's predecessor, Western Epithermal, located sixteen lode mining claims (the "Kerby Claims") on BLM-administered public lands in Malheur County, Oregon. ECF 23-8; Brown Decl. ¶ 10. In the late 1980s and early 1990s, Western Epithermal, and subsequently MMC, conducted geological mapping, soil geochemistry testing, and exploratory drilling. Complaint for Declaratory and Injunctive Relief, ECF 1 ("Complaint") ¶ 28. MMC has continued to pay annual maintenance fees on the Kerby Claims to BLM, but, given that MMC would have had to file a Notice of Operations to conduct any activities above casual use and BLM has received no such filings from MMC since the 1990s, BLM does not believe that MMC has conducted any other exploration activities since that time. 43 C.F.R. § 3809.11; ECF 23-8; Brown Decl. ¶ 11.

In December 2007, Idaho Power Company ("IPC") submitted an application to BLM under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1761(a)(4), for a right-of-way ("ROW") to construct the Boardman to Hemingway ("B2H") transmission line. U.S. Bureau of Land Management, *Boardman to Hemingway Project,* BLM NATIONAL NEPA REGISTER, last accessed Sep. 14, 2026, https://eplanning.blm.gov/Project-Home/?id=8e67a393-a7f2-f011-8407-001dd80c29f3 ("B2H Webpage"). BLM subsequently conducted an extensive environmental review in compliance with the National Environmental Policy Act ("NEPA"). BLM published a final environmental impact statement ("FEIS") in November 2016. *See generally* ECF 20-6; *see also* B2H Webpage. On November 17, 2017, BLM issued a Record of Decision ("ROD") approving the decision to grant a ROW for the B2H project. ECF 20-7. On January 19, 2018, BLM's Vale District Manager formally issued the B2H ROW grant to IPC. ECF 20-8. Multiple parties timely, but unsuccessfully, brought suit against the FEIS, ROD, and

ROW grant in 2019 on NEPA and FLPMA challenges. *See Stop B2H Coalition v. BLM*, 552 F. Supp. 3d 1101 (D. Or. 2021). Plaintiff MMC was not among the parties bringing a challenge.

In November 2024, BLM issued a Notice to Proceed to IPC authorizing non-ground disturbing pre-construction activities for the B2H project and outlining terms and conditions for IPC to meet before conducting construction activities. Brown Decl. ¶ 4, Ex. 1. IPC received clearance to initiate ground-disturbing construction activity in the area of the Kerby Claims on July 15, 2025, with BLM's acceptance of the Preconstruction Inventory Report. Brown Decl. ¶ 4, Ex. 2. IPC began ground disturbing work thereafter. Brown Decl. ¶ 4. In the summer of 2025, MMC visited the area of the Kerby Claims and observed IPC's construction activities. Complaint ¶ 50. MMC then contacted IPC in the fall of 2025, and the parties engaged in settlement discussions. *Id.* at ¶ 52; Brown Decl. ¶ 6, Ex. 3. IPC paused construction of the B2H project in the area of the Kerby Claims for over eight months during the pendency of these negotiations. Brown Decl. ¶ 6, Ex. 3. In November 2025, while private settlement discussions were ongoing, MMC filed 105 additional lode mining claims (the "Malheur Claims") surrounding and overlapping with the B2H ROW. Complaint ¶ 34; Brown. Decl. ¶ 10; ECF 21-3. BLM officially recorded the new claims in January 2026. Complaint ¶ 34. After negotiation attempts between MMC and IPC failed, IPC resumed pre-construction activities in June 2026. Brown Decl. ¶ 6.

On May 14, 2026, BLM received a Notice of Intent to Conduct Exploration from MMC, proposing exploratory drilling on its claims. Brown Decl. ¶ 14. On June 16, 2026, BLM notified MMC personnel that the May 14 notice did not meet regulatory requirements. *Id.* Also on June 16, 2026, BLM received an email from MMC's counsel, Steve Odell, titled "NOTICE OF VIOLATION & MATERIAL INTERFERENCE WITH VALID MINING CLAIMS & REQUEST TO IMMEDIATELY SUSPEND & ORDER CESSATION OF ALL SUCH

VIOLATIVE ACTIVITIES," which alleged IPC's construction constituted material interference with MMC's mining claims. ECF 20-11; Brown Decl. ¶ 7. BLM responded within two weeks to coordinate an in-person meeting in Boise, Idaho to discuss technical details of the alleged dispute. Brown Decl. ¶ 7, Ex. 4. This meeting occurred on July 14, 2026. Brown Decl. ¶ 7. During this meeting, MMC was not forthcoming with technical information and stated that it needed at least four weeks to provide the technical information required for the parties to even begin to assess the scope of the situation. Brown Decl. ¶ 7. MMC, instead, initiated this suit the same day. *See* Complaint. BLM issued a follow-up letter shortly after the meeting, requesting that MMC contact BLM once the required technical information became available so that it could schedule follow-up meetings. Brown Decl. ¶ 8, Ex. 5. BLM has been awaiting this requested technical information for analysis since that technical data request in July 2026. Brown Decl. ¶ 9.

