Jessica Vander Velde, Bar No. 241679
jessica.vandervelde@ashurstperkins.com
ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: +1.503.727.2000
Facsimile: +1.503.727.2222

Erika E. Malmen, *Admitted Pro Hac Vice*
erika.malmen@ashurstperkins.com
Sarah A. Hugues, *Admitted Pro Hac Vice*
sarah.hugues@ashurstperkins.com
Malori M. Basye, *Admitted Pro Hac Vice*
malori.basye@ashurstperkins.com
ASHURST PERKINS COIE US LLP
1111 West Jefferson Street, Suite 500
Boise, Idaho 83702-5391
Telephone: +1.208.343.3434
Facsimile: +1.208.343.3232

*Attorneys for Defendant Idaho Power Co.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

MALHEUR MINING CO., LTD., an Oregon corporation,

Plaintiff,

v.

IDAHO POWER CO., an Idaho corporation; and BUREAU OF LAND MANAGEMENT, an agency and instrumentality of the U.S. Government,

Defendants.

Case No. 2:26-cv-01451-IM

**Defendant Idaho Power Co.'s OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER &/OR PRELIMINARY INJUNCTION [ECF NO. 20]**

PAGE

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PROCEDURAL BACKGROUND .......... 2

III. ARGUMENT .......... 6

A. MMC's Motion Is Procedurally Deficient and Should Be Denied on That Basis Alone .......... 6

1. MMC's "TRO" Label Does Not Change the Governing Standard .......... 6

2. MMC's Delay Is Inconsistent with Emergency Relief .......... 7

B. MMC Cannot Satisfy the Winter Standard for Preliminary Injunctive Relief .......... 8

1. MMC Is Unlikely to Succeed on the Merits .......... 8

2. MMC Cannot Demonstrate Irreparable Harm .......... 14

3. The Balance of Equities Tips Sharply Against MMC .......... 16

4. The Public Interest Favors Denying the Motion .......... 22

5. MMC's theory would create an impossible standard for public infrastructure. .......... 22

C. MMC Also Fails the Ninth Circuit's Sliding-scale Test .......... 23

IV. CONCLUSION .......... 23




ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ....................17, 18

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................23

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018)....................8

*Chrisman v. Miller*,
197 U.S. 313 (1905)....................9, 10

*Cole v. Ralph*,
252 U.S. 286 (1920)....................1, 9, 11, 18

*Converse v. Udall*,
399 F.2d 616 (9th Cir. 1968) ....................10

*Env't Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ....................6, 8

*Friends of Sierra R.R. v. I.C.C.*,
*881 F.2d 663* (9th Cir. 1989) ....................18

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,* 546 U.S. 418 (2006)....................7

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*,
415 U.S. 423 (1974)....................6

*Lydo Enters., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) ....................8

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
762 F.2d 1374 (9th Cir. 1985) ....................7, 14

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,
636 F.3d 1150 (9th Cir. 2011) ....................14

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013) ....................23



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) .....17, 19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
240 F.3d 832 (9th Cir. 2001) .....7

*Union Oil Co. of California v. Smith*,
249 U.S. 337 (1919).....9, 12

*United States v. Allen*,
578 F.2d 236 (9th Cir. 1978) .....13

*United States v. Coleman*,
390 U.S. 599 (1968).....10

*United States v. Curtis-Nevada Mines, Inc.*,
611 F.2d 1277 .....13

*W. Watersheds Project v. Bernhardt*,
391 F. Supp. 3d 1002 (D. Or. 2019) .....6

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).....1, 6, 7, 14, 15

**STATUTES**

28 U.S.C. § 1927.....24

30 U.S.C. § 23.....20

30 U.S.C. § 35.....20

30 U.S.C. § 612.....2, 5, 13, 14

43 U.S.C. § 1761.....2, 4

44 U.S.C. § 1507.....18

Oregon Revised Statute § 517.705.....20

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 11 .....24

Federal Rule of Civil Procedure 15 .....2

Federal Rule of Civil Procedure 65 .....1, 6, 24

House Report No. 84-730 (1955).....22



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

Defendant, Idaho Power Co. ("***Idaho Power***"), by and through its counsel of record Ashurst Perkins Coie US LLP, hereby submits its Opposition to Plaintiff's Motion for Temporary Restraining Order &/or Preliminary Injunction ("***Motion***"). For the reasons set forth herein Idaho Power respectfully requests the Court deny Plaintiff's Motion.

## I. INTRODUCTION

Plaintiff Malheur Mining Co., Ltd. ("***MMC***") asks this Court to halt construction of the federally authorized Boardman-to-Hemingway ("**B2H**") transmission line—a 300-mile, 500-kilovolt project—through a temporary restraining order and/or preliminary injunction. Because such relief is an "extraordinary remedy," MMC must establish a likelihood of success on the merits, likely irreparable harm, a balance of equities tipping in its favor, and that an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008). The Motion should be denied: it is procedurally deficient—mislabeled as a "TRO" without the affidavit or attorney certification required by Rule 65(b), and filed nearly a year after construction began and years after MMC learned of the B2H project—and it fails every *Winter* factor.

On the merits, MMC's original Complaint did not allege a valid mineral discovery on any of its 122 claims. A First Amended Complaint (First Am. Compl. Declaratory & Inj. Relief ("***FAC***"), ECF No. 30) now includes discovery allegations, but only after MMC filed expert declarations with the PI motion on September 1, 2026—nearly seven weeks after the original Complaint—and those allegations remain untested. The Motion asserts discoveries on only seven of the 21 claims in the "Immediate Interference Zone," leaving the remaining 14 supported only by pre-discovery exploratory rights. *Cole v. Ralph*, 252 U.S. 286, 295–96 (1920). MMC alleges no mining operations for more than 25 years; 106 of its 122 claims were staked after BLM granted the right-of-way ("***ROW***") and construction was underway; Idaho Power's construction is



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

authorized by a Federal Land Policy and Management Act ("***FLPMA***") ROW, 43 U.S.C. § 1761 *et seq.*; and all 122 claims are post-1955 claims subject to the Multiple Surface Use Act, 30 U.S.C. § 612(b).