## LEGAL BACKGROUND

### I FLPMA

FLPMA authorizes BLM to "regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development" of public lands. 43 U.S.C. § 1732(b). BLM's authority to regulate such uses includes the power to grant rights-of-way to allow "systems for generation, transmission, and distribution of electric energy" under 43 U.S.C. § 1761(a)(4). BLM's FLPMA implementing regulations state that a user of public lands "must have a grant" if it plans to use public lands "for systems or facilities over, under, on, or through public lands . . . for generating, transmitting, and distributing electricity." 43 C.F.R. § 2801.9(a)(4).

## II NEPA

NEPA serves the purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions, so that such potential effects may be considered in the decision-making process. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 172-73 (2025). NEPA is procedural, not substantive, in nature – it "imposes no substantive environmental obligations or restrictions." *Id.* at 173. NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An agency prepares an environmental assessment ("EA") to determine whether the impacts of an action will be significant, and if not, the agency may prepare a finding of no significant impact and forego preparation of an EIS. 42 U.S.C. § 4336(b). "Importantly, NEPA does not require the agency to weigh environmental consequences in any particular way . . . The goal of the law is to inform agency decisionmaking, not to paralyze it." *Seven Cnty.*, 605 U.S. at 173.

In reviewing an agency's compliance with NEPA, "a court should afford substantial deference to the agency." *Id.* at 180. In conducting a NEPA analysis, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry." *Id.* at 182-83. "Courts . . . should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.*

## III Mining Laws

Mining on federal public lands is primarily governed by (A) the General Mining Law of 1872, (B) the Surface Resources and Multiple Use Act of 1955, and (C) 43 C.F.R. § 3809 Regulations.

### A General Mining Law of 1872

The General Mining Law of 1872 (the "Mining Law"), codified, as amended, at 30 U.S.C. §§ 22-54, is considered the "cornerstone of federal legislation dealing with mineral lands." *United States v. Coleman*, 390 U.S. 599, 600 n. 1 (1968). Under the Mining Law, a private citizen may enter public lands to prospect and mine for mineral deposits. 30 U.S.C. § 22. The grant of rights to use public lands pursuant to the Mining Law has always been restricted solely to explore for and mine valuable mineral deposits. *See Multnomah Mining, Milling & Dev. Co. v. United States*, 211 F. 100 (9th Cir. 1914). The Mining Law also authorizes citizens to stake, or "locate," a valid mining claim upon "discovery" of a valuable mineral deposit and compliance with all other applicable statutory and regulatory requirements. *Chrisman v. Miller*, 197 U.S. 313, 320-21 (1905). The government retains substantial regulatory powers over mineral interests on the public lands established under the Mining Law. *United States v. Locke*, 471 U.S. 84, 105, (1985) (Claimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests."); *see also United States v. Shumway*, 199 F.3d 1093, 1102-03 (9th Cir. 1999) (stating that, until a patent issues, federal land management agencies retain authority and control over the lands that are subject to mining claims).

### B Surface Resources and Multiple Use Act of 1955

Congress passed the Surface Resources and Multiple Use Act of 1955 (SRA), 30 U.S.C. §§ 611-612, as "corrective legislation" to clarify the law and alleviate prior abuses under the Mining Law, as well as the land management challenges that grew out of the provision in 30 U.S.C. § 26 granting mining claimants "exclusive right of possession" of the surface of their claims. *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1280-81 (9th Cir. 1980).

To achieve these goals, SRA expressly limits activities on mining claims to "prospecting, mining or processing operations and uses reasonably incident thereto." 30 U.S.C. § 612(a). SRA also withdraws "common varieties" of minerals previously subject to disposal under the Mining Law and placing them under the authority of the Materials Act of 1947. 30 U.S.C. § 611. Most relevant to the present case, SRA makes mining claims located after its enactment subject to "the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof" provided that use by the United States, its licensees, and permittees with regard to vegetative resources and surface resources other than minerals subject to disposal under the Mining Law did not "materially interfere" with mining or processing operations. 30 U.S.C. § 612(b).

One method BLM uses to manage the surface resources over mining claims is rights-of-way allowing third parties to make use of these surface resources. A right-of-way grant constitutes a license to enter the public land at issue, and a mining claimant has no right either to prevent the granting or the use of the right-of-way unless it can be shown that the use endangers or materially interferes with its mining activities. *See Curtis-Nevada Mines, Inc.*, 611 F.2d at 1277 (finding that a mining company could not prohibit public use of the surface of its mining claims so long as their surface use did not interfere with the company's mining operations); *Willoughby/Leavitt Ass'n*, 149 IBLA 250, 255 (June 22, 1999) (allowing a ROW authorizing a road to be built on the surface of a mining claim because the road did not interfere with the exploration of the mining claim or mining activities). Under SRA, to "endanger" is "to bring into danger or peril" and to "materially interfere" is to "substantially hinder, impede, or clash" with the mining claimant's actual, established prospecting, mining, or processing operations (or reasonably related uses). *Robert E. Shoemaker*, 110 IBLA 39, 54 (July 13, 1989).