MMC cannot show irreparable harm after its years-long delay, and the balance of equities and public interest favor denial because an injunction would halt federally authorized regional energy infrastructure to protect undeveloped claims based on late, untested discovery assertions and no current approved exploration or mine plan. The Court should deny MMC's motion in its entirety.

## II. PROCEDURAL BACKGROUND

MMC filed its Complaint for Declaratory & Injunctive Relief ("***Complaint***") on July 14, 2026, asserting claims for trespass, nuisance, quiet title, and ejectment against Idaho Power, along with claims against BLM. Compl., ECF No. 1. Idaho Power filed a Motion to Dismiss on August 21, 2026, demonstrating that MMC's original Complaint failed to state a claim because it did not allege a valid mineral discovery on any of its claims. Def.'s Mot. Dismiss, ECF No. 9. MMC subsequently filed the FAC on September 11, 2026 as a matter of right under Rule 15(a)(1)(B), which for the first time includes discovery allegations. FAC, ECF No. 30.

Nearly seven weeks after filing suit—and nearly a year after it was aware that construction of the B2H line was underway—MMC filed the instant Motion on September 1, 2026. Mot., ECF No. 20. MMC's awareness of the B2H project is long-standing. In November 2008, MMC's counsel submitted scoping comments to BLM and Idaho Power. FAC ¶ 49. The 2008 letter was authored by W. Kirk Williams, the same individual who submitted a declaration in support of MMC's Motion. Mot. Ex. 3, ECF No. 20-3. MMC's counsel closed by stating: "We appreciate the opportunity to provide these comments, so Idaho Power may better plan for a final right-of-way



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

with the least impact on anyone." FAC ¶ 49. Idaho Power also directly contacted MMC in February 2013 regarding the ROW for surveys on MMC's property related to the project. Decl. of Joe Stippel in Supp. of Def. Idaho Power Co.'s Opp'n to Pl.'s Mot. for TRO &/or Prelim. Inj. ("***Stippel Decl.***"), ¶ 20, Ex. A.

MMC then went silent for the remainder of the decade-long NEPA process. The FAC suggests MMC lacked notice because BLM did not include it in a July 2010 letter sent to 27 other mining claimants. FAC ¶ 50. But MMC's own 2008 scoping comments demonstrate that it had actual knowledge of the B2H project, knew the proposed route corridors, and knew its claims could be affected. *Id.* ¶ 49. A party with actual knowledge of a major federal infrastructure project cannot disclaim responsibility to monitor its progress simply because it did not receive one form letter—particularly when, as here, the Draft EIS, Final EIS, Record of Decision, and ROW grant were all publicly available. MMC challenged none of these milestones *Id.* ¶¶ 25–29. The ROW was granted in January 2018, and MMC did not file a judicial challenge. *Id.* ¶ 29.

## III. FACTUAL BACKGROUND

In 1986, MMC's predecessor, Western Epithermal, located 16 lode mining claims (the "***Kerby Claims***") on BLM-administered public lands in Malheur County, Oregon. In the late 1980s and early 1990s, Western Epithermal and subsequently MMC conducted geological mapping, soil geochemistry, and some exploratory drilling, confirming "surface mineralization ranging from 0.010 to 0.250 ounces of gold per ton" and identifying "two primary ore zones or pods containing ore grade mineralization of gold with upside potential laterally and at depth." FAC ¶¶ 28, 31. All exploration ceased by approximately 1998. FAC ¶¶ 30–32.

For the next 25 years—from approximately 1998 through 2025—no work of any kind was performed on the claims: no drilling, mining equipment, mining plan, exploration permit from



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

BLM or DOGAMI, workforce, or updated geologic mapping. The only activity was payment of annual maintenance fees. FAC ¶ 32. In 2014, MMC reduced its holdings to just 16 claims to "minimize its carrying costs," while Idaho Power's federal permitting process was publicly underway. FAC ¶ 43. The FAC itself acknowledges that "only additional planned prospecting and exploration activities will be able to determine" the extent of the mineralization. FAC ¶ 35.

Meanwhile, in December 2007, Idaho Power applied to BLM under FLPMA, 43 U.S.C. § 1761 *et seq.*, for a ROW to construct the B2H transmission line—a 300-mile, 500-kV project. BLM conducted an exhaustive NEPA review spanning nearly a decade, including public scoping, a Draft EIS, a Final EIS issued in November 2016, and a Record of Decision approved at the Assistant Secretary level on November 17, 2017. FAC ¶¶ 36–42. MMC filed no judicial challenge to those federal milestones. On January 19, 2018, BLM's Vale District Manager formally issued the B2H ROW, expressly subject to "any and all valid existing rights." FAC ¶ 43.

MMC was not unaware of this process. In November 2008, MMC's counsel submitted scoping comments to BLM. FAC ¶ 49. Idaho Power also directly contacted MMC in February 2013 regarding ROW surveys. Stippel Decl. ¶ 20 Ex. A. MMC did not respond to the February 20, 2013 right-of-entry letter. *Id.* ¶ 21. MMC then went silent for the remainder of the NEPA process, challenging none of the subsequent federal milestones.