### C 43 C.F.R. § 3809 Regulations

BLM's surface management regulations at 43 C.F.R. § 3809 implement FLPMA's requirement to prevent unnecessary or undue degradation for operations under the Mining Law on public lands. Under these regulations, all operations must prevent unnecessary or undue degradation by complying with the performance standards at 43 C.F.R. § 3809.420 and by providing a financial guarantee covering the costs of reclamation. BLM's regulations regarding surface management for locatable mineral operations on public lands are codified at 43 C.F.R. § 3809. BLM regulations define "exploration" to include "sampling, drilling, or developing surface or underground workings to evaluate the type, extent, quantity, or quality of mineral values present." 43 C.F.R. § 3809.5. The regulations further provide that "[e]xploration does not include activities where material is extracted for commercial use or sale." *Id.*

If a claimant seeks to conduct operations (including exploration) that will disturb more than five acres of public lands or remove a bulk sample over 1,000 tons of presumed ore, the claimant must file a Plan of Operations. 43 C.F.R. §§ 3809.11; 3809.21. If a claimant seeks to conduct operations that will disturb acreage or resources under these thresholds, the claimant must file a Notice. §§ 3809.10, 3809.21. A claimant may conduct "casual use" that results in no or negligible disturbance to public lands or resources (e.g., collection of materials with hand tools) without filing a Notice or Plan of Operations. 43 C.F.R. § 3809.5.

If exploration drilling showed a potential resource, a mining claimant would then conduct development drilling to attempt to define the parameters of the potential ore body. If the exploration work ultimately indicated that full scale development was warranted, then the claimant would submit a Plan of Operations for mining and processing. 43 C.F.R. § 3809.401. The claimant would need to secure state mining, water use, and other permits. 43 C.F.R. §

3809.411. The Plan of Operations filed with BLM would need to demonstrate that the mining can be conducted without unnecessary and undue degradation of public lands. § 3809.401(b)(5). Among other things, a Plan of Operations addresses operating areas, waste rock and tailing disposal areas, structures, buildings, and access routes. § 3809.401(b)(2). Plans also include water management plans, spill contingency plans, a schedule of operations, access roads, water supplies, and utility services. *Id.* A Plan of Operations must include a Reclamation Plan and Monitoring Plan. § 3809.401(b). Upon receipt of a complete Plan of Operations, BLM conducts analysis under NEPA before approving the Plan of Operations. §§ 3809.411(c) and (d).

The Interior Board of Land Appeals provides a helpful description of exploration in contrast to full mine development:

> Exploration is a multi-stage process in which prospects are subjected to an ever-increasing level of scrutiny. Initially, a mining company, using a variety of exploration techniques, determines the extent and concentration of the commodity of choice. If both concentration and extent appear in economically viable amounts, the company will enter a pre-feasibility stage where a detailed examination of costs associated with mining, metallurgical extraction, and permitting is made. This process entails additional drilling, testing of mining and extractive techniques, baseline analysis, and reserve studies under various market conditions. If each of these parameters is met in this economic analysis, the property is advanced to the final feasibility/permitting stage where the primary choice in mining and metallurgy is submitted to the various local, state, and Federal agencies for review. In the permitting stage, the agencies may reject the plan or suggest amendments. If agency amendments are economically feasible, the mining company will proceed to development of the property.

*Concerned Citizens for Responsible Mining (On Reconsideration)*, 131 IBLA 257, 266 (Nov. 23, 1994). At the exploration stage, it is too early to predict the method of mining because the mining method "can only be determined by exploration and subsequent design work." *Id.* at 268.

## ARGUMENT

### I Likelihood of Success on the Merits

The Court's assessment of the merits of Plaintiff's claims against BLM is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Section 706(1) of the APA grants federal courts the power to "compel agency action unlawfully withheld or unreasonably delayed." The Ninth Circuit has held that "[t]his provision serves important interests, but does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take. Instead, our ability to 'compel agency action' is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010). In *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004), the Supreme Court addressed the requirements to compel an agency to take action under APA § 706(1). The Supreme Court held that a "failure to act" claim must be limited to "a *discrete* action" and "the only agency action that can be compelled under the APA is action legally *required.*" *Id.* at 63 (emphasis in original). Consequently, "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65. (emphasis in original). Even where the law demands a discrete agency action, the court may only compel under 706(1) action that the agency has unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

Here, MMC has no likelihood of success on the merits of its FLPMA or NEPA claims against BLM because BLM has not unlawfully withheld or unreasonably delayed any mandatory and discrete agency action.

### A MMC Has No Likelihood of Success on the Merits of its FLPMA Claim Against BLM

MMC has no likelihood of success on the merits of its FLPMA claim against BLM because (1) there is no specific, unequivocal command compelling BLM to take a discrete agency action and (2) even if there were, BLM has taken appropriate actions in light of the information that has been provided to the agency at this time.

#### 1 There is No Specific, Unequivocal Command Compelling BLM to Take a Discrete Agency Action

A court can compel agency action under section 706(1) "only if there is a specific, unequivocal command placed on the agency to take a discrete agency action, and the agency has failed to take that action." *Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (internal quotations omitted) (citing *Norton*, 542 U.S. at 63-64). Section 706(1) does not empower courts to "enter general orders compelling compliance with broad statutory mandates" because such judicial action would risk "injecting the judge into day-to-day agency management." *Norton*, 542 U.S. at 66-67. A specific, unequivocal act that gives rise to a 706(1) claim is a "precise, definite act . . . about which [an official] had no discretion whatever." *Id.* at 63 (citing *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888)) (internal citations omitted).