Idaho Power received a Notice to Proceed from BLM in November 2024, and construction commenced in the Claims Area. Stippel Decl. ¶¶ 30–32. In July 2025, MMC representatives visited the Claims Area and observed construction activities. FAC ¶ 50. During settlement discussions that followed, in November 2025, MMC staked 106 additional mining claims surrounding and overlapping with the B2H route—more than seven years after the ROW was issued and during



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

active settlement negotiations. FAC ¶¶ 34, 51, 54. The FAC offers no explanation for why these claims were suddenly needed after MMC had voluntarily reduced its holdings to 16 in 2014.

On May 14, 2026, MMC submitted a Notice of Intent to Conduct Exploration to BLM. BLM accepted the Notice as complete in July 2026, and MMC paid the Financial Guarantee. FAC ¶ 62. MMC still lacks DOGAMI authorization, an absolute prerequisite to conducting exploration drilling in Oregon. Decl. of Erika E. Malmen in Supp. of Opp'n to Pl.'s Mot. for TRO &/or Prelim. Inj. ("***Malmen Decl.***") ¶ 8, Ex. A. In fact, it appears that MMC has not even applied to DOGAMI as of the date of this motion. *Id.* Notably, the proposed drill locations coincide with Idaho Power's already-constructed tower-pad locations. Glowacki Decl. ¶ 52. MMC filed its original Complaint on July 14, 2026. The original Complaint—31 pages and 83 paragraphs—never alleged a valid mineral discovery on any claim. Idaho Power moved to dismiss on August 21, 2026. Def.'s Mot. to Dismiss, ECF No. 9.

Nearly seven weeks after filing suit, on September 1, 2026, MMC filed the Motion with expert declarations claiming valid discoveries on seven of the 21 claims in the Immediate Interference Zone and valuing the deposit at $544 million. Glowacki Decl. ¶ 18; Anderson Decl. ¶ 21, ECF No. 21. Ten days later, on September 11, MMC filed the FAC, which for the first time includes discovery allegations—but those allegations plainly derive from the same declarations that did not exist when MMC filed suit. FAC, ECF No. 30. Even now, the FAC describes the deposits as having "upside potential" and needing "additional planned prospecting and exploration activities." FAC ¶¶ 40, 46. Fourteen of the 21 claims in the Immediate Interference Zone still have no alleged discovery.

All 122 of MMC's claims were staked after 1955—the oldest claims date to 1986. Under the Multiple Surface Use Act, 30 U.S.C. § 612(b), the United States and its permittees may use the



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

surface of post-1955 claims so long as that use does not "endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." Neither the Complaint nor the FAC alleges ongoing operations at any relevant time.

## IV. ARGUMENT

A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 24, 22. MMC fails on every factor.

### A. MMC's Motion Is Procedurally Deficient and Should Be Denied on That Basis Alone

#### 1. MMC's "TRO" Label Does Not Change the Governing Standard

MMC styles its Motion as seeking a "temporary restraining order and/or preliminary injunction," but a TRO is designed for genuine emergencies—short-duration orders meant to preserve the status quo only until a preliminary injunction motion can be briefed and heard. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974) (holding that ex parte TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"); *see also W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008 n.5 (D. Or. 2019) (noting that although the 14-day limit of Rule 65(b)(2) applies by its terms only to TROs issued without notice, "a court may not extend a TRO indefinitely, even upon notice and a hearing"). MMC's Motion was filed with notice to Idaho Power—its counsel certified that



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

the parties conferred in good faith regarding the issues. Mot. at 2. A noticed TRO application is subject to the same *Winter* factors as a preliminary injunction, and the "TRO" label does not entitle MMC to expedited consideration or a lower burden of proof. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (declining to address the TRO separately because the court's "analysis is substantially identical for the injunction and the TRO"); *see Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006) (holding that "the burdens at the preliminary injunction stage track the burdens at trial," so that the movant's evidentiary burden is not reduced by styling the motion as one for a TRO). MMC's Motion is therefore properly analyzed as a request for preliminary injunctive relief—and as shown below, it fails every *Winter* factor.

The "TRO" label appears to be a tactical choice to manufacture urgency. As detailed below, MMC's delay in seeking relief is irreconcilable with the emergency posture the label is meant to convey. A party that has been aware of a project for nearly two decades and waited more than nineteen months after construction began to file suit is not facing the kind of genuine emergency a TRO is designed to address.

### 2. MMC's Delay Is Inconsistent with Emergency Relief

Even if the Motion could properly be construed as a TRO request, MMC's extraordinary delay in seeking relief undermines any claim of emergency. The Ninth Circuit has held that "[a] long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

The timeline here speaks for itself. MMC has been aware of the B2H project since at least 2008, when its counsel submitted scoping comments identifying the location of its claims and recommending a specific route placement. FAC ¶ 49. That 2008 letter is irreconcilable with any



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

suggestion that MMC was unaware the project was advancing. MMC knew, and it chose not to act. BLM issued the ROW in January 2018. Stippel Decl. ¶ 29. Idaho Power commenced construction in November 2024. *Id.* ¶¶ 30–31 MMC waited until July 2026—more than nineteen months after construction began—to file its Complaint, and then waited nearly seven more weeks to file this motion for "emergency" relief. This is not the conduct of a party facing imminent, irreparable harm. *See Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213–14 (9th Cir. 1984) (reversing preliminary injunction where movant delayed five years before taking action and noting that delay "is a factor to be considered in weighing the propriety of relief"); *Benisek v. Lamone*, 138 S. Ct. 1942, 1944–45 (2018) (per curiam) (six-year delay in seeking preliminary injunction was "unnecessary" and weighed against relief).