Here, MMC brings its FLPMA claim under 43 U.S.C. §§ 1732 and 1761. Complaint ¶¶ 71-77. Neither of these statutory provisions, nor BLM's implementing regulations found at 43 C.F.R. § 2800 or the terms and conditions in the 2018 ROW issued by BLM, contains any specific, unequivocal commands compelling BLM to take any discrete agency action. In arguing that BLM has failed to take a discrete agency action under 43 U.S.C. § 1732, MMC cites to the portion of § 1732 that generally requires that BLM only permit the development of public lands through rights-of-way. Complaint at ¶ 73; 43 U.S.C. § 1732(b). Similarly, 43 U.S.C. § 1761(a)(4)

states that BLM is "authorized to grant, issue, or renew rights-of-way over, upon, under, or through [public] lands for . . . systems for generation, transmission, and distribution of electric energy . . ." Neither of these provisions contains any specific, unequivocal command compelling any discrete agency action of relevance to this matter. In summarizing these provisions, MMC states that "FLPMA authorizes the Secretary of the Interior to grant rights-of-way on public lands to authorize systems for transmission of electricity" and does not permit such development on public lands without such a right-of-way. Complaint ¶ 73. This is an accurate summary of those provisions, but nowhere in that authorizing language is a specific requirement to take any discrete agency action that would sustain a § 706(1) claim here.

BLM has granted a ROW to IPC permitting the B2H Project. Therefore, BLM has complied with both 43 U.S.C. §§ 1732 and 1761. *See* ECF 20-8. However, MMC argues that "BLM has a discrete, mandatory duty under FLPMA and its own implementing regulations to ensure that the public lands not be used for electricity transmission purposes beyond the explicit authority conveyed in and/or inconsistently with the express terms and conditions of a right-of-way granted pursuant to that statute and in accordance with those regulations." Complaint ¶ 77. Despite this bald assertion, MMC cites no legal authority requiring that BLM affirmatively take any discrete agency action to investigate or enforce compliance with the terms and conditions of a right of way. *See generally* Complaint; ECF 20; First Amended Complaint, ECF 30 ("Amended Complaint"). Instead, MMC cites only to the 2026 BLM NEPA Implementation Handbook, without citing to any specific statutory language or requirements. Amended Complaint ¶ 28.

To the extent that BLM has an obligation to investigate and enforce compliance with the conditions of its ROW, BLM has discretion as to how to do so. MMC cites no provisions in law or in the ROW conditions themselves requiring BLM to take a *clear and defined* set of actions to

investigate or enforce compliance with those conditions. *See generally* Complaint, ECF 20, Amended Complaint. Under 706(1), a court cannot "enter general orders compelling compliance with broad statutory mandates." *Norton*, 542 U.S. at 57.

The only ROW terms to which MMC cites are Paragraph 4, Terms a and d, and Special Stipulation No. 18. Complaint ¶ 43. ROW Paragraph 4, Terms and Conditions letter "a" states that the ROW is issued subject to "the Holder's compliance with all applicable regulations contained in *Title 43 Code of Federal Regulations, part 2800 and part 2880*." ECF 20-8 at 3. This term and condition, summarily requiring compliance with 43 C.F.R. Part 2800, mandates no discrete agency action by BLM. MMC cites no applicable regulations requiring any discrete agency action that BLM has failed to take. Although MMC cites to the definition of "trespass" at 43 C.F.R. § 2808.10(a), MMC cites no legal requirement mandating that BLM must take any discrete action to investigate, prevent, or remediate any trespass, even if one were to have occurred. *See generally*, Complaint, Amended Complaint. *See also Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. DOI*, 927 F. Supp. 2d 921, 949 (S.D. Cal. 2013) (finding that a plaintiff's APA challenge alleging that BLM failed to enforce a ROD, right of way, and mitigation measures was not cognizable because it did not allege a failure to take an agency action as defined by the APA).

ROW Paragraph 4, Terms and Conditions letter "d" states that the "mitigation measures contained in the Final EIS, dated November 2017, and the Record of Decision dated November 17, 2017, and Exhibit D Plan of Development dated June 9, 2017, and any subsequent revision to the Plan of Development, attached hereto, are incorporated into and made a part of this grant instrument as fully and effectively as if they were set forth herein in their entirety." ECF 20-8 at 3. This term does not mandate any discrete agency action. MMC cites to Selective Mitigation

Measure No. 8 throughout its briefing as a mitigation measure which it claims that IPC has not complied with. Complaint ¶ 40. Selective Mitigation Measure No. 8, "Span and/or Avoid Sensitive Features," in the FEIS states that:

> *Within the limits of standard tower design*, structures would be located to allow conductors to avoid identified sensitive features, such as dwellings/buildings and span sensitive existing land uses, natural features, hazardous substance remediation sites, and cultural resource sites. This could be accomplished through methods *such as* selective tower placement, spanning sensitive features, or realigning the B2H Project centerline (micro-siting).