To put this in perspective: MMC knew for nearly *two decades* that the B2H project was headed toward its claims. FAC ¶ 49. It had every opportunity during that time to continue participating in the federal permitting process, challenge the Environmental Impact Statement, challenge the Record of Decision, or drill its claims to establish the mineral discovery it needed to perfect its rights. It did not challenge the Environmental Impact Statement or Record of Decision, and the record shows no drilling or other exploration during the intervening decades. Stippel Decl. ¶ 24. Instead, it reduced its claim holdings in 2014 to "minimize carrying costs"—while Idaho Power's federal permitting process was publicly underway—and went silent for years. FAC ¶ 43. A party that sleeps on its rights for this long is not entitled to wake up and demand emergency judicial intervention.

### B. MMC Cannot Satisfy the Winter Standard for Preliminary Injunctive Relief

#### 1. MMC Is Unlikely to Succeed on the Merits

"Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Carlson*, 968 F.3d at 989. In order to claim protectable property interests, MMC must



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

show valid mineral discoveries, but its discovery allegations are belated and untested. The Motion asserts discoveries on only seven of the 21 claims in the Immediate Interference Zone and invokes pre-discovery exploratory rights for the other 14. Those allegations do not establish the property interests required for preliminary injunctive relief.

***The discovery allegations are belated and untested.*** Under the Mining Law of 1872, a mining claim is not "valid" until a "discovery" of a valuable mineral deposit has been made. *Cole*, 252 U.S. at 296 (holding that mere location "confers no right in the absence of discovery"); *Union Oil Co. of California v. Smith*, 249 U.S. 337, 346–48 (1919) (explaining that before discovery, prospectors are merely "licensees or tenants at will" whose possession requires "continued actual occupancy" and "diligent prosecution of work looking to the discovery of mineral"). The original Complaint is 31 pages and 83 paragraphs, devotes extensive attention to the claims' history and value, yet never alleges that a valid discovery was made on any claim. The FAC now alleges discovery, but MMC added that allegation only after filing the expert declarations with its Motion on September 1, 2026. The FAC still describes mineralization as having "upside potential" and says that additional prospecting and exploration are needed to determine the deposits' extent. FAC ¶ 40. During the months of negotiations, MMC never asserted to Idaho Power that it had made a valid mineral discovery on any claim; instead, MMC repeatedly characterized its alleged orebodies as "estimated" and acknowledged uncertainty about the location of mineralization. Stippel Decl. ¶ 43; *see also id.* Ex. D.

Even on its face, MMC's allegations describe mineralization—not a valid discovery. "The mere indication or presence of gold or silver is not sufficient to establish the existence of a lode." *Chrisman v. Miller*, 197 U.S. 313, 322 (1905). "The mineral must exist in such quantities as to justify expenditure of money for the development of the mine and the extraction of the mineral."



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

*Id.* As the Ninth Circuit likewise explains, "the finding of some mineral, or even of a vein or lode, is not enough to constitute discovery—their extent and value are also to be considered." *Converse v. Udall*, 399 F.2d 616, 619 (9th Cir. 1968). MMC's own references to "surface mineralization," "upside potential," and "additional planned prospecting and exploration" describe a prospect awaiting confirmation, not a discovery whose extent and value have been established. FAC ¶¶ 40, 46, 64. And under *United States v. Coleman*, the minerals must be capable of being "extracted, removed, and marketed at a profit"—a showing MMC's equivocal allegations do not make. 390 U.S. 599, 600–03 (1968).

***The timing warrants skepticism.*** The sequence of events is telling. MMC filed its 31-page Complaint on July 14, 2026. Compl, ECF No. 1. That Complaint discusses the mining claims at length but never alleges a valid mineral discovery. *Id.* Nearly seven weeks later, when MMC filed this Motion on September 1, it attached expert declarations claiming valid discoveries on seven claims and valuing the deposit at $544 million. Decl. Edward Glowacki III in Supp. Pl.'s Mot. TRO and/or Prelim. Inj. ("***Glowacki Decl.***") ¶ 18, ECF No. 20; Decl. Brian G. Anderson Supp. Pl.'s Mot. TRO & Prelim. Inj. ("***Anderson Decl.***") ¶ 21, ECF No. 21. Ten days after that, on September 11, 2026, MMC filed the FAC that for the first time includes discovery allegations—but those allegations plainly derive from the same declarations that were not available when MMC filed suit. The obvious question is: if MMC had this information, why was it not in the Complaint? And if MMC did not have it then, what does that say about when and why the analysis was prepared? The record suggests MMC did not have the discovery analysis when it filed suit, which raises questions about when and why the analysis was prepared. A discovery analysis that was not presented when MMC filed suit deserves careful scrutiny before it is used to justify halting a major infrastructure project.



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

***MMC's characterization of its deposits has been consistent over time—and consistently falls short of claiming a valid discovery***. In its 2008 scoping comments, MMC's counsel described the deposits as "ore grade mineralization" with "upside potential laterally and at depth." Mot. Ex. 3 at 1–2, ECF No. 20-3. The letter also stated that BLM had issued a Finding of No Significant Impact ("***FONSI***") for the Project Site, that the IBLA upheld the FONSI on appeal, and that the Project "would have been developed at that time but for the then existing market conditions." *Id.* at 2. That contemporaneous account attributes the lack of development to market conditions—not a legal obstacle—and supports the conclusion that MMC's claims remained dormant by choice rather than circumstance. This is the language of a prospect with potential, not a validated discovery. It is consistent with the FAC's own description of the deposits as having "upside potential" and needing "additional planned prospecting and exploration activities" to determine their extent. FAC ¶¶ 40, 46. The FAC itself continues to use equivocal language about the deposits.