ECF 20-6 (Table 2-13) (emphasis added). This language provides significant discretion for how BLM is to achieve the identified objective, since it requires avoiding identified sensitive features only "within the limits of standard tower design" and provides several methods for how such avoidance could be accomplished. Further, the mitigation measure does not require *BLM* to take any action – the measure is directed at IPC's actions of tower design and placement. As such, there is no discrete agency action contained within this condition which BLM could have unlawfully withheld or delayed.

Special Stipulation Number 18 states: "Failure of the Holder to comply with applicable law or regulations or any terms, conditions, or stipulations of this instrument shall constitute grounds for suspension or termination thereof." ECF 20-8 at 47. MMC appears to emphasize the "shall" contained in this stipulation to argue that the term is a mandatory, discrete action. However, MMC fails to grapple with the stipulation's actual language, which outlines noncompliance as "*grounds* for suspension or termination." *Id.* (emphasis added). The term "grounds" assumes a discretionary consideration period and outlines a particular status as a factor of that consideration, not an automatic trigger.

Furthermore, MMC fails to grapple with Special Stipulation No. 19, which states:

> The Authorized Officer *may* order an immediate temporary suspension of operations, orally or in writing, in accordance with 43 CFR 2807.16 to protect

> public health or safety or the environment if the Authorized Officer determines that the Holder has violated one or more of the terms, conditions, or stipulations of this instrument.

ECF 20-8 at 47 (emphasis added). "May" is a permissive term that outlines BLM's discretion in its analysis of compliance and pursuit of enforcement, if determined necessary based upon the facts presented and information available to the agency. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 163 (2016) ("the word 'shall' usually connotes a requirement, unlike the word 'may,' which implies discretion.").

Even if a statute or condition is mandatory as to the object to be achieved, if it leaves an agency "discretion to decide how to achieve that object," the court is limited in the actions it can take to mandate any action by the agency because "[i]f courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered to decide whether compliance was achieved." *Norton*, 542 U.S. at 57. The APA does not permit "injecting the judge into day-to-day agency management" by allowing the court to compel compliance with such broad statutory mandates. *Id.* at 67.

As such, MMC has no likelihood of success on its FLPMA claim because MMC does not (and could not) cite to any legal authority containing a specific, unequivocal statutory command compelling BLM to undertake any discrete agency action to investigate compliance with or affirmatively enforce the conditions of the ROW that it granted to IPC. MMC therefore has not stated a cognizable claim under 706(1).

### 2 Even if There Were a Specific, Unequivocal Command Compelling BLM to Take a Discrete Agency Action, that Command Does Not Mandate That BLM Take Any Action at This Time

Even if there were a specific, unequivocal command compelling BLM to enforce compliance with the conditions of the ROW that it granted to IPC, that command would not

require BLM to take any action at this time beyond its request for additional technical information to assess the situation.

MMC does not clearly identify what specific "mandatory terms and conditions that expressly require construction of the transmission line to avoid any discernable effect on active mining claims or the capacity to develop mineral resources" it alleges BLM has shirked its purported discrete, mandatory duty to enforce. Complaint ¶¶ 71-77. However, at other points within its brief, MMC cites to Selective Mitigation Measure No. 8 as a particular measure that was intended to "mitigate impacts to mineral resources to a low or negligible level." Complaint ¶ 40. As discussed above in I.A.1, *supra*, Selective Mitigation Measure No. 8 does not actually mandate that BLM take any discrete action.

However, even if this measure were construed as a specific, unequivocal command compelling BLM to take a discrete agency action, this measure would not require BLM to take any such action at this time because this measure only requires that "structures be located to allow conductors to avoid *identified* sensitive features." ECF 20-6 (Table 2-13) (emphasis added). Here, although MMC holds active, unpatented mining claims, MMC is only at the prospecting (exploration) stage with respect to those claims and has been at that stage since 1987. Complaint ¶ 29; Brown Decl. ¶ 11, Ex. 6. Although MMC undertook a spate of exploration activity from 1987 through the 1990s, MMC thereafter let its mining claims sit dormant for decades without pursuing mine development. Brown Decl. ¶ 11. MMC has only recently shown interest in renewed exploration, *see* Ex. 6 and has not provided BLM sufficient technical information on its exploration plans to assess whether the ROW currently endangers or materially interferes with exploration. Brown Decl. ¶ 9.

MMC was either unable or unwilling to provide an alleged mineral resource location or any other technical information at the July 14, 2026 meeting with BLM and IPC. Brown Decl. ¶ 7. But now, in a declaration filed with its September 1, 2026 motion, MMC asserts that it has defined two gold ore bodies. ECF 21 ¶ 3. It appears that, after the July 14 meeting, MMC consultant Brian Anderson "modeled the location and extent of the Kerby Project's Central Ore Deposit." *Id.* at ¶ 25. Mr. Anderson alleges that the ROW will "likely foreclose further exploration." *Id.* at ¶ 3b. Mr. Anderson states that "[d]rill rigs cannot practicably operate within or in the immediate proximity of an energized 500-kV transmission line corridor." *Id.* at ¶ 35. However, the transmission line is not yet energized, so there is no imminent material interference with exploration drilling from an energized line. Brown Decl. ¶ 15.