***Fourteen claims have no alleged discovery.*** MMC's own Motion concedes that only seven of the 21 claims in the Immediate Interference Zone are alleged to have valid discoveries. Glowacki Decl. ¶ 18. For the remaining 14, MMC can assert only pre-discovery exploratory rights. Under *Cole*, an explorer before discovery is "a licensee or tenant at will"; the interest is inchoate and does not become a vested property right merely because a claim is staked or annual maintenance fees are paid. *Cole*, 252 U.S. at 294–95. That limited interest cannot support an injunction against a federal permittee exercising authority under a pre-existing FLPMA ROW. In other words, for two-thirds of the claims at issue, MMC does not even assert it has a property right—only a license to keep looking. That license is not the kind of legal interest that justifies the extraordinary remedy of a preliminary injunction against a federal permittee.



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

***No active operations.*** MMC's Complaint alleges no ongoing mining or exploration activity at the time construction began—and none in the preceding 25 years. MMC's 2026 Notice of Intent was accepted as complete by BLM in July 2026, and MMC paid the Financial Guarantee, however, the Notice nevertheless described a proposed future drilling program. FAC ¶ 62, ECF No. 30. The Glowacki declaration says MMC was seeking Oregon Department of Geology and Mineral Industries ("***DOGAMI***") authorization for that program and identifies proposed drill holes at a tower-footing location. Glowacki Decl. ¶ 52, ECF No. 22. But MMC still lacks DOGAMI authorization to conduct exploration drilling, and it remains unclear whether—or when—that authorization will be granted. *See* Glowacki Decl., ¶ 12; FAC ¶ 62. Even if the Court halted Idaho Power's construction, MMC therefore could not lawfully conduct the drilling program it claims is being impeded, undermining any showing of imminent, irreparable harm. Nothing in the record shows that MMC had actually commenced drilling or mining when Idaho Power constructed the disputed segment. A party with no operating mine, no workforce or equipment, and no current approved exploration or mine plan cannot show that construction interfered with ongoing exploratory or mining operations.

***Pedis possessio fares no better.*** "*Pedis possessio*" is a mining-law principle that protects a prospector who is physically present on a claim and actively searching for minerals from being forcibly removed by a rival prospector trying to jump the claim. *Union Oil Co. of California*, 249 U.S. at 346-47. But the doctrine has two strict requirements: the claimant must be in actual physical occupation of the claim, and must be diligently searching for minerals. *Id.* MMC meets neither. *Union Oil* also makes clear that the doctrine protects a prospector only against forcible, fraudulent, or clandestine intrusion by a rival claimant. *Id.* MMC has had no physical presence on these claims for approximately 25 years; the record identifies no drilling, equipment, workforce, or updated



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

geologic mapping during that period. Idaho Power is not a rival claimant attempting to jump MMC's claim—it is a federal permittee acting under a FLPMA ROW. Stippel Decl. ¶¶ 22–23. *Pedis possessio* therefore supplies no basis for treating MMC's inchoate interests as a vested property right against Idaho Power.

***Idaho Power is a federal permittee, and the Multiple Surface Use Act governs.*** Idaho Power's right to construct and operate the B2H transmission line derives from a ROW granted by BLM under FLPMA, after more than a decade of federal environmental review, including a Draft EIS, Final EIS, and Record of Decision at the Assistant Secretary level. Stippel Decl. ¶¶ 27–29. Its presence on the land is therefore federally authorized. *Id.* ¶¶ 29–31; *see United States v. Allen*, 578 F.2d 236, 238 (9th Cir. 1978) (affirming ejectment of holders of invalid mining claims from public land and holding that such claims "cannot be used to assert rights contrary to those of the general public" under 30 U.S.C. § 612). That authorization matters here because all 122 of MMC's claims were staked after 1955, so the Multiple Surface Use Act ("***MSUA***") applies. Under the Act, the United States and its permittees—including Idaho Power as the holder of a federal FLPMA ROW—may use the surface so long as that use does not "endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." 30 U.S.C. § 612(b). The statute's focus on "operations" protects actual mining activity, not the abstract possibility of future mining. MMC had no active mining operations when Idaho Power began construction, and the record shows no drilling or other exploration activity on the claims for approximately 25 years before MMC's proposed 2026 program. Because MMC had no ongoing operations with which construction could interfere, § 612(b) does not convert undeveloped claims into an exclusive surface veto. *See United States v. Curtis-Nevada Mines, Inc.,* 611 F.2d 1277, 1286 (holding that where mining claimants "have not presented any evidence that the public use



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

of land included within their unpatented mining claim has 'materially interfered' with any mining activity," § 612(b) affords the United States and its permittees the right of surface use).

**2. MMC Cannot Demonstrate Irreparable Harm**

"Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. MMC has not made such a showing.

First, MMC's years-long delay, as detailed above, is strong evidence that no irreparable harm exists. "[A] long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune*, 762 F.2d at 1377. A party that delays seeking relief cannot show the urgency required for irreparable harm.

Second, even if MMC's claims had merit—which they do not—MMC has not demonstrated irreparable harm. Irreparable harm analysis presupposes a cognizable interest capable of being irreparably injured. As demonstrated above, MMC has not established a vested property right in any of its claims: discovery was never alleged until seven weeks after suit was filed, and those belated assertions remain untested. Without a validated discovery, MMC holds at most a contingent possessory interest on public land—not the kind of established property right that gives rise to a presumption of irreparable injury. MMC cites *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, but that case involved residential tenants facing loss of their homes—an established possessory interest in specific real property. 636 F.3d 1150, 1159 (9th Cir. 2011). Unpatented mining claims on federal land, contingent on a discovery MMC has never validated outside its own litigation-driven declarations, are not analogous.