It is common for BLM to issue rights of way across mining claims. Brown Decl. ¶ 10. Given the vast acreage covered by mining claims (many of which never proceed to development), it would be impractical to avoid issuing authorizations over mining claims. *Id.* "While miners and mining companies appear at times to be incurable optimists, the reality is that considerable exploration takes place without subsequent mineral development." *Concerned Citizens*, 131 IBLA at 267.

As a result, given that there is currently no *identified* sensitive feature which could be avoided in the construction of the B2H Project, there is no discrete agency action for BLM to take at this time to ensure that construction avoid any such feature. Given that MMC's pre-ROW issuance Kerby mining claims span 330.3 acres, and the vast acreage covered by mining claims throughout the United States, it is impractical for BLM to prohibit all construction on the surface of lands that are the subject of MMC's or others' mining claims, in particular where there is no identified sensitive feature to mine in the immediate term. Brown Decl. ¶ 10; *see also* ECF 21-3.

### 3 Even if There Were a Specific, Unequivocal Command Compelling BLM to Take a Discrete Agency Action at This Time, BLM Has Done So

Even if Selective Mitigation Measure No. 8 was specific and unequivocal and BLM had a clear duty to assess noncompliance with the ROW, rather than the discretion outlined in Special Stipulation No. 19, BLM has not “unreasonably delayed” that federal action. MMC claims that “BLM has been notified of the existing and escalating encroachments on MMC’s rights but it has not acted.” ECF 20 at 36. This is not true – to the contrary, BLM has taken action to assess whether any noncompliance with the ROW conditions has occurred and to remedy any such noncompliance. BLM received an allegation letter from MMC on June 16 and responded efficiently, coordinating schedules and travel requirements to host an in-person meeting on July 14 to discuss the technical status of the alleged conflict. Brown Decl. ¶ 7. MMC was not forthcoming with technical information at that meeting and opined that it needed at least four weeks to produce the requisite technical information to even begin to assess the situation. *Id.* BLM issued a follow-up letter days later, requesting to be contacted once that technical information became available and to schedule follow-up meeting(s). Brown Decl. ¶ 8, Ex. 5. BLM has been awaiting this requested technical information for analysis since that technical data request. Brown Decl. ¶¶ 8-9. Without a detailed drilling exploration plan from MMC, BLM has indicated that it is difficult to envision how the ROW facilities would materially interfere with exploration drilling (if and when that drilling is approved with State of Oregon permits). Brown Decl. ¶ 15. Drilling can be conducted using angled directional drilling and is often conducted in a grid. BLM is not currently aware of a technical basis as to why MMC would need to drill specifically at the IPC tower pad locations. BLM looks forward to continuing to work with the parties once MMC provides sufficient exploration planning information to engage in a meaningful discussion. Brown Decl. ¶ 20.

These efforts by BLM show that, even if there were a specific, unequivocal command requiring BLM to take a discrete agency action to investigate and enforce compliance with the ROW conditions, BLM has initiated its assessment of the alleged noncompliance but has been unable to proceed in its assessment due to the lack of technical information provided by MMC.

### B MMC Has No Likelihood of Success on the Merits of its NEPA Claim Against BLM

MMC has no likelihood of success on the merits of its NEPA claim against BLM because (2) MMC lacks standing to bring a NEPA challenge; and (3) even if MMC had standing to bring a NEPA challenge, no supplemental NEPA analysis is required.

#### 1 MMC Lacks Standing to Bring a NEPA Challenge Because MMC's Purely Economic Concerns Lie Outside NEPA's Zone of Interests

MMC has purely economic interests at stake in this matter and therefore lacks standing to challenge BLM's actions under NEPA. When a plaintiff challenges an agency decision under the APA, it must demonstrate that it satisfies the "the non-constitutional or prudential standing requirements." *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006). These requirements evaluate "whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit." *Id.* (internal citations and quotations omitted). To establish prudential standing under the APA, "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (emphasis in original; internal quotation and citation omitted).

The Ninth Circuit has "long described the zone of interests that NEPA protects as being environmental." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005); *see*

*also Nuclear Info.*, 457 F.3d at 950 ("It is well settled that the zone of interests protected by NEPA is environmental."); *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions.") (citation omitted). Bona fide NEPA interests include "recreational use and aesthetic enjoyment." *Lujan*, 497 U.S. at 885.

Here, MMC's interests are limited to "interference with its ability to explore and develop [its mining] claims," Complaint ¶ 80, and potential detrimental impacts to MMC's ability to extract "marketable gold ore." ECF 20 at 40. Nowhere in its Complaint, Motion for Temporary Restraining Order &/Or Preliminary Injunction, or Amended Complaint does MMC purport to have any interest in environmental protection on the lands at issue. *See generally*, Complaint, ECF 20, Amended Complaint.