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

MMC's "sterilization" theory does not change the analysis. The Anderson declaration projects that construction would render approximately 42,000 ounces of gold—31% of the Central Ore Deposit—permanently inaccessible. Anderson Decl. ¶ 29. But that projection assumes valid discoveries (unproven), economic viability (the $544 million figure is gross in-situ value, not net project value), and that MMC would actually develop a mine—which, after 25 years of dormancy and no current approved exploration plan, feasibility study, mining permit, or approved mine plan, the record does not support. "Sterilization" of a resource that has never been mined, by a company that reduced its holdings in 2014 to "minimize its carrying costs" while Idaho Power's permitting was publicly underway, is not the concrete, imminent injury *Winter* requires. FAC ¶ 43; *Winter*, 555 U.S. at 22. MMC's prolonged delay in seeking relief further undermines any claim of imminence.

Finally, MMC's own framing confirms that any harm is compensable through money damages. MMC has quantified its interest at $544.4 million and projects the affected resource at 42,000 ounces—a calculable sum at any gold price. Anderson Decl. ¶¶ 21, 29. A plaintiff whose own expert has quantified the value of the allegedly sterilized resource cannot simultaneously argue that the loss defies monetary calculation. MMC cannot tell this Court that its gold is worth $544 million to establish the magnitude of harm and then assert that no damages award could compensate for that same loss to establish irreparability.

Third, MMC has not demonstrated any imminent exploration or mining use of the claims that is being thwarted. MMC has no mining permit or current approved mine plan, and no evidence shows that drilling or mining had begun. BLM accepted MMC's 2026 Notice of Intent in July 2026, and MMC paid the Financial Guarantee, but approval of a proposed drilling program is not ongoing mining, and the Glowacki Declaration conspicuously identifies proposed drill locations



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

at Idaho Power's already-constructed tower-footing locations. FAC ¶ 62; Glowacki Decl. ¶ 52,. There is no active mine or mining operation to protect.

**3. The Balance of Equities Tips Sharply Against MMC**

The balance of equities tips sharply—indeed overwhelmingly—against MMC. Idaho Power is actively constructing a billion-dollar-plus, 300-mile, 500-kV project authorized by the United States after more than a decade of environmental review and intended to serve hundreds of thousands of electricity customers; stopping it would idle construction crews, impose enormous daily financial losses, disrupt supply chains, trigger contractual penalties, and delay critical regional energy infrastructure. Stippel Decl. ¶¶ 47–54. The Project has also created at least 800 temporary construction jobs during the three-year construction phase and is expected to generate tax revenue for the six counties along the route. Stippel Decl. ¶¶ 12–13. MMC, by contrast, seeks to halt that project based on undeveloped mining claims that sat dormant for a quarter century, on which no mining has occurred, and for which the key legal prerequisite—a valid mineral discovery—was not asserted until nearly seven weeks after this lawsuit was filed.

An injunction would also delay the B2H Project's planned in-service date because the construction schedule is interdependent: stopping any segment affects the project's overall timeline. Idaho Power plans to complete the B2H Project and bring it online in 2027, and a delay would leave Idaho Power, and other entities and customers relying on the Project's completion, without time to build a replacement resource. Stippel Decl. ¶ 52. That delay would increase financing and carrying costs on Idaho Power's billion-dollar-plus investment, could trigger regulatory consequences, and postpone delivery of the grid-reliability improvements to hundreds of thousands of electricity customers. Stippel Decl. ¶ 54.



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

Nor did Idaho Power ignore MMC's concerns. Before and during construction, Idaho Power engaged in months of good-faith negotiations with MMC and developed multiple engineering reroute and micro-siting options ranging from approximately $400,000 to more than $1 million, including raising the line, moving structures, changing structure types, and spanning MMC's alleged orebody entirely. MMC rejected all of them. MMC instead demanded at least seven figures in compensation but refused to identify a specific amount, provide geological data or an appraisal, or accept Idaho Power's offer of a joint appraisal, which MMC declined. Stippel Decl. ¶¶ 34–38, Ex. C; Stippel Decl. ¶¶ 40–42, Ex. D. Idaho Power thus exhausted reasonable accommodation before proceeding with construction.

In *Al Otro Lado v. Wolf*, the Ninth Circuit held that the government's asserted harm was "self-inflicted" because it resulted from the government's own recordkeeping failures—the government chose not to maintain lists of metered asylum seekers when it could have, then invoked the difficulty of identifying those individuals as a basis for equitable relief. 952 F.3d 999, 1008 (9th Cir. 2020). The court emphasized that the government's harm was "largely the result of the government's own failure to keep records" and that the deficiency "was avoidable and so self-inflicted." *Id.* In *Sierra Club v. Trump*, the court held that the government's contractor penalties were self-inflicted because the government awarded construction contracts *after* a preliminary injunction motion had been filed and while it knew the district court had been asked to halt construction. 929 F.3d 670, 705–06 (9th Cir. 2019). The court concluded that "[p]lacing significant weight on financial obligations that Defendants knowingly undertook would, in effect, reward them for self-inflicted wounds." *Id.* at 706.

Both cases involved a party that *chose* to create the very hardship it later invoked—in one case by failing to keep records it could have maintained, and in the other by entering contracts



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

while litigation challenging the underlying authority was already pending. Neither case stands for the proposition that a party acting under valid federal authorization, against claims that have never been substantiated, is inflicting a wound on itself.

That is precisely the distinction here. Idaho Power did not proceed in the face of an established legal right or a pending challenge to its authority. Idaho Power holds a Record of Decision issued at the Assistant Secretary level after more than a decade of NEPA review, a FLPMA ROW, and a Notice to Proceed with corresponding written authorization from BLM. Stippel Decl. ¶¶ 27, 29–30. MMC never challenged the EIS, the ROD, or the ROW grant within the applicable limitations period. *Id.* ¶¶ 25–29. Publication of the EIS in the federal register constitutes constructive notice. *See* 44 U.S.C. § 1507; *see also Friends of Sierra R.R. v. I.C.C.*, 881 F.2d 663, 667–68 (9th Cir. 1989) (acknowledging that "[p]ublication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance."). Idaho Power's construction was—and is—federally authorized.