Instead, MMC attempts to fit its economic interests within the environmental zone of interests that NEPA seeks to protect by citing to a NEPA Implementation Handbook which "defines 'effects' or 'impacts' broadly to include 'ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, local custom and culture or health effects." Complaint at ¶ 24 (citing Sec. 6.1(k)(1), U.S. Dept. of the Interior NEPA Implementing Procedures, 516 DM 1 (Feb. 2026)); Amended Complaint at ¶ 24 (same). However, MMC cites no case law which has upheld a NEPA challenge based upon solely economic interests. *See generally*, Complaint, ECF 20, Amended Complaint. In fact, in asserting this argument, MMC ignores the numerous cases which have unequivocally held that purely economic interests are *not* sufficient to support a NEPA challenge. *See, e.g.*, *Ashley Creek*, 420 F.3d at 940 ("[W]e have consistently held that purely economic interests do not fall within

NEPA's zone of interests") (citations omitted); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) ("[A] NEPA claim may not be raised by a party with no claimed or apparent environmental interest.") (citation omitted); *Nevada Land Action Ass'n*, 8 F.3d at 716 ("[t]he purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions.").

Because MMC's purely economic interests are not within the environmental zone of interests protected by NEPA, MMC lacks standing to bring a NEPA claim and therefore has no likelihood of success on the merits of its NEPA claim.

**2 Even if MMC Had Standing to Bring a NEPA Challenge, No Supplemental NEPA Analysis is Required**

NEPA requires supplementation of an EIS only if "a major Federal Action is incomplete or ongoing," and "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns" or "[t]here are substantial new circumstances or information about the significance of adverse effects that bear on the analysis." 40 C.F.R. § 1502.9(d)(1).[2] Here, even if MMC had standing to bring a NEPA challenge, no supplemental NEPA analysis is required because (i) there is no major federal action left to occur; (ii) there has been no significant change to the B2H Project that would require additional NEPA analysis; and (iii) there are no substantial new circumstances or information about the significance of adverse effects that bear on the analysis.

[2] Although 33 C.F.R. § 333.34 is an Army Corps of Engineers implementing NEPA regulation, there is not a fundamental difference to the analysis governing when supplemental NEPA analysis is required.

### i There is No Major Federal Action Left to Occur

MMC is not likely to succeed on its claim that BLM has an obligation to conduct supplemental NEPA analysis because there is no major federal action left to occur with respect to the B2H Project. BLM issued a Record of Decision in 2017, ECF 20-7; BLM granted a ROW to IPC in 2018, ECF 20-8 (2018 ROW); BLM issued a Notice to Proceed in 2024 Ex. 1; and BLM accepted IPC's ground-disturbing clearance in 2025, Ex. 2. The ongoing monitoring and enforcement actions by BLM that are the focus of MMC's NEPA claim are not major federal actions. Whether a supplemental analysis is required "turns on the value of the new information to the *still pending* decisionmaking process." *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989)). Once an agency makes a decision to approve a particular plan or permit, there is no major federal action left to occur. *See id.*; *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004). Merely because an agency continues to be involved in a project in an oversight capacity and may make ministerial decisions to ensure compliance with the parameters of its decision does not mean that major federal action remains. *See Center for Biological Diversity*, 706 F.3d at 1095-96.

In *Cold Mountain*, the Ninth Circuit found that no additional NEPA analysis was required where a plaintiff alleged (similar to here) that a supplemental analysis was required because the permittee had allegedly violated the terms of its special use permit for a bison testing facility. *Cold Mountain*, 375 F.3d at 894. "Pointing to eyewitness affidavits, videotape footage, and photographs that purport to demonstrate violations of the [permit]," the plaintiffs argued that the Forest Service was required to prepare a supplemental NEPA analysis. *Id.* at 889, 891. But the

Ninth Circuit concluded that no additional analysis was required because, the permit having been issued, there was no outstanding major federal action. *Id.* at 894.

Similarly, in *Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 1:25-cv-710-DCN, 2026 WL 810003 (D. Idaho Mar. 24, 2026), the plaintiffs challenged a U.S. Army Corps of Engineers permit issued under the Clean Water Act. *Id.* at *1. The plaintiffs alleged that the permittee had conducted construction activities in a manner that was not consistent with the permit, and they argued that the agency was required to prepare supplemental NEPA analysis. *Id.* at *4. The district court rejected that argument on the basis that there was no major federal action left to occur, stating, "neither party has identified a case where an ongoing major Federal action was found based solely on the fact an agency previously issued a permit, and the permitted action is ongoing." *Id.* at *11. The court further explained that "[o]nce the Corps issues a permit, the nature of the Corps' responsibilities typically changes from determining what is best for the environment in a broad sense to determining how best to exact compliance with the permit's conditions." *Id.* But such ongoing enforcement activities are not, themselves, major federal actions, and therefore "the Corps' NEPA obligations terminated on issuance of the Permit." *Id.*