What Idaho Power knew was that MMC held *staked claims*—not that MMC possessed valid mineral discoveries or any other vested property right. Stippel Decl. ¶¶ 22–23. Under well-established law, location confers "no right in the absence of discovery." *Cole*, 252 U.S. at 296. MMC's original Complaint, filed July 14, 2026, did not allege that a valid mineral discovery had been made on any of its 120 claims. Compl., ECF No. 1. Discovery was not asserted until the Glowacki Declaration was filed with the Motion on September 1, 2026—nearly seven weeks after MMC initiated this lawsuit. Glowacki Decl., ECF No. 22. A party that proceeded under valid federal authorization, in the absence of any assertion by the opposing party that it held a cognizable property right, is not in the same position as the government in *Al Otro Lado* (which created an



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

administrative problem through its own negligence) or the government in *Sierra Club* (which incurred financial obligations while a motion to enjoin the very expenditure was pending before the court).

In 2008, MMC's own counsel submitted scoping comments to BLM. Mot. Ex. at 2. Having engaged with the process, MMC then went silent for the remainder of the decade-long permitting process and challenged none of the subsequent federal milestones—not the Draft EIS, not the Final EIS, not the Record of Decision, and not the ROW grant. Stippel Decl. ¶¶ 25–29. Idaho Power proceeded with a route that had been publicly evaluated, subject to years of environmental review, and approved at the Assistant Secretary level. *Id.* ¶¶ 27–32.

A party that submitted comments, said nothing for nearly two decades as the project was permitted and constructed, and then—only after filing suit—asserted for the first time that it held valid mineral rights, cannot credibly claim that the resulting situation is a "self-inflicted wound" by anyone other than itself. The same is true of the parties' later negotiations: Idaho Power developed detailed engineering accommodation proposals, attached as Stippel Decl. Ex. C, designed to allow mining and transmission-line operations to coexist, but MMC rejected all of them and at one point reversed its own request for an eastern route after Idaho Power had invested time and resources evaluating it. Stippel Decl. ¶¶37–37, Ex. C; *id.* ¶¶ 39–44, Ex. D.

If anything, it is MMC's own conduct that created the current impasse. During this same period, MMC staked approximately 106 additional claims along and around the B2H route in November 2025—during the pendency of discussions between the parties and more than seven years after the ROW was issued. FAC ¶¶ 51, 54. The First Amended Complaint offers no explanation for why 104 new claims were suddenly needed after MMC had voluntarily reduced its claim holdings to just 16 in 2014. MMC then filed a Notice of Exploration proposing drill



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

locations that coincide with Idaho Power's already-constructed tower-pad locations. Glowacki Decl., ¶ 52.

The proposed drill-pad locations are highly suspect. Under the Mining Law, a lode claim cannot exceed 1,500 feet by 600 feet—slightly more than 20 acres—and a placer claim cannot exceed 20 acres. 30 U.S.C. §§ 23, 35. MMC's claims are therefore approximately 20 acres apiece. Nothing in MMC's filings explains why these new exploration drill pads need to be placed at the exact locations of Idaho Power's already-constructed tower pads when each claim offers roughly 20 acres of available surface area. Glowacki Decl. ¶ 52.

If MMC's purpose were genuinely geological exploration, it could site drill pads virtually anywhere else on these approximately 20-acre claims. Moreover, MMC still lacks DOGAMI authorization to conduct exploration drilling in Oregon—an absolute prerequisite to any drilling. *See* Or. Rev. Stat. § 517.705(1) (requiring DOGAMI exploration permit before conducting exploration that disturbs more than one surface acre or involves drilling deeper than 50 feet). Even if the Court halted Idaho Power's construction, MMC could not lawfully drill at these or any other locations until it secures that authorization. Should MMC ever obtain DOGAMI approval, nothing would prevent it from siting drill pads elsewhere on these claims—away from Idaho Power's infrastructure—to conduct the geological exploration it claims is being impeded.

The coincidence between the proposed drill sites and the tower pads, combined with the absence of any geological justification for that overlap, strongly suggests that MMC's exploration notice was designed to manufacture a conflict with Idaho Power's existing infrastructure rather than to advance legitimate exploration.



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

A party that dramatically expands its claim footprint around existing infrastructure, positions proposed drill sites at constructed tower pads, and then seeks an injunction based on the resulting conflict should not receive the benefit of an impasse of its own making.

The $544 million figure overstates the equities. MMC's Motion and Anderson declaration describe approximately $544.4 million as the "*in-situ*" value of gold in the Central Ore Deposit Anderson Decl. ¶ 21. That figure is not a present-value or after-cost valuation; it does not account for extraction and processing costs, permitting, capital expenditures, environmental compliance, or the time value of money. Anderson separately identifies all-in sustaining costs for mining and processing and describes the Kerby Project as still at the pre-feasibility stage *Id.* ¶¶ 33, 36. The in-situ figure therefore does not establish a presently mineable asset or the magnitude of any likely legal injury. The $544 million figure is eye-catching, but it does not represent a real economic asset that MMC is currently in a position to realize.

In 2008, MMC engaged with the NEPA scoping process. Mot. Ex. 3 at 2, ECF No. 20-3. That was the last meaningful engagement MMC had with the project. MMC did not participate further in the NEPA process, did not comment on the Draft EIS or the Final EIS, did not challenge the Record of Decision, and did not appeal the ROW grant—despite having been on notice since 2008 that the project was being routed through the area of its claims. Stippel Decl. ¶¶ 25–29. Idaho Power proceeded with a route that was publicly evaluated over a decade-long environmental review process and approved at the Assistant Secretary level. *Id.* ¶¶ 27–32.