Likewise, *Center for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687 (D. Ariz. 2011) involved BLM's approval of a uranium mine. *Id.* at 690. As explained in the court's prior preliminary injunction ruling, over the life of the mine (and a change in ownership) BLM "continue[d] to monitor the environmental impacts of the . . . mine" and imposed new requirements. *Center for Biological Diversity v. Salazar*, No. CV-09-8207C, 2010 WL 2493988, at **1, 6 (D. Ariz. June 17, 2010), *aff'd*, 431 F. App'x 593 (9th Cir. 2011). Plaintiff argued that BLM's ongoing monitoring and oversight of the mine required the agency to prepare a supplemental NEPA analysis. *Salazar*, 791 F. Supp. 2d at 696-97. The district court disagreed,

ruling that "BLM's obligation to monitor compliance with statutory and regulatory requirements" was not an ongoing major federal action. *Id.* at 697 (quoting *Sierra Club v. Penfold*, 857 F.2d 1307, 1312-13 (9th Cir. 1988)). Further, the court stated, "[t]he fact that BLM continues to monitor the Arizona 1 mine to ensure compliance with relevant laws does not require NEPA supplementation." *Id.* at 698; *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 379 F. Supp. 2d 1071, 1099 (N.D. Cal. 2005) ("If there is no 'major federal action,' that is the end of the inquiry; the agency need not prepare an EIS or EA."); *Env't Prot. Info. Center v. U.S. Fish & Wildlife Serv.*, No. C 04-4647 CRB, 2005 WL 3877605, at *2 (N.D. Cal. Apr. 22, 2005) ("In 1999 the government issued Pacific Lumber its incidental take permit. There is no other on-going major federal action; accordingly, NEPA does not apply.").

The same principle applies in this case. BLM's decision-making process has been completed, and Plaintiff identifies no remaining discretionary federal approval process requiring supplemental NEPA review.

**ii There Has Been No Significant Change to the B2H Project that Would Require Additional NEPA Analysis**

MMC argues that BLM must supplement the FEIS under NEPA because the FEIS projected minimal impact on mineral resources when applying Selective Mitigation Measure No. 8 to mitigate impacts on mineral resources during the initial construction period. Complaint ¶¶ 40, 41, 46, 49. MMC asserts that, because IPC's alleged material interference will purportedly occur once MMC develops the mine, the FEIS projection is incorrect. *Id.* at ¶ 46. However, MMC is not yet conducting full scale mine operations and may never do so; therefore, it is speculative to assume that the ROW will materially interfere with full scale mining operations. Brown Decl. ¶ 11. As discussed in I.B.2.ii, *supra*, MMC has not even shown that the ROW is

materially interfering with exploration. There has been no significant change in the action or circumstances disclosed in the FEIS.

No supplemental NEPA analysis is required here because MMC has not demonstrated that IPC's construction is being carried out in a manner that is substantially different than was considered in BLM's original NEPA analysis.

#### iii There Are No Substantial New Circumstances or Information About the Significance of Adverse Effects that Bear on the Analysis

MMC does not identify any alleged substantial new circumstances or information about the significance of adverse effects that bear on the NEPA analysis previously conducted. *See generally* Complaint, ECF 20, Amended Complaint. MMC may argue that the potential material interference it alleges will occur with developing the mine constitutes a substantial new circumstance or information given that MMC claims such interference was not accounted for under the FEIS because the FEIS was prefaced on compliance with the selective mitigation measures, including Selective Mitigation Measure No. 8. However, as discussed in I.B.2.ii, *supra*, MMC has not shown that the ROW will materially interfere with mining or exploration. Therefore, there has been no substantial new circumstances or information requiring supplemental NEPA analysis.

## II Irreparable Harm

Because MMC does not appear to be seeking a preliminary injunction or temporary restraining order against BLM, BLM does not address whether MMC is likely to suffer irreparable harm in the absence of a preliminary injunction or temporary restraining order against IPC.

### III Balance of Equities

Because MMC does not appear to be seeking a preliminary injunction or temporary restraining order against BLM, BLM does not address whether the balance of equities tips in favor of MMC with respect to the preliminary injunction or temporary restraining order it is seeking against IPC.

### IV Public Interest

It is not in the public interest to grant the preliminary injunction or temporary restraining order that MMC requests here because such an order would create negative implications for the federal land management system. At the end of the fiscal year 2025, there were 11,903 active mining claims covering 277,393 acres on federal lands in Oregon alone, and 551,666 claims covering 12,169,985 acres nationwide. Brown Decl. ¶ 10. Many of these mining claims never lead to full-scale mining. *Id.* Given this vast number of mining claims, BLM commonly grants rights of way and other authorizations on lands subject to these claims. *Id.* Allowing a mining company to sit on mining rights for decades only to raise them again after a surface ROW was granted to block construction in accordance with that surface ROW would undermine BLM's ability to effectively manage public lands.

Moreover, granting MMC's requested preliminary injunction or temporary restraining order is not in the public interest to the extent that such a grant is based upon MMC's purported likelihood of success on its claims against BLM because, as discussed in Section I *supra*, MMC is not likely to succeed on either of its claims against BLM. Contrary to MMC's assertions, BLM has not shirked any obligations. ECF 20 at 44. BLM has taken action to assess any alleged violation with the ROW, including facilitating a meeting and requesting additional technical information to assess the situation.

## CONCLUSION

For the foregoing reasons, BLM requests that this Court find that MMC has no likelihood of success on the merits of its claims against BLM. BLM also requests that this Court find that MMC's requested temporary restraining order or preliminary injunction is not in the public interest.

Respectfully submitted this 15th day of September 2026.

SCOTT E. BRADFORD
United States Attorney

*/s/ Chelsea Wein*
CHELSEA WEIN
Assistant United States Attorney

Attorneys for the United States