In sum, MMC offers undeveloped and largely dormant claims against Idaho Power's active, federally authorized, billion-dollar infrastructure project. The balance of hardships weighs overwhelmingly in Idaho Power's favor.



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

**4. The Public Interest Favors Denying the Motion**

The B2H transmission line is critical regional energy infrastructure designed to improve grid reliability and accommodate growing electricity demand across Oregon and Idaho. Stippel Decl. ¶¶ 11, 46. The public interest in reliable electrical infrastructure outweighs a request to halt a federally authorized project based on undeveloped claims and untested discovery assertions regarding only seven of the 21 claims in the Immediate Interference Zone. Halting construction to protect claims on which no mining has occurred in over 25 years—and for which MMC has no current approved exploration, mine plan or mining permit—would disserve the public interest. The Court should not deploy the extraordinary remedy of a preliminary injunction to protect a disputed mineral interest at the expense of concrete, federally authorized infrastructure serving the public welfare.

**5. MMC's theory would create an impossible standard for public infrastructure.**

Consider where MMC's legal theory leads if accepted. Under that theory, a person could pay a few hundred dollars per year in maintenance fees to hold mining claims on public land, do absolutely nothing with those claims for decades, and then—when the federal government authorizes a major infrastructure project on that land—emerge to demand that the project stop. If the project tries to reroute, the person can simply stake more claims along the new route, as MMC did here. FAC ¶¶ 44–45, ECF No. 30. The result would be a private veto over public infrastructure, purchasable for a few hundred dollars per claim per year. That is not what Congress intended. Congress enacted the Multiple Surface Use Act against the backdrop that mining claims were increasingly being used not for mining but to gain exclusive control over public land surfaces for other purposes. *See* H.R. Rep. No. 84-730, at 3–4 (1955). The public interest favors applying that



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

statute as a protection against indefinite control of public land by dormant, unproven claims—not converting the Mining Law into a veto over federally authorized projects.

### C. MMC Also Fails the Ninth Circuit's Sliding-scale Test

MMC contends that even if it cannot demonstrate a likelihood of success on the merits, a preliminary injunction may still issue under the Ninth Circuit's sliding-scale approach if there are "serious questions going to the merits" and "the balance of hardships tips sharply in the plaintiff's favor." Mot. at 27, (citing *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011))). MMC does not meet that standard either. There are no serious questions going to the merits: the foundational deficiency is not a close call—MMC's discovery allegations rest entirely on untested declarations that appeared for the first time with the Motion, and the FAC's own language remains equivocal. Nor does the balance of hardships tip sharply toward MMC, given its quarter-century of dormancy and lack of any approved mine plan, while Idaho Power faces enormous concrete losses from halting a billion-dollar-plus federally authorized project. Stippel Decl. ¶¶ 47–55. Indeed, MMC still lacks DOGAMI authorization to conduct exploration drilling on its claims, so even if the Court halted Idaho Power's construction, MMC could not lawfully conduct the drilling program it claims is being impeded—a fact that further undermines any claim that the balance of hardships tips sharply in its favor. Thus, even under the Ninth Circuit's sliding-scale approach, MMC cannot meet its burden.

## V. CONCLUSION

For the foregoing reasons, Defendant Idaho Power Company respectfully requests that the Court deny Plaintiff's Motion in its entirety. MMC's motion asks this Court to issue the most powerful remedy in the judicial toolkit—an order halting a federally authorized infrastructure



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

project—based on mining claims that lay dormant for 25 years, a discovery analysis that appeared for the first time nearly seven weeks after the Complaint was filed, and a pattern of conduct that raises serious questions about whether MMC is genuinely seeking to mine gold or simply seeking leverage over a billion-dollar project. The Court should decline that request.

In the alternative, should the Court be inclined to consider any injunctive relief, Idaho Power requests that the Court defer ruling until Idaho Power has had the opportunity to challenge the sufficiency of the First Amended Complaint; and require MMC to post a substantial security bond under Rule 65(c) to compensate Idaho Power for the losses it would sustain if construction is halted; and set a separate briefing schedule and hearing on the amount of the security bond, given the complexity and magnitude of Idaho Power's potential losses from halting construction of a billion-dollar regional infrastructure project, including idle crew and equipment costs, contractual penalties, supply chain disruption, and schedule delay.

DATED: September 15, 2026.

**ASHURST PERKINS COIE US LLP**

By: */s/ Erika E. Malmen*

Jessica Vander Velde, OSB No. 241679
jessica.vandervelde@ashurstperkins.com
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: +1.503.727.2000

Erika E. Malmen, *Admitted Pro Hac Vice*
erika.malmen@ashurstperkins.com
Sarah A. Hugues, *Admitted Pro Hac Vice*
sarah.hugues@ashurstperkins.com
Malori M. Basye, *Admitted Pro Hac Vice*
malori.basye@ashurstperkins.com
1111 West Jefferson Street, Suite 500
Boise, Idaho 83702-5391
Telephone: +1.208.343.3434

*Attorneys for Defendant Idaho Power Co.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 15th day of September, 2026, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF System which sent a Notice of Electronic Filing to the following persons:

Stephen J. Odell
Marten Law LLP
1050 SW Sixth Avenue, Suite 2150
Portland, OR 97204
Email: sodell@martenlaw.com

*Attorneys for Plaintiff*

Chelsea Wein
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2936
Email: Chelsea.Wein@usdoj.gov

*Attorneys for Defendant*
*Bureau of Land Management*

*/s/ Erika E. Malmen*
Erika E. Malmen



ASHURST PERKINS COIE US LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